No. 25-6142

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

LANDLORDS AND PROPERTY MANAGEMENT
COMPANIES IN ALAMEDA COUNTY
Plaintiffs-Appellants,

v.

COUNTY OF ALAMEDA et al.
Defendants-Appellees,

ALLIANCE OF CALIFORNIANS FOR COMMUNITY
EMPOWERMENT ACTION,
Intervenor-Defendant-Appellee.

---

Appeal from the United States District Court
for the Northern District of California
Case No. 3:22-cv-01274-LB

---

## COUNTY DEFENDANTS' ANSWERING BRIEF

---

Matthew D. Zinn
Mindy K. Jian
Chloe S. Lew
Shute, Mihaly & Weinberger LLP
396 Hayes Street
San Francisco, California 94102
Telephone: (415) 552-7272
Facsimile: (415) 552-5816

Attorneys for Defendants-Appellees County of Alameda and Board of
Supervisors of the County of Alameda

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................4

INTRODUCTION .......................................................................... 10

ISSUES PRESENTED .................................................................... 12

JURISDICTIONAL STATEMENT ................................................ 12

STATEMENT OF THE CASE ........................................................ 13

    I.    State and local governments respond to the global COVID-19 pandemic. ........................................................ 13

    II.    The County enacts a temporary eviction moratorium to mitigate the pandemic's impacts. ......................................... 14

    III.    Landlords challenged the Moratorium, and the district court repeatedly rejected their claims. ............................... 16

STANDARD OF REVIEW.............................................................. 19

SUMMARY OF ARGUMENT ........................................................ 19

ARGUMENT ................................................................................. 22

    I.    Per se takings occur only in an extreme case where regulation compels a landowner to allow physical occupation by a stranger. The vast majority of challenges are governed by *Penn Central* ............................. 22

    II.    The Moratorium regulated preexisting landlord-tenant relationships and thus did not cause a physical taking. ....... 24

        A.    This Court and many others have applied *Yee* to COVID-19 eviction moratoria and refused to find them to be physical takings. ........................................ 25

        B.    The Moratorium was a permissible limitation on "the right to exclude." *Cedar Point* is inapposite because it applies only where a regulation grants access to strangers. ....................................................... 30

        C.    Landlords' position would imperil legitimate rent control................................................................................. 34

III.   All three *Penn Central* factors weigh against finding a taking.................................................................35

   A.   Landlords' *Penn Central* claims fail because they do not allege the severe impact to property value that this Court's precedent demands. .........................36

      1.   Landlords cannot show economic impact based on operating losses....................................39

      2.   The district court correctly declined to be the first court to recognize a *Penn Central* taking where the plaintiff's property retained the majority of its value. ......................41

      3.   The Marchitelli Declaration did not show a severe impact on property values because it estimated only a 31.6 percent diminution and did not include property-specific allegations. ........................................................46

   B.   Landlords' failure to allege severe economic impact is fatal to their claims, but the remaining *Penn Central* factors also weigh against finding a taking. ...................................................................48

      1.   The Moratorium did not interfere with reasonable investment-backed expectations because it was limited in scope, temporary, and consistent with past emergency housing regulations. ......................................................48

      2.   The Moratorium was a permissible adjustment of economic burdens; the character factor weighs against finding a taking. ...............................................................51

CONCLUSION ..................................................................53

Form 8. Certificate of Compliance .........................................54

# TABLE OF AUTHORITIES

## FEDERAL CASES

*238 Serrano Props. LLC v. California*,
No. 2:24-cv-08443-SSS-SSCx, 2025 WL 2946988
(C.D. Cal. Sep. 22, 2025) ................................................ 25, 27, 41

*Alford v. Walton County*,
159 F.4th 844 (11th Cir. 2025) ................................................ 32, 34

*Apt. Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*,
10 F.4th 905 (9th Cir. 2021) ........................................................ 50

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................... 43

*Auracle Homes, LLC v. Lamont*,
478 F. Supp. 3d 199 (D. Conn. 2020) ......................................... 26

*Ballinger v. City of Oakland*,
24 F.4th 1287 (9th Cir. 2022) ................................................ 27, 34

*Baptiste v. Kennealy*,
490 F. Supp. 3d 353 (D. Mass. 2020) ..................................... 25, 50

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................... 43

*Block v. Hirsh*,
256 U.S. 135 (1921) .............................................. 21, 34, 35, 49

*Bridge Aina Le'a, LLC v. Land Use Comm'n*,
950 F.3d 610 (9th Cir. 2020) ....................................................... 48

*CCA Assocs. v. United States*,
667 F.3d 1239 (Fed. Cir. 2011) ............................................... 42, 45

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ............................................................. passim

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) ............................................... 44, 45

*Cmty. Housing Improvement Prog. v. City of New York*,
59 F.4th 540 (2nd Cir. 2023) ....................................................... 25

4

*Colony Cove Properties, LLC v. City of Carson*,
888 F.3d 445 (9th Cir. 2018) ................................................ passim

*Darby Development Company, Inc. v. United States*,
112 F.4th 1017 (Fed. Cir. 2024) ...................................................32

*El Papel LLC v. Durkan*,
No. 2:20-cv-01323-RAJ-JRC, 2021 WL 4272323
(W.D. Wash. Sep. 15, 2021)................................................. 13, 28

*El Papel, LLC v. City of Seattle*,
No. 22-35656, 2023 WL 7040314
(9th Cir. Oct. 26, 2023)................................................ 19, 25, 28, 30

*Elmsford Apt. Assocs., LLC v. Cuomo*,
469 F. Supp. 3d 148 (S.D.N.Y. 2020) .....................................26, 50

*Evans Creek, LLC v. City of Reno*,
No. 21-16620, 2022 WL 14955145
(9th Cir. Oct. 26, 2022)................................................ 37, 41, 44, 48

*Farhoud v. Brown*,
No. 3:20-cv-2226-JR, 2022 WL 326092 (D. Or. Feb. 3, 2022)........25

*FCC v. Fla. Power Corp.*,
480 U.S. 245 (1987) ...............................................................24, 26

*Gallo v. District of Columbia*,
610 F. Supp. 3d 73 (D.C. Cir. 2022)............................................29

*Gallo v. District of Columbia*,
No. 1:21-cv-03298 (TNM), 2023 WL 7552703
(D.D.C. Nov. 14, 2023)................................................................25

*GHP Mgmt. Corp. v. City of Los Angeles*,
No. CV 21-06311 DDP (JEMx), 2022 WL 17069822
(C.D. Cal. Nov. 17, 2022)............................................................28

*GHP Mgmt. Corp. v. City of Los Angeles*,
No. 23-55013, 2024 WL 2795190 (9th Cir. May 31, 2024) .... passim

*Guggenheim v. City of Goleta*,
638 F.3d 1111 (9th Cir. 2010) (en banc) .....................................27

*Harris v. City of Los Angeles*,
No. EDCV 24-2679 JGB (SPx), 2025 WL 2300169
(C.D. Cal. Jul. 31, 2025).............................................................25

*Hartzell v. Marana Unified Sch. Dist.*,
    130 F.4th 722 (9th Cir. 2025)......................................................38

*Heart of Atlanta Motel, Inc. v. United States*,
    379 U.S. 241 (1964) .................................................................34

*Heights Apts., LLC v. Walz*,
    30 F.4th 720 (8th Cir. 2022).............................................31, 34, 45

*Heights Apts., LLC v. Walz*,
    39 F.4th 479 (8th Cir. 2022).......................................................32

*Hendler v. United States*,
    175 F.3d 1374 (Fed. Cir. 1999)...................................................33

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934) ...........................................................21, 22, 49

*Hotop v. City of San Jose*,
    982 F.3d 710 (9th Cir. 2020) ......................................................41

*Kaiser Aetna v. United States*,
    444 U.S. 164 (1979) .............................................................23, 33

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470 (1987) .............................................................37, 40

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005) ........................................................... passim

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) .........................................................23, 29, 34

*McDonald v. Cal. Dep't of Motor Vehicles in Sacramento Cnty.*,
    No. 2:21-cv-1561 KJM DB PS, 2022 WL 1460209
    (E.D. Cal. May 9, 2022)............................................................50

*MHC Fin. LP v. City of San Rafael*,
    714 F.3d 1118 (9th Cir. 2013) ...............................................23, 42, 53

*Nollan v. Cal. Coastal Comm'n*,
    438 U.S. 825 (1987) .................................................................23

*Parker v. Fleming*,
    329 U.S. 531 (1947) .................................................................35

*Penn Central Transportation Co. v. City of New York*,
    438 U.S. 104 (1978) ........................................................... passim

6

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393 (1922) ................................................................... 22

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
494 F.3d 788 (9th Cir. 2007) ..................................................... 19

*Portsmouth Harbor Land & Hotel Co. v. United States*,
260 U.S. 327 (1922) ................................................................... 23

*PruneYard Shopping Center v. Robins*,
447 U.S. 74 (1980) ......................................................... 24, 31, 34

*PVM Redwood Co. v. United States*,
686 F.2d 1327 (9th Cir. 1982) ................................................... 41

*Rancho de Calistoga v. City of Calistoga*,
800 F.3d 1083 (9th Cir. 2015) ............................................ passim

*Russellville Legends, LLC v. United States*,
172 Fed. Cl. 455 (Fed. Cl. 2024) .......................................... 41, 42

*S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*,
550 F. Supp. 3d 853 (S.D. Cal. 2021) .................................... 25, 50

*Saddle Mountain Minerals, LLC v. City of Richland*,
No. 23-34622, 2024 WL 4903280 (9th Cir. Nov. 27, 2024) ............ 40

*Seaplane Adventures, LLC v. County of Marin*,
71 F.4th 724 (9th Cir. 2023) ...................................................... 13

*Shanks v. Dressel*,
540 F.3d 1082 (9th Cir. 2008) ................................................... 19

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ..................................................... 51

*Stuart Mills Props., LLC v. City of Burbank*,
No. 2:22-cv-04246-RGK-AGR, 2022 WL 4493573
(C.D. Cal. Sep. 19, 2022) .......................................................... 25

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning
Agency*,
535 U.S. 302 (2002) ............................................................ 35, 51

*TwoRivers v. Lewis*,
174 F.3d 987 (9th Cir. 1999) ..................................................... 19

7

*United States v. Causby,*
  320 U.S. 256 (1946) ........................................................... 23, 32

*William C. Haas & Co., Inc. v. City and Cnty. of San Francisco,*
  605 F.2d 1117 (9th Cir. 1979) ....................................................... 42

*Yancey v. United States,*
  915 F.2d 1534 (Fed. Cir. 1990) ................................................. 44, 45

*Yee v. City of Escondido,*
  503 U.S. 519 (1992) ......................................................... passim

## CALIFORNIA CASES

*Birkenfeld v. City of Berkeley,*
  17 Cal. 3d 129 (1976) ................................................................ 35

*Davidson v. Quinn,*
  138 Cal. App. 3d Supp. 9 (1982) .................................................... 33

*Fisher v. City of Berkeley,*
  37 Cal. 3d 644 (1984) ................................................................ 34

*Hong Sang Market, Inc. v. Peng,*
  20 Cal. App. 5th 474 (2018) ......................................................... 29

*Howard v. County of Amador,*
  220 Cal. App. 3d 962 (1990) ......................................................... 27

*Lee v. Baca,*
  73 Cal. App. 4th 1116 (1999) ........................................................ 33

## CALIFORNIA STATUTES

Cal. Civ. Code § 1946.2 ................................................................ 50

Cal. Civ. Proc. Code § 1159-1179a ..................................................... 50

Cal. Civ. Proc. Code § 1161 ........................................................... 33

Cal. Civ. Proc. Code § 1174 ........................................................... 33

Cal. Gov't Code §§ 7060 et seq. ................................................... 15, 51

**ALAMEDA COUNTY CODE OF ORDINANCES**

§ 6.120.010 ................................................................................. 14

§ 6.120.030 ........................................................ 14, 15, 16, 30, 50, 51, 52

§ 6.120.040 ................................................................ 14, 15, 16, 51, 52

§ 6.120.060 ................................................................................. 15

§ 6.120.090 ..................................................................... 14, 15, 29, 51, 52

**INTRODUCTION**

When COVID-19 arrived in March 2020, the County of Alameda, like many jurisdictions, responded by temporarily suspending most evictions ("Moratorium"). The Moratorium aimed to prevent disease transmission and housing instability during a once-in-a-century public health crisis. It expired automatically in April 2023, after the County Health Officer terminated the local public health emergency.

Plaintiffs Landlords and Property Management Companies in Alameda County ("Landlords") challenged the moratorium as an unconstitutional taking. They argue it effected a per se physical taking by preventing them from evicting tenants. But this Court and others have uniformly rejected that theory—and have done so in this very context. The Supreme Court in *Yee v. City of Escondido*, 503 U.S. 519 (1992), made clear that regulations governing landlord-tenant relationships—even those that limit eviction—do not cause physical takings because they do not compel property owners to accept uninvited strangers. Landlords voluntarily entered the rental market and invited tenants onto their properties. The Moratorium temporarily adjusted the terms of those commercial relationships by limiting one of Landlords' remedies. Landlords' theory that any limit on the right to exclude—whatever its duration— triggers physical takings scrutiny threatens a wide swath of landlord-tenant regulation.

Landlords also claim a regulatory taking under the multi-factor test from *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978) ("*Penn Central*"). But after three attempts, they still did not allege

10

the severe economic impact that *Penn Central* demands. The complaint must show that the moratorium drastically reduced property values—not just that Landlords suffered operating losses. This Court held in *Colony Cove Properties, LLC v. City of Carson*, 888 F.3d 445 (9th Cir. 2018) ("*Colony Cove*"), that the economic impact of a regulation must be measured by comparing before-and-after property values and that no court has *ever* found a taking where a property retained more than half its value. Yet Landlords alleged no reduction in value for most of their properties, and where they did allege reductions, those reductions were nearly all well below 50 percent. That falls far short of what the law requires.

Although Landlords' failure to allege an adequate economic injury is dispositive, the other *Penn Central* factors—reasonable investment-backed expectations and the character of the regulation—also undermine their claim. Emergency housing regulations during public health crises, even an extraordinary pandemic, are hardly beyond expectation, particularly in a heavily-regulated field like landlord-tenant relations. Indeed, the Supreme Court upheld similar moratoria during World War I and the Great Depression. Further, the Moratorium was expressly temporary, preserved tenants' obligation to pay rent, allowed evictions in several circumstances, and left landlords free to pursue other remedies. It was thus a measure adjusting the benefits and burdens of a consensual economic relationship and hardly akin to a physical appropriation of land.

The County's temporary eviction moratorium responded to a global pandemic that killed over 2,100 County residents. It was a measured response like many others adopted by local governments around the

11

country. This Court should follow the vast majority of courts that have upheld these measures and affirm the judgment.

## ISSUES PRESENTED

1.     Did the district court correctly hold that the County's temporary limitation on Landlords' ability to enforce prompt payment of rent and lease compliance through eviction should be evaluated as a regulation of the landlord-tenant relationship under *Yee v. City of Escondido*, 503 U.S. 519 (1992), rather than under the physical takings doctrine?

2.     Did the district court correctly dismiss Landlords' regulatory takings claim in holding that

a.     Under *Colony Cove Properties, LLC v. City of Carson*, 888 F.3d 445 (9th Cir. 2018), Landlords failed to allege facts showing the severe impact to their property values essential to a regulatory takings claim under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978);

b.     Housing regulations enacted during a public health emergency would foreseeably impact the landlord-tenant relationship; and

c.     A temporary limitation on landlords' ability to pursue one form of remedy for breaches of lease does not resemble a physical invasion of property?

## JURISDICTIONAL STATEMENT

The County agrees with Landlords' statement of jurisdiction.

## STATEMENT OF THE CASE

### I.  State and local governments respond to the global COVID-19 pandemic.

On January 31, 2020, the United States Secretary of Health and Human Services declared a nationwide public health emergency in response to the alarming spread of the novel coronavirus, "COVID-19". *See* Joint Supplemental Excerpts of Record ("JSER") 18. On March 4, Governor Newsom declared a state of emergency in California. JSER-11-16. The County's Health Officer declared a local health emergency six days later. 2 Excerpts of Record ("ER") 206.

COVID-19 had widespread health, economic, and social impacts on County residents. Multiple surges of new, more infectious variants prolonged the pandemic and its pervasive impacts.[1] As of June 2023, the Centers for Disease Control and Prevention reported over 1.1 million COVID-19 deaths nationwide. *Seaplane Adventures, LLC v. County of Marin*, 71 F.4th 724, 726 (9th Cir. 2023). By the end of the local health emergency, COVID-19 resulted in over 2,140 deaths in Alameda County alone.[2]

---

[1] *See* World Health Organization webpage on Tracking SARS-CoV-2 variants (last accessed Feb. 2, 2026), *available at* https://www.who.int/activities/tracking-SARS-CoV-2-variants; *El Papel LLC v. Durkan*, No. 2:20-cv-01323-RAJ-JRC, 2021 WL 4272323, at *5-6 (W.D. Wash. Sep. 15, 2021) (noting "drastic surge in COVID-19 cases" in late 2021).

[2] *See* Alameda County Public Health Department webpage on COVID-19 Data (last accessed Feb. 2, 2026), *available at* https://covid-19.ac-gov.org/data.page.

Beyond the physical danger, the pandemic threatened financial stability and housing security. Many residents would not receive paid sick leave if forced to quarantine. 2-ER-206. Some would also face an impossible choice between paying for housing or for food, medical care, and other necessities. 2-ER-207. Furthermore, housing instability and displacement would increase the risk of disease transmission and further exacerbate the pandemic's impacts. 2-ER-208. Losing housing would also compound residents' hardship with relocation costs, stress and anxiety, and potential homelessness. 2-ER-207.

## II. The County enacts a temporary eviction moratorium to mitigate the pandemic's impacts.

On April 21, 2020, the County adopted Urgency Ordinance No. O-2020-23, which enacted the Moratorium. 1-ER-82. The temporary Moratorium aimed "to reduce the transmission of COVID-19, to promote housing stability during the COVID-19 pandemic and to prevent avoidable homelessness." 2-ER-220 (Alameda County Code of Ordinances ("ACCO") § 6.120.010). It had three main components: (1) a general moratorium on evictions (2-ER-221-22 (ACCO § 6.120.030)); (2) a moratorium on evictions based on nonpayment of rent due to COVID-19-related hardship (2-ER-222-23 (ACCO § 6.120.040)); and (3) provisions for the repayment of back rent (2-ER-225 (ACCO § 6.120.090)). The Moratorium would expire automatically 60 days after the County Health Officer declared an end to the local health emergency. 2-ER-221-22 (ACCO §§ 6.120.030(A), 6.120.040(A)).

14

The general moratorium provided a defense to unlawful detainer and other repossession actions. 2-ER-222 (ACCO § 6.120.030(D)). A landlord or lender could not assess late fees, fines, or interest on rent due during the Moratorium. 2-ER-222 (ACCO § 6.120.030(E)). Nevertheless, evictions could proceed under any of three circumstances: (1) the landlord was removing the unit from the rental market pursuant to the Ellis Act, California Government Code sections 7060 et seq., (2) a government or court order required vacating the unit, or (3) "[c]ontinued occupancy by the resident pose[d] an imminent threat to health or safety." 2-ER-222 (ACCO § 6.120.030(F)).

The Moratorium also provided a defense to unlawful detainer and other repossession actions where a tenant could not make rent or mortgage payments due to "substantial loss of income, substantial out-of-pocket medical expenses, or extraordinary child care needs . . . caused by COVID-19." 2-ER-222-23 (ACCO § 6.120.040(A)), (D)). As with the general moratorium, a landlord could not assess late fees, fines, or interest on late rent resulting from a qualifying loss. 2-ER-223 (ACCO § 6.120.040(E)). The Moratorium required tenants to "document[]" any such COVID-19-related financial hardship and provide that evidence to landlords upon request. 2-ER-224 (ACCO § 6.120.060(B)-(F)).

The Moratorium expressly preserved tenants' "liability for unpaid rent or mortgage payments." 2-ER-225 (ACCO § 6.120.090(A)). If a tenant failed to repay rent that became due during the Moratorium, the "landlord may collect the back rent as any other consumer debt" after one year from when the rent became due. 2-ER-225 (ACCO § 6.120.090(D)).

15

### III. Landlords challenged the Moratorium, and the district court repeatedly rejected their claims.

On March 1, 2022, Landlords sued to challenge the Moratorium. 2-ER-241. Their original complaint named six plaintiffs and raised facial and as-applied constitutional claims, including physical and regulatory takings claims, procedural and substantive due process claims, and an equal protection claim, as well as a state inverse condemnation claim and a request for writ of mandate. 2-ER-241-60.

Landlords moved for partial summary judgment on their facial physical takings, procedural due process, and state law challenges. 1-ER-28-67. The district court denied the motion on November 22, 2022. 1-ER-67. The court held that *Yee* defeated Landlords' physical takings claim. 1-ER-47. The Moratorium resembled the rent control regime in *Yee* because it did not apply to uninvited strangers, did not absolve tenants of their obligation to pay rent, was cabined by exceptions, and lasted only for the duration of the local health emergency. *See* 1-ER-43-47.

On February 28, 2023, both the California State of Emergency and the County's local public health emergency ended. JSER-8-9. The Moratorium therefore expired automatically on April 29. 2-ER-221-22 (ACCO §§ 6.120.030(A), 6.120.040(A)).

Several months later, Landlords filed a First Amended and Supplemental Complaint ("FAC"), raising the same claims as the original complaint. 2-ER-151, 174-80. The FAC added 52 new plaintiff landlords, most of which were corporate entities, but included specific factual allegations for only eight of the 58 named plaintiffs. 2-ER-153-60, 165-73.

16

The County, Defendant City of Oakland, and Defendant-Intervenor Alliance of Californians for Community Empowerment moved to dismiss the FAC. 1-ER-16-17. These motions sought dismissal of the physical takings, due process, equal protection, and state law claims without leave to amend; dismissal of the *Penn Central* regulatory takings claim with leave to amend; and dismissal of Plaintiff Housing Providers of America on standing grounds. *See* 1-ER-19, 26-27.

The district court granted Defendants' motions in their entirety and granted Landlords leave to amend their *Penn Central* claim. 1-ER-26. The court applied its prior holding on Landlords' physical takings claim to both their facial and as-applied claims. 1-ER-20. On Landlords' *Penn Central* claim, the court held they did not allege a severe economic impact to the value of their properties, rejecting their attempts to rely on lost income. 1-ER-21-22. The court directed Landlords to "be more specific as to before-and-after [property] values." 1-ER-22.

*Half a year later*, Landlords filed their Second Amended Complaint ("SAC"), alleging additional facts about some of the properties. 2-ER-69-122. For example, the SAC alleged estimated totals for lost rent and property damage for some listed properties. 2-ER-83-122. But for many properties, the SAC failed to allege any diminution in property value. *See* 2-ER-83-93, 105-106, 112-19. The SAC also relied on multiple methodologies to support alleged changes in property value, including a "gross rent multiplier" and an attached declaration purporting to tie property value to a property's capitalization rate, or "risk profile" ("Marchitelli Declaration"). 2-ER-121-22, 134-39. For many properties, the SAC did not

explain its asserted changes in property value at all. 2-ER-93-106. The County provided the district court with a table that summarized the allegations of property value (or lack thereof) for each property in the SAC and the alleged bases for those values. JSER-3-6.

The Defendants again moved to dismiss Landlords' *Penn Central* claim, and the court granted the motion without leave to amend. 1-ER-12. Relying on a recent Ninth Circuit decision, the court held that Landlords again failed to allege that the Moratorium had a sufficiently severe impact on their property values. 1-ER-10-11 (citing *Colony Cove*, 888 F.3d at 451). It found that most of the alleged diminutions in property value were less than 50 percent, which does not amount to the "functional[] equivalent" of the "classic taking in which government directly appropriates private property or ousts the owner." 1-ER-10 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005)). The court also held that the Marchitelli Declaration did not save the SAC because it estimated a decrease in property value of only 31.6 percent. 1-ER-10-11. Additionally, the court found that Landlords had failed to defend their gross rent multiplier methodology and thus conceded it could not support any allegation of economic impact. 1-ER-10-11. The court also held that the other two *Penn Central* factors, Landlords' investment-backed expectations and character of the Moratorium, weighed against finding a taking. 1-ER-11-12.

Landlords appealed the district court's dismissal of their as-applied physical takings claim and regulatory takings claim. 2-ER-263; Appellants' Opening Brief ("AOB") 25-26.

## STANDARD OF REVIEW

This Court reviews de novo a district court's judgment following a motion to dismiss. *Shanks v. Dressel*, 540 F.3d 1082, 1086 (9th Cir. 2008). In doing so, it accepts all factual allegations in the complaint as true. *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). However, "the court need not accept conclusory allegations of law or unwarranted inferences," and dismissal is proper "if the facts are insufficient to support a cognizable claim." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794 (9th Cir. 2007).

## SUMMARY OF ARGUMENT

1. The district court correctly held that the Moratorium did not effect a physical taking. The Supreme Court established in *Yee* that regulations governing landlord-tenant relationships—including restrictions on eviction—do not cause physical takings because landlords voluntarily invite tenants onto their properties. The physical takings doctrine applies only when the government compels property owners to accept uninvited strangers, not when it regulates preexisting commercial relationships.

a. This Court and numerous others have applied *Yee* to reject physical takings challenges to COVID-19 eviction moratoria. *See, e.g.*, *GHP Mgmt. Corp. v. City of Los Angeles*, No. 23-55013, 2024 WL 2795190, at *1 (9th Cir. May 31, 2024) ("*GHP*"), *cert. denied,* 145 S. Ct. 2615 (2025); *El Papel, LLC v. City of Seattle*, No. 22-35656, 2023 WL 7040314, at *1-2 (9th Cir. Oct. 26, 2023) ("*El Papel*"), *cert. denied*, 144 S. Ct. 827 (2024).

19

b.     The Moratorium did not grant access to trespassers or strangers. It applied only to tenants, people Landlords voluntarily invited onto their properties and to whom they had already granted possession. Nor did the Moratorium impair Landlords' other rights. It temporarily limited one remedy for breach of lease while preserving Landlords' rights to enforce lease compliance through other legal proceedings. And Landlords could still pursue evictions under the Ellis Act, to comply with court or government orders, and in situations involving threats to health or safety.

c.     Landlords' reliance on *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021), is misplaced. *Cedar Point* involved a regulation granting strangers access to private agricultural land. It has no application where, as here, the government merely regulates the terms on which landlords may evict tenants that they invited onto their property.

d.     If Landlords are correct that *any* limitation on the right to exclude triggers physical takings scrutiny, then wide swaths of regulation, including rent control, minimum wage laws, and public accommodation laws would all be subject to the physical takings analysis. The Supreme Court and this Court have repeatedly rejected such a sweeping interpretation of the physical takings doctrine.

2.     After three opportunities, Landlords failed to allege a severe economic impact to property values, which is essential to stating a regulatory takings claim under *Penn Central*.

a.     In *Colony Cove*, this Court held that economic impact must be measured by comparing the total value of property before and

after the challenged regulation. Operating expenses and lost rental income cannot substitute for allegations of reduced property value.

b. For 48 of the 87 properties at issue, Landlords alleged no diminution in property value whatsoever. For the remaining 39 properties, most alleged diminutions fell well below 50 percent—and this Court recognized in *Colony Cove* that no court has ever found a taking where a property retained the majority of its value. The few instances where Landlords alleged reductions greater than 50 percent, those allegations were either unsupported or relied on methodologies they failed to defend.

c. The Marchitelli Declaration, on which Landlords heavily rely, undermines rather than supports their claims. Even applying the declaration's methodology, the maximum diminution in property value it supports is 31.6 percent—far below the severe impact necessary to state a *Penn Central* claim. Moreover, reliance on the declaration's generic, county-wide approach cannot satisfy *Colony Cove*'s requirement to allege property-specific impacts.

3. The remaining *Penn Central* factors also weigh against finding a taking. Even if Landlords had alleged a sufficient economic impact—which they did not—the other *Penn Central* factors confirm that no taking occurred.

a. The Moratorium did not interfere with Landlords' reasonable investment-backed expectations. The Supreme Court previously upheld emergency housing regulations in response to unique crises in *Block v. Hirsh*, 256 U.S. 135 (1921) (World War I), and *Home Building &*

*Loan Association v. Blaisdell*, 290 U.S. 398 (1934) (Great Depression). Landlords also chose to enter a heavily-regulated industry in which state and local governments have long imposed restrictions on the landlord-tenant relationship, including limits on eviction. Landlords reasonably should have expected that the County would adopt further restrictions in response to another public health emergency.

b.     The character of the Moratorium weighs against finding a taking. It is a paradigmatic example of economic regulation that adjusts the benefits and burdens of commercial life. This Court has repeatedly upheld rent control and eviction restrictions against *Penn Central* challenges, recognizing that such regulations merely adjust economic burdens within the landlord-tenant relationship. *Colony Cove*, 888 F.3d at 454; *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1091 (9th Cir. 2015).

## ARGUMENT

**I.     Per se takings occur only in an extreme case where regulation compels a landowner to allow physical occupation by a stranger. The vast majority of challenges are governed by *Penn Central*.**

Historically, the Takings Clause applied only to direct physical appropriation of property. But in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), the Supreme Court recognized that regulation could be "so onerous that its effect is tantamount to a direct appropriation or ouster" and thereby causes a taking. *Lingle*, 544 U.S. at 537. Most takings cases apply the multi-factor test from *Penn Central*. "The goal is to determine whether regulatory actions 'are functionally equivalent to the classic

22

taking in which government directly appropriates private property.'" *Colony Cove*, 888 F.3d at 450 (quoting *MHC Fin. LP v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013)).

The Court has nevertheless recognized "two relatively narrow categories" of per se takings for regulations that either (1) "completely deprive an owner of all economically beneficial use" or (2) "require[] an owner to suffer a permanent physical invasion." *Lingle*, 544 U.S. at 538. Landlords invoke the second category, rooted in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). There, the city required apartment owners to allow cable companies to install equipment on their buildings. *Id.* at 422-23. The Court held that compelled permanent physical occupation by a stranger effects a per se taking. *Id.* at 441.

This "very narrow" category applies only to interference with an owner's right to exclude *strangers*.[3] *Id.* The rule rests on the fact that "an owner suffers a special kind of injury when a *stranger* directly invades and occupies the owner's property." *Id.* at 436 (emphasis in original). "[S]uch an occupation is qualitatively more severe than a regulation of the use of property, . . . since the owner may have no control over the timing, extent, or nature of the invasion." *Id.* The rule does not apply,

---

[3] *See Cedar Point*, 594 U.S. at 150-52 (citing *United States v. Causby*, 320 U.S. 256 (1946) (overflights by government aircraft took avigation easement); *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327 (1922) (firing coastal defense guns across private property); *Kaiser Aetna v. United States*, 444 U.S. 164 (1979) (public access to private pond and marina); and *Nollan v. Cal. Coastal Comm'n*, 438 U.S. 825 (1987) (exaction of public access easement along private beach)).

however, when the government merely limits a landowner's ability to exclude persons the landowner has invited onto the property. *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("*Fla. Power*") (holding *Loretto* inapplicable to rent regulations for cable companies leasing space on utility poles because "the element of required acquiescence is at the heart of the concept of occupation," and noting "the unambiguous distinction between a . . . lessee and an interloper with a government license"). The distinction between invited persons and strangers also explains why the physical takings doctrine does not apply to regulations governing access to premises generally open to the public. *See Cedar Point*, 594 U.S. at 157; *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 82-84 (1980).

Most takings challenges to regulation are governed by *Penn Central* because the regulations fall short of requiring property owners to open private property to invasion by strangers. This case is no different because the Moratorium did not compel Landlords to open their property to uninvited third parties. Landlords voluntarily entered into contracts with tenants, inviting them onto the property.

## II. The Moratorium regulated preexisting landlord-tenant relationships and thus did not cause a physical taking.

Landlords contend that the Moratorium effected a physical taking by granting a possessory interest to trespassers. AOB 41-47. But this Court (twice), alongside numerous others, has already refused to apply the physical takings rubric to COVID-19 eviction moratoria. They all agree that, because such moratoria merely adjust the terms of a landlord-tenant relationship, *Yee* dictates that they are subject to review under

24

the traditional regulatory takings framework. As the district court recognized, the law is clear that the County's regulation of such an existing commercial relationship could not cause a physical taking.

### A. This Court and many others have applied *Yee* to COVID-19 eviction moratoria and refused to find them to be physical takings.

Nearly every court to consider challenges to eviction moratoria adopted in response to COVID-19, including this Court, has held that a landlord who invites tenants to rent her property does not suffer a physical invasion when the government temporarily restricts her ability to evict those tenants. *See GHP*, 2024 WL 2795190, at \*1; *El Papel*, 2023 WL 7040314, at \*1-2; *238 Serrano Props. LLC v. California*, No. 2:24-cv-08443-SSS-SSCx, 2025 WL 2946988, at \*5 (C.D. Cal. Sep. 22, 2025), *appeal dismissed*, No. 25-6750, 2026 WL 190455, at \*1 (9th Cir. Jan. 22, 2026); *Harris v. City of Los Angeles*, No. EDCV 24-2679 JGB (SPx), 2025 WL 2300169, at \*5-6 (C.D. Cal. Jul. 31, 2025); *Stuart Mills Props., LLC v. City of Burbank*, No. 2:22-cv-04246-RGK-AGR, 2022 WL 4493573, at \*2-3 (C.D. Cal. Sep. 19, 2022); *Farhoud v. Brown*, No. 3:20-cv-2226-JR, 2022 WL 326092, at \*10 (D. Or. Feb. 3, 2022); *S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 865-66 (S.D. Cal. 2021), *appeal dismissed as moot*, No. 21-55798, 2022 WL 16832819 (9th Cir. Nov. 9, 2022); *Cmty. Housing Improvement Prog. v. City of New York*, 59 F.4th 540, 552-53 (2nd Cir. 2023); *Gallo v. District of Columbia*, No. 1:21-cv-03298 (TNM), 2023 WL 7552703, at \*5-6 (D.D.C. Nov. 14, 2023), *aff'd on other grounds*, No. 23-7158, 2025 WL 1446283, at \* (D.C. Cir. May 20, 2025); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 388 (D. Mass. 2020);

25

*Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 220 (D. Conn. 2020); *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 162–64 (S.D.N.Y. 2020), *appeal dismissed as moot*, *36 Apt. Assocs., LLC v. Cuomo*, 860 Fed. Appx. 215 (2d Cir. 2021). The court in each case found that *Yee*, not the physical takings doctrine, governed.

In *Yee*, the Court held that residential rent control regulation—including regulation of eviction—did not cause a physical taking. 503 U.S. at 531-32. *Yee* involved a challenge to a local mobile home rent control ordinance restricting eviction of mobile home owners. *See id.* at 524-25. The plaintiffs alleged that, in conjunction with a state statute, the ordinances made mobile home owners unwanted "perpetual tenant[s] of the park" and had "transferred a discrete interest in land—the right to occupy the land indefinitely at a submarket rent—from the park owner to the mobile home owner." *Id.* at 527.

The Court roundly rejected the argument. "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Id.* (citing *Fla. Power*, 480 U.S. at 252); *see also id.* (holding the physical takings doctrine applies only to "a compelled physical invasion of property"). By contrast, the mobile home park owners had "voluntarily open[ed] their property to occupation by others" (*Yee*, 503 U.S. at 531); the "tenants were invited by [the park owners], not forced upon them by the government" (*id.* at 527-28). The government did not require park owners to continue renting their parks in perpetuity;

26

park owners could still evict tenants to change the use of the property.[4] *Id.*

Applying the same reasoning, courts have found that COVID-19 eviction moratoria do not effect per se takings because they do not compel property owners to rent to persons with no right to be there. *See, e.g., 238 Serrano Props. LLC*, 2025 WL 2946988, at *5 ("Plaintiffs chose to enter the rental market, offered their properties for rent, and invited tenants into the properties.") (citing *GHP*, 2024 WL 2795190, at *1). The moratoria therefore did not interfere with the landlords' right to possession because they had already granted possession to their tenants by leasing the properties. *See also Howard v. County of Amador*, 220 Cal. App. 3d 962, 972 (1990) (a "lease gives the lessee the exclusive possession of the premises against all the world, including the owner"); *Ballinger*, 24 F.4th at 1293 ("[W]hen a person voluntarily surrenders liberty or property, like when [owners] chose to rent their property . . . the State has not *deprived* the person of a constitutionally protected interest.") (internal quotation marks omitted).

For example, in *GHP* and *El Papel*, plaintiff landlords brought a physical takings claim against Los Angeles's COVID-19 eviction

---

[4] The Ninth Circuit has since consistently evaluated a variety of landlord-tenant regulations through the lens of traditional regulatory, rather than physical, takings. *See Ballinger v. City of Oakland*, 24 F.4th 1287, 1292-93 (9th Cir. 2022); *Rancho de Calistoga*, 800 F.3d at 1089 n.1 ("The Supreme Court laid to rest any argument that a mobile home rent control ordinance constitutes a physical taking in Yee."); *MHC Fin. LP*, 714 F.3d at 1126-27; *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc).

moratorium and Washington's and Seattle's eviction moratoria, respectively. *See GHP*, 2024 WL 2795190 at *1; *El Papel*, 2023 WL 7040314, at *1. The challenged moratoria temporarily established general prohibitions on evictions subject to certain exceptions and excused nonpayment of rent. *See GHP Mgmt. Corp. v. City of Los Angeles*, No. CV 21-06311 DDP (JEMx), 2022 WL 17069822, at *1 (C.D. Cal. Nov. 17, 2022) (prohibiting evictions for nonpayment of rent and allowing up to 12 months after end of the emergency for repayment, no-fault reasons, and lease violations related to unauthorized occupants and pets); *El Papel LLC*, 2021 WL 4272323, at *3-5 (excepting evictions to address "imminent threat[s] to the health or safety" and prohibiting collection of late fees or related charges). The *GHP* and *El Papel* plaintiffs, like Landlords here, argued that *Yee* did not apply and that the moratoria effected a physical taking under *Cedar Point* because they effectively compelled access to plaintiffs' property. *GHP*, 2024 WL 2795190, at *1; *El Papel*, 2023 WL 7040314, at *2.

This Court rejected plaintiffs' claims in both cases. It held that the moratoria did not effect physical takings because they did not *require* plaintiffs to submit to physical occupation. *See GHP*, 2024 WL 2795190, at *1; *El Papel*, 2023 WL 7040314, at *2. Plaintiffs "voluntarily opened their property to occupation by tenants" and the moratoria "did not compel landlords to rent property in perpetuity." *GHP*, 2024 WL 2795190, at *1; *see El Papel*, 2023 WL 7040314, at *2 ("The Landlords here chose to use their property as residential rentals; the tenants' occupancy was not imposed over the Landlords' objection *in the first instance*.") (emphasis

added). Under *Yee*, "a statute that merely adjusts the existing relationship between landlord and tenant, including adjusting rental amount, terms of eviction, and even the identity of the tenant, does not effect a taking." *GHP*, 2024 WL 2795190, at *1.

The district court rightly applied these cases to dismiss Landlords' physical takings claim. The Moratorium did not interfere with Landlords' right to possession because it expressly applied only to "tenants," i.e., people to whom Landlords had already granted entry and possession. 2-ER-221 ("'[r]esident' shall mean a tenant"), 222 ("[n]o landlord or lender may evict a resident," "It shall be an absolute defense to any unlawful detainer action against a resident"); *see* 1-ER-45, 47 ("Like the laws in *Yee*, the moratoria apply to tenants that the plaintiff landlords had already invited onto their property."). Contrary to Landlords' unsupported suggestions (AOB 43), the Moratorium did not provide any rights to "squatters" or third parties with whom Landlords had no preexisting relationship—as the district court recognized. 1-ER-45.

Nor did the Moratorium impair Landlords' nonpossessory use of their properties. *See Loretto*, 458 U.S. at 435-36 (where a physical taking has occurred, a landowner "can make no nonpossessory use of the property"); *Gallo v. District of Columbia*, 610 F. Supp. 3d 73, 89 (D.C. Cir. 2022). It expressly preserved tenants' obligation to pay rent and Landlords' other remedies for breach. 2-ER-225 (ACCO § 6.120.090(A), (D)); 1-ER-44; *see also Hong Sang Market, Inc. v. Peng*, 20 Cal. App. 5th 474, 491 (2018) (landlords may maintain action for back rent independent of unlawful detainer). Landlords also retained the right to take their units off

of the rental market. *See* 2-ER-222 (ACCO § 6.120.030(F)); 1-ER-44-45. That Landlords retained these substantial rights vis-à-vis their tenants confirms that the physical takings doctrine does not apply to the Moratorium.[5]

Landlords object to the district court's discussion of the Moratorium's duration. AOB 47-48. But that discussion served only to show that the Moratorium did not come within *Yee*'s dictum suggesting that a different rule might apply to a regulation requiring a landlord to "refrain *in perpetuity* from terminating a tenancy." 1-ER-44 (quoting *Yee*, 503 U.S. at 528) (emphasis added).

Accordingly, *Yee* dictates that the Moratorium could not cause a physical taking.

### B. The Moratorium was a permissible limitation on "the right to exclude." *Cedar Point* is inapposite because it applies only where a regulation grants access to strangers.

Landlords concede that the district court's application of *Yee* to this case is consistent with *GHP*, *El Papel*, and others upholding similar moratoria. AOB 39-40. They ask the Court to disregard those cases, look to out-of-circuit decisions, and instead apply *Cedar Point* to hold that the Moratorium effects a taking because it has "strip[ped]" Landlords of their

---

[5] Landlords argue that the continuing obligation to pay rent is irrelevant because courts do not consider economic impact in a physical takings analysis. *See* AOB 48-49. This only begs the question. A tenant's ongoing rent obligation and a landlord's continuing ability to enforce that obligations confirms that the physical takings analysis is *inapplicable*.

"right to exclude." AOB 41-47, 50-55. But *Cedar Point* is inapplicable because it involved a compelled invasion by *strangers*.

*Cedar Point*—like the other physical takings cases—held only that the physical takings doctrine applies to restrictions on the right to exclude strangers. It is thus irrelevant to Landlords' claim. *Cedar Point* involved a statute allowing union organizers to physically "take access" to agricultural properties. 594 U.S. at 143-44. The Supreme Court held that the statute effected a physical taking because it "appropriated a right of access" to the properties for the union organizers—persons with whom the property owner had no existing relationship. *Id.* at 152. Moreover, the Court distinguished *PruneYard*, where "[u]nlike the growers' properties, the [property] was open to the public." *Cedar* Point, 594 U.S. at 156. Unlike the union organizers, the tenants here were invited by Landlords to "access" and possess their properties. As explained above, this distinction is critical because the Moratorium did not "take" any access that Landlords had not already granted to tenants. *See supra* Sections I, II.A.

Landlords cite three out-of-circuit cases to support their view that *Cedar Point*, and not *Yee*, applies here. *See* AOB 51-55. But the two cases that directly address *Yee* erroneously distinguish it. *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022) misreads *Yee*. There, the Eighth Circuit mistakenly concluded the ordinance in *Yee* did not restrict eviction—an error this Court recognized in declining to follow the case. *GHP*, 2024 WL 2795190, at *1, n.2 (citing *Heights Apts., LLC v. Walz*, 39 F.4th

31

479, 480 (8th Cir. 2022) (Colloton, J., dissenting from denial of rehearing en banc)).

And the Federal Circuit in *Darby Development Company, Inc. v. United States*, 112 F.4th 1017 (Fed. Cir. 2024) distinguished *Yee* on the grounds that the ordinance permitted evictions for nonpayment of rent. *See id.* at 1035. But, *Yee* did not turn on the fact that the park owners could still evict for nonpayment of rent. The Court held that the ordinance did not effect a taking because the park owners had "voluntarily rented their land to mobile home owners" and the city did not compel the owners to rent their property. 503 U.S. at 527-28. Likewise, here, Landlords voluntarily entered the rental market and entered into agreements with their tenants. Thus, under *Yee*, Landlords cannot state a physical takings claim. *Darby* also undermines Landlords' reliance on *Cedar Point* because it states that the landlords' voluntary invitation of tenants "distinguishes this case from *Cedar Point*." 112 F.4th at 1036.

*Alford v. Walton County*, 159 F.4th 844 (11th Cir. 2025), is also distinguishable. The ordinance in *Alford* barred property owners from entering and remaining on their own properties "under threat of arrest and criminal prosecution," while permitting county officers to physically occupy the owners' property. *Id.* at 854. The case involved physical occupation by strangers—county officers—and thus clearly fell within the physical takings doctrine. *See, e.g., Causby*, 320 U.S. at 259 (low-flying government aircraft over poultry farm). By contrast, the Moratorium did not compel occupation of private property by strangers.

Landlords argue they have an unlimited right to exclude tenants who breach the lease, equating them with trespassers. *See* AOB 43-44, 52-53. This argument is wrong as a matter of law. Unlike trespassers, a tenant, even one in breach, has a continuing interest in the leasehold until a court rules otherwise. *See Davidson v. Quinn*, 138 Cal. App. 3d Supp. 9, 11-12 (1982) ("The failure of [a] tenant to pay rent does not *ipso facto* work a forfeiture of the leasehold."); *Lee v. Baca*, 73 Cal. App. 4th 1116, 1119 (1999) ("[A] tenant has no legal or equitable interest in rented property once a judgment for possession has been entered in favor of the landlord."). Indeed, California's unlawful detainer statutes do not permit repossession upon breach. Landlords must provide notice of the breach to the tenant and allow an opportunity to cure before even filing an unlawful detainer action. Cal. Civ. Proc. Code § 1161. Even after obtaining a judgment, landlords must wait before enforcing a writ of possession.[6] *Id.* § 1174.

Landlords also argue that even partial limits on the right to exclude effects a physical taking. AOB 50-51. But they cite only cases that involved direct physical appropriation or a grant of access to strangers. *See* AOB 50-52 (citing *Hendler v. United States*, 175 F.3d 1374, 1376, 1383 (Fed. Cir. 1999) (agency's entry onto property to install wells and monitor groundwater); *Kaiser Aetna*, 444 U.S. at 166, 180 (regulation requiring

---

[6] Because Landlords argue that any limitation on the right to exclude triggers physical takings scrutiny and that the duration of such a limitation is *irrelevant* to the analysis (*see* AOB 47-52), they would convert all these limits on eviction into per se takings.

public access to private property); *Cedar Point*, 594 U.S. at 143-44 (regulation allowing uninvited union organizers to "take access"); *Alford*, 159 F.4th at 854 (officers' physical occupation of private property). In fact, regulations restricting property owners' discretion to exclude people from their properties regularly pass constitutional muster. *See Yee*, 503 U.S. at 528-29 (citing *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261 (1964), and *PruneYard Shopping Ctr.*, 447 U.S. at 82-84)); *Loretto*, 458 U.S. at 440 (citing same and others); *Block*, 256 U.S. at 153-55 (upholding 2-year eviction moratorium); *see also Heights Apts.,* 30 F.4th at 728-29 ("the right to exclude may properly be limited by government regulation under some circumstances").

### C. Landlords' position would imperil legitimate rent control.

Furthermore, Landlords' arguments threaten rent control, which despite policy arguments pro and con, remains a legitimate and common field of regulation. *Loretto*, 458 U.S. at 440 (reiterating government's "broad power to regulate housing conditions in general and the landlord-tenant relationship in particular"); *Ballinger*, 24 F.4th at 1292 (citing the same). Rent control simply cannot function without limiting eviction. "Without such [eviction] controls, the security of tenure objectives of rent control laws could be undermined and the threat of eviction could be used to nullify the operation of rent regulations." *Fisher v. City of Berkeley*, 37 Cal. 3d 644, 693 (1984) (internal quotation marks omitted), *see Block*, 256 U.S. at 157-58 (Holmes, J.) ("If the tenant remained subject to the landlord's power to evict, the attempt to limit the landlord's [rent] demands

34

would fail."); *Parker v. Fleming*, 329 U.S. 531, 536-37 (1947); *Birkenfeld v. City of Berkeley*, 17 Cal. 3d 129, 148 (1976). By limiting eviction, rent control programs allow existing tenants to remain in their homes under regulated leases, despite the landlord's wish to "exclude" them in favor of other, higher-paying tenants. As the Supreme Court has recognized, "a government regulation that merely prohibits landlords from evicting tenants unwilling to pay a higher rent . . . does not constitute a categorical taking." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322-23 (2002) (citing *Block*). Landlords' theory that every limitation on the "right to exclude" is a physical taking would cut a wide swath through these programs across the country.

In fact, Landlords' absolutist view of the right to exclude could imperil a variety of long-accepted economic regulations. The 40-hour workweek or minimum wage can be reframed as restrictions on an employer's right to exclude from its property workers who refuse to work more than 40 hours or for less than the minimum wage. *Yee* resolves this problem by recognizing a distinction between regulation of the voluntary commercial relationship reflected in a lease and regulation that compels a landowner to suffer invasion by strangers.

## III. All three *Penn Central* factors weigh against finding a taking.

Regulatory takings occur where a regulation "goes too far" and is "so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537, 539; *Rancho de Calistoga*, 800 F.3d at 1088-89 (same). In evaluating such a claim, courts consider the three

35

*Penn Central* factors: (1) "[t]he economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." *Penn Central*, 438 U.S. at 124. Although the analysis is case-specific, courts do not hesitate to dismiss *Penn Central* claims where plaintiffs have not plausibly alleged a taking. *See GHP*, 2024 WL 2795190 at *2 (affirming dismissal of *Penn Central* claim); *Rancho de Calistoga*, 800 F.3d at 1091 (same).

None of the *Penn Central* factors support Landlords' claims. Most importantly, despite multiple opportunities, Landlords failed to allege facts showing that the Moratorium caused a severe loss of property value for each property. The district court therefore correctly dismissed their *Penn Central* claims. *See* 1-ER-12.

### A.  Landlords' *Penn Central* claims fail because they do not allege the severe impact to property value that this Court's precedent demands.

The SAC alleged a variety of consequences of the Moratorium for Landlords' 87 properties, but *Penn Central* requires a plaintiff to show a severe reduction in *property value*. The *Penn Central* analysis "focuses directly upon the severity of the burden that government imposes upon [the plaintiff's] private property rights," to determine whether the regulation is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle,* 544 U.S. at 539. "[E]conomic impact" for purposes of a *Penn Central* claim "is determined by comparing the total value of the affected property before and after the government action." *Colony*

*Cove*, 888 F.3d at 451; *see also id.* (holding "the severity of the loss can be determined only by comparing the post-deprivation value to the pre-deprivation value"); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987) ("our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property").

Because a truly severe impact on the value of property is the sine qua non of a *Penn Central* claim, failure to allege that impact is fatal. *See GHP*, 2024 WL 2795190, at \*2 (affirming dismissal where landlords "failed to allege the diminution in property values they suffered as a result of the eviction moratorium"); *accord Evans Creek, LLC v. City of Reno*, No. 21-16620, 2022 WL 14955145, at \*1 (9th Cir. Oct. 26, 2022); *see also Colony Cove*, 888 F.3d at 451 (reversing jury verdict even assuming a diminution in property value of 24.8 percent).

Landlords' factual allegations fell *far* short of this Court's standard. *See* JSER-3-6 (table summarizing allegations and deficiencies corresponding to each property). First, for over half of the properties (48), the SAC did not allege *any* change in property value caused by the Moratorium.[7] 2-ER-71-72, 74-78, 83-93, 105-06, 112-19; JSER-3-5, lines 1-48. They argue that these allegations were nonetheless sufficient because they were not required to allege a change in property value at the

---

[7] For 25 of these 48 properties, the SAC did not include any corresponding factual allegations. 2-ER-74-78; JSER-3-4, lines 1-5, 7-9, 12, 15-17, 20, 28-37, 40-41. For the remaining 23 properties, Landlords alleged only operating losses. 2-ER-71-76; JSER-3-5, lines 6, 10-11, 13-14, 18-19, 21, 27, 38-39, 42-48.

pleadings stage and could rely on assertions of expenses and lost income to support their claims. AOB 60-61. But, as this Court held in *Colony Cove*, operating losses cannot be the basis for a *Penn Central* claim; Landlords must show how those losses affected the value of their property. *See infra* Section III.A.1.

Second, for the 39 properties for which the SAC did allege a diminution in property value, the alleged diminution was insufficiently severe or unsupported or both. For the vast majority of properties (30), the SAC alleged a diminution in value of less than 50 percent. 2-ER-93-106, 108-10, 112; JSER-5-6, lines 49-78. Landlords contend the district court improperly rejected allegations of a less-than-50-percent diminution in value. AOB 63-66. But no court has ever found a taking where plaintiffs retain the majority of their property value.[8] *See infra* Section III.A.2.

---

[8] Landlords alleged diminution greater than 50 percent for nine out of 87 properties. 2-ER-99-101, 104-05, 107-12; JSER-6, lines 79-87. But those allegations either relied on an inapplicable Gross Rent Multiplier ("GRM") methodology (JSER-6, lines 79, 83-86) or were not supported by any factual allegations (JSER-6, lines 81-82, 87). The allegations for one property also contradicted official records showing that the property had actually increased in value by over 50 percent in 2024. 1-ER-11, n.26; JSER-6, line 87. Landlords did not defend their GRM methodology or their failure to include any supporting factual allegations, and the district court thus found they had conceded these arguments. 1-ER-10-11. The court thus dismissed Landlords' claims as applied to these nine properties because the alleged diminutions were unsupported. *Id.* Landlords do not challenge these conclusions on appeal. Any such challenge is thus doubly waived. *See Hartzell v. Marana Unified Sch. Dist.*, 130 F.4th 722, 743 (9th Cir. 2025).

Third, the SAC attached a declaration which purported to tie the Moratorium's impact on a property's capitalization rate to a diminution in that property's value. 2-ER-134-48. Landlords assert that this declaration "by itself, satisfied the necessary pleadings standard." AOB 62. But, in fact, the declaration undermines Landlords' argument because it demonstrates that, at most, the Moratorium decreased property values by only 31.6 percent. *See infra* Section III.A.3.

Because Landlords cannot demonstrate a severe impact to property value—a prerequisite under *Penn Central*—their claims fail as a matter of law.

### 1. Landlords cannot show economic impact based on operating losses.

Landlords assert that dismissal was improper because they have "identified property losses ranging from the tens of thousands, to the hundreds of thousands, to the millions of dollars." AOB 61. These "property losses" consist largely of delinquent rent, ongoing maintenance costs, decreases in revenue and cash flow, landscaping and cleaning costs, emotional distress, and legal fees. 2-ER-83-122. But such operating losses cannot substitute for a significant reduction in property value.

In *Colony Cove*, this Court expressly rejected the plaintiff's attempt to rely on operating losses as a measure of a rent control ordinance's economic impact. 888 F.3d at 452. It held that "[p]rojected income streams can contribute to . . . determining the post-deprivation value of property, but the severity of the loss can be determined only by comparing the post-deprivation value to pre-deprivation value." *Id.* at 451; *see also Keystone*

*Bituminous Coal Ass'n*, 480 U.S. at 497. Landlords therefore cannot rely on their operational expenses and lost income to establish a taking. If they contend that those alleged losses affected the properties' market value, they must allege facts to support that conclusion.

This Court has repeatedly rejected *Penn Central* claims where the plaintiffs do not allege a severe impact to property value, even where they allege other harms. For example, in *GHP*, this Court affirmed dismissal of a *Penn Central* claim challenging a COVID eviction moratorium because the landlords "failed to allege the diminution in property values they suffered as a result of the eviction moratorium, and alleged only the amount of rent lost."[9] 2024 WL 2795190 at *2. In *Saddle Mountain Minerals, LLC v. City of Richland*, No. 23-34622, 2024 WL 4903280 (9th Cir. Nov. 27, 2024), this Court affirmed summary judgment for the defendants where the plaintiffs similarly failed to show a decrease in the value of the affected property. The plaintiff argued that the city took its mineral rights by prohibiting mining and authorizing construction on its property. *Id.* at *2. It claimed the rights were worth $2.8 million, the estimated cost of clearing title to the property. *Id.* This Court held that estimate was "irrelevant to the economic impact of the City's zoning ordinances" because it did not measure "the value of the minerals themselves." *Id.*

---

[9] Landlords assert that the Court should disregard *GHP* because it is unpublished. AOB 67. Although this Court is not bound to follow *GHP*, that case applied well-established circuit precedent to uphold dismissal of a *Penn Central* challenge to a COVID-19 eviction moratorium at the pleading stage. It could not be more on-point.

Numerous other cases have similarly held that *Penn Central* requires more than a showing of increased costs or decreased income. Plaintiffs must plead a change in property value. *See Evans Creek*, 2022 WL 14955145, at *1 (affirming dismissal for failure to allege "any information about the value of the property" before or after the challenged action); *Hotop v. City of San Jose*, 982 F.3d 710, 716-17 (9th Cir. 2020) (affirming dismissal where only alleged economic impact was inability to increase rent); *PVM Redwood Co. v. United States*, 686 F.2d 1327, 1328-29 (9th Cir. 1982) (affirming dismissal where plaintiffs alleged only an increase of production costs); *238 Serrano Props. LLC*, 2025 WL 2946988, at *6 (loss of rental income, interest, and late fees insufficient to establish a *Penn Central* claim); *Russellville Legends, LLC v. United States*, 172 Fed. Cl. 455, 470 (Fed. Cl. 2024) (loss of business opportunity "do[es] not establish economic loss under the Fifth Amendment").

### 2. The district court correctly declined to be the first court to recognize a *Penn Central* taking where the plaintiff's property retained the majority of its value.

Landlords next argue that the district court erred in holding that they could not state a *Penn Central* claim for properties with less-than-50-percent reductions in value. AOB 64-66. They assert that the district court improperly applied a heightened pleading standard and arbitrarily set a 50-percent threshold. AOB 65-66. But the district court did not require Landlords to *prove* that their property values actually decreased as alleged. Nor did the court create a new threshold for *Penn Central* claims. Rather, it simply recognized—as this Court has done—that no court has

41

ever found a compensable taking based on a diminution in value of less than 50 percent. *See* 1-ER-10 (quoting *Colony Cove*, 888 F.3d at 451). Landlords' allegations, falling short of that benchmark, therefore failed to state a claim.

To state a *Penn Central* claim, a plaintiff must allege that the challenged regulation had a truly *severe* impact on the value of her property. The regulatory burden must be "*so onerous* that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537 (emphasis added). Applying this principle in *Colony Cove*, this Court noted that it had held that reductions in value of "75% to 92.5% do[] not constitute a taking" and that it was "aware of no case in which a court has found a taking where diminution in value was less than 50 percent."[10] 888 F.3d at 451 (citing *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011)). Indeed, as the district court here also recognized, courts have declined to find a taking despite much steeper diminutions in property value than those alleged by Landlords. *See* 1-ER-10; *MHC Fin. LP*, 714 F.3d at 1127 (rejecting a claim alleging 81 percent diminution); *William C. Haas & Co., Inc. v. City and Cnty. of San Francisco*, 605 F.2d 1117, 1120-21 (9th Cir. 1979) (95 percent diminution); *Russellville Legends, LLC*, 172 Fed. Cl. at 470 (diminution of 55 percent is at the "low end of the spectrum").

---

[10] Landlords argue that *Colony Cove* is inapplicable because it was decided on appeal from a jury verdict. AOB 66. But "[*Colony Cove*'s] formula for determining economic impact is binding at all stages of the litigation process." *GHP*, 2024 WL 2795190, at *2 (affirming dismissal).

42

Here, of the 39 properties for which Landlords even alleged diminutions in property value, 30 properties suffered diminutions of less than 50 percent, well below what courts have found necessary to state a *Penn Central* claim. *See* JSER-5-6, lines 49-78 (alleged diminutions in value range from 5.01 to 43.30 percent). Accordingly, the district court held that those allegations could not support Landlords' claims. 1-ER-12.

Landlords do not dispute that most of their properties retained the majority of their value. They instead argue that requiring them to allege a greater-than-50-percent diminution in property value (1) demands something more than does the Rule 8 pleading standard and (2) improperly sets a quantitative threshold for economic impact. AOB 36-39, 63. Neither argument holds water.

The district court's dismissal was a straightforward application of Rule 8. To survive dismissal, Landlords must *allege* facts showing "more than a sheer possibility that a defendant has acted unlawfully."[11] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)). Here, a severe impact on the value of property is an indispensable element of a *Penn Central* claim. *See Colony Cove,* 888 F.3d at 451; *GHP*, 2024 WL 2795190, at \*2; *Evans Creek*, 2022

---

[11] Landlords argue that the Moratorium's impact can only be determined by expert testimony after discovery and trial. AOB 62. But all the evidence they needed to allege the effect on their own properties was in their possession or fully available to them prior to filing suit; the County has no special evidence of their property values. Conversely, if they were unaware of the severity of the alleged effects, then they were in no position to claim that the County had taken their properties.

WL 14955145, at *1. And *Colony Cove* further clarified that courts have not found a diminution in value of less than 50 percent to be sufficiently severe. 888 F.3d at 451. Accordingly, to state a plausible *Penn Central* claim, Landlords had to allege for each property, at a minimum, that the Moratorium "took" a majority of the property's value. They failed to do so. Based on their own allegations, the Moratorium did not diminish their property values by more than 50 percent and its impact was not sufficiently severe to state a *Penn Central* claim. *See* 1-ER-10-11 (finding impact insufficient after applying Landlords' proffered methodology).

The district court was also correct to recognize that a reduction in value of less than 50 percent is not the functional equivalent of appropriation or ouster. *See Lingle,* 544 U.S. at 539. Landlords cite three out-of-circuit decisions in which the courts did not apply a quantitative threshold. AOB 65-66 (citing *Heights Apts.,* 30 F.4th at 734, *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003), and *Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990)). However, none of these cases suggest that a less-than-50-percent diminution in property value is sufficient to state a *Penn Central* taking.

In fact, two of the three cases *support* dismissal. In *Cienega Gardens*, the court declined to find an "automatic barrier" preventing compensation where the alleged diminution falls below 75 percent. *See* 331 F.3d at 1345. But the court noted that plaintiffs had nonetheless established a "severe economic impact" because their proven "96% diminution suffices in comparison" with percentages cited in other cases. *Id.* (referencing diminutions of 75 percent and 87.5 percent). Similarly,

in *Yancey*, the court determined that a 77 percent diminution was not too small because it was comparable to compensable diminutions in other cases. *See* 915 F.2d at 1539, 1541. Landlords' quoted language appears only in dicta where the court declined to set a numerical threshold. *See id.* Moreover, both *Cienega Gardens* and *Yancey* were Federal Circuit cases predating that court's decision in *CCA Associates*—the source of *Colony Cove*'s 50 percent threshold. *See CCA Assocs.*, 667 F.3d at 1246, *quoted in Colony Cove*, 888 F.3d at 451.

*Heights Apartments* also does not help Landlords. The Eighth Circuit there did not consider whether the plaintiffs alleged a sufficient impact on property values. Rather, the court generally held that allegations of being "deprived . . . of receiving rental income and managing its property according to the leases' terms" could survive dismissal. 30 F.4th at 734-35. That conclusion is flatly inconsistent with *Colony Cove*. *See supra* Section III.A.1.

Finally, Landlords ask why a 50 percent reduction in value is insufficient to show a taking, but a 51 percent reduction is sufficient. AOB 64. This reflects a logical fallacy. That the former is plainly not a taking does not mean the latter is one. A 51 percent reduction is *also* almost certainly insufficient because it is nothing like appropriation or ouster. The 50 percent threshold in *Colony Cove* simply reflects the reality that no court in history has found a taking given such a limited economic impact.

### 3. The Marchitelli Declaration did not show a severe impact on property values because it estimated only a 31.6 percent diminution and did not include property-specific allegations.

Landlords also argue that they sufficiently pled economic impact by attaching an expert declaration to the SAC, the Marchitelli Declaration. AOB 62-63. The declaration cannot save their claims because it estimated only a 31.6 percent diminution in property value. And if the declaration's county-wide allegations sufficed, then every rental property owner in the County could bring a *Penn Central* claim without alleging property-specific impacts, a result that contradicts *Colony Cove*.

The Marchitelli Declaration asserted that the Moratorium impaired the values of all rental properties in the County by increasing their "risk profile," as measured by the "capitalization rate." 2-ER-121-22, 137. It asserted that one can estimate the value of rental property by dividing its net operating income ("NOI") by a hypothetical capitalization rate. 2-ER-135-36. The declaration opined that the type of rental properties owned by Landlords would ordinarily be ascribed a capitalization rate of 6.5 percent, but that the Moratorium increased the rate by two to three percentage points (i.e., to 8.5 to 9.5 percent) because it introduced unpredictability into the market. 2-ER-138. Property values, it contended, would be accordingly reduced. *Id.*

However, even at the highest estimated capitalization rate, 9.5 percent, the resulting decrease in property value would be only 31.6 percent. *See, e.g.,* 2-ER-115 (estimating a value of $2,871,302.46 without the Moratorium and a value of $1,964,575.37 with the Moratorium), 2-ER-118-

46

19 (estimating a value of $4,255,074.15 without the Moratorium and a value of $2,910,734.95 with the Moratorium).[12] Thus, even if the declaration accurately described the Moratorium's effect on property values, it would fall far short of the economic impact necessary to state a *Penn Central* claim. *See supra* Section III.A.2; *see also Colony Cove*, 888 F.3d at 451 (reduction of 24.8% was *"far too small* to establish a regulatory taking") (emphasis added).

In any event, the declaration cannot support a *Penn Central* claim for each of Landlords' 87 properties because it relied on generic assertions about the Moratorium's purported effect on the value of *all rental properties* in the County. *See* 2-ER-137-38. Its methodology applied an identical change in capitalization rate, and thus percent reduction in value, to all properties regardless of their specific circumstances. 2-ER-135-37. If these generalized allegations were sufficient, then the SAC would state a *Penn Central* claim as to *every single rental property in the County* without having to allege *any* property-specific impacts, including before-and-after property values. That result contravenes *Colony Cove*.

---

[12] The initial values for these properties were estimated by dividing the most recent alleged NOI for the property by the declaration's asserted baseline capitalization rate of 6.5 percent. The allegedly Moratorium-impacted values were estimated by dividing the same NOI by a 9.5 percent rate. *See* 2-ER-138.

**B.      Landlords' failure to allege severe economic impact is fatal to their claims, but the remaining *Penn Central* factors also weigh against finding a taking.**

Because Landlords have failed to allege a sufficiently severe impact to the value of any of their properties, they cannot prevail on their *Penn Central* claims. *See Colony Cove*, 888 F.3d at 451; *Evans Creek*, 2022 WL 14955145, at \*1. Regardless, neither of the remaining *Penn Central* factors—interference with reasonable investment-backed expectations or the character of the governmental action—supports their claims.[13]

**1.      The Moratorium did not interfere with reasonable investment-backed expectations because it was limited in scope, temporary, and consistent with past emergency housing regulations.**

Under the second *Penn Central* factor, courts evaluate the regulation's interference with a property owner's "distinct investment-backed expectation." *Penn Central*, 438 U.S. at 124. The reasonableness of an expectation is assessed based on the "regulatory environment at the time of the acquisition of the property." *Bridge Aina Le'a*, 950 F.3d at 633-34. Landlords argue the Moratorium unexpectedly "suspen[ded] unlawful detainer laws" by "indefinitely" prohibiting evictions of destructive renters regardless of a tenant's or landlord's financial circumstances"

---

[13] And even if it were possible for Landlords to be *the first plaintiffs in history* to state a takings claim based on reductions in property value of less than 50 percent, they would surely need to make an exceptionally compelling showing on the remaining *Penn Central* factors. They have not come close to doing so.

AOB 69. They assert that, despite prior regulation, the Moratorium was not reasonably foreseeable. AOB 69-72. But Supreme Court precedent shows that restrictions on eviction are foreseeable when responding to a health emergency. And the terms of the Moratorium were more limited than Landlords suggest.

Limitations on evictions like those in the Moratorium were hardly unprecedented in the context of a widespread crisis. The Supreme Court previously upheld emergency housing regulations that affected landlords' ability to collect rent or evict nonpaying residents. In *Block*, the Supreme Court upheld an emergency rent control regulation that responded to "dangerous . . . public health and burdensome" housing conditions brought on by World War I. 256 U.S. at 154. The regulation modified rents and permitted tenants to retain possession of units past expiration of their leases at modified rates. *Id.* at 153-54. And in *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 420 (1934) ("*Blaisdell*"), the Supreme Court upheld an eviction moratorium enacted to mitigate the impacts of the Great Depression, a "nation wide and world wide business and financial crisis." *Id.* at 420, 423.

As in *Block* and *Blaisdell*, even though the Moratorium responded to an extraordinary emergency, Landlords should have reasonably expected that the County would enact housing protections under circumstances threatening a widespread danger to health and safety.[14]

---

[14] Nor was the COVID-19 pandemic without precedent. *See McDonald v. Cal. Dep't of Motor Vehicles in Sacramento Cnty.*, No. 2:21-cv-1561 KJM

49

*See Elmsford Apt. Assocs.*, 469 F. Supp. 3d at 169 (upholding COVID-19 eviction moratorium and finding "past regulation puts industry participants on notice that they may face further government intervention in the future"); *accord S. Cal. Rental Hous. Ass'n.*, 550 F. Supp. 3d at 862. Furthermore, the County adopted the Moratorium against the background of pervasive, preexisting state and local laws that regulate the landlord-tenant relationship, including a landlord's ability to evict tenants.[15] *See*, *e.g.*, Cal. Civ. Proc. Code §§ 1159-1179a (establishing unlawful detainer proceedings, including mandatory notice periods); Cal. Civ. Code § 1946.2 (requiring just cause for terminating long-term tenancies).

Landlords are also wrong to suggest that the Moratorium indefinitely altered unlawful detainer law. AOB 69-70. It created a temporary defense to unlawful detainer actions in some situations for the duration of the public health emergency.[16] 2-ER-222-23 (ACCO §§ 6.120.030,

---

DB PS, 2022 WL 1460209, at *2 (E.D. Cal. May 9, 2022) (comparing COVID-19 to 1918 Spanish flu pandemic).

[15] Landlords cite cases finding that other eviction moratoria did interfere with landlords' reasonable investment backed expectations. But those cases ultimately rejected plaintiffs' challenges to the moratoria. *See Apt. Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 914 (9th Cir. 2021) ("*AAGLA*"), *cert. denied*, 142 S. Ct. 1699 (2022). *Baptiste*, 490 F. Supp. 3d at 390. In fact, the chorus of cases upholding COVID-19 eviction moratoria throughout the nation demonstrate that the County's action was not unprecedented.

[16] Citing *Tahoe-Sierra*, Landlords argue the district court should not have considered the Moratorium's temporary nature on dismissal. AOB 72.

6.102.040). It included express exceptions for Ellis Act evictions, court and government orders, and "imminent threat[s] to health or safety."[17] 2-ER-222 (ACCO § 6.120.030(F)). Therefore, the Moratorium likely still permitted evictions in some circumstances involving "property-destroying, criminally-acting renters" to prevent serious risks to Landlords. And the Moratorium preserved renters' obligation to pay rent and landlords' ability to enforce lease terms through a breach of contract action. 2-ER-225 (ACCO § 6.120.090(D)). Thus, the Moratorium did not "indefinitely suspend" Landlords' ability to collect rent or prevent them from pursuing action against tenants for property damage or lease violations. At most, the Moratorium temporarily limited Landlords' ability to pursue one remedy against a subset of tenants in breach of their leases.[18]

### 2. The Moratorium was a permissible adjustment of economic burdens; the character factor weighs against finding a taking.

The "character" of a challenged regulation supports a finding of a taking if the regulation is comparable to a physical invasion of property,

---

But *Tahoe-Sierra* did not involve a *Penn Central* claim, because the plaintiffs had previously abandoned it. *See* 535 U.S. at 317 n.14.

[17] The Ellis Act establishes a procedure by which landlords can remove rental units from the market. *See* Cal. Gov't Code §§ 7060 et seq.

[18] Landlords also contend that the district court should not have "weighed the pled facts and mitigate[d] some facts as against others." AOB 72. But they do not explain which facts the court improperly weighed in its decision. And courts properly consider all judicially noticeable and properly pleaded facts at the motion to dismiss stage. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

rather than "merely affect[ing] property interests through some public program adjusting the benefits and burdens of economic life to promote the common good."[19] *Lingle*, 544 U.S. at 539 (internal quotations omitted). Landlords argue that the Moratorium functioned like a physical taking because Landlords "were stripped of their right to exclude." AOB 73. They assert that they were alone forced to bear "public burdens" while the Moratorium was in effect. AOB 74-75. But again, Landlords misrepresent the scope of the Moratorium's limitations.

As explained in Sections II.A and B, above, the Moratorium was not akin to a physical invasion. At most, it temporarily limited the availability of a single remedy for the breach of a lease—unlawful detainer—in some circumstances. It did not relieve tenants of their obligation to pay rent and landlords could still pursue unpaid rent in a breach of contract action. 2-ER-224 (ACCO § 6.120.090). The Moratorium also preserved landlords' ability to enforce other lease terms, initiate Ellis Act evictions, or exclude non-tenants from their properties. 2-ER-221-22 (ACCO § 6.120.030(F)). And the Moratorium did not force landlords alone to bear the pandemic's economic burdens. It also protected them from evictions based on missed mortgage payments. *See* 2-ER-223 (ACCO § 6.120.040(D)) ("It shall be an absolute defense to any unlawful detainer

---

[19] Landlords argue that assessing whether the Moratorium "merely . . . adjust[s] the benefits and burdens of economic life" "is the equivalent of the 'substantially advances' test that was abrogated . . . in *Lingle*." AOB 75. On the contrary, *Lingle* endorses the "benefits and burdens" standard. 544 U.S. at 539.

action against an affected resident based on a failure to timely make rent *or mortgage* payments") (emphasis added).

This Court has repeatedly upheld rent and eviction controls against *Penn Central* challenges, finding that they merely adjust economic burdens within the landlord-tenant relationship. *See Colony Cove*, 888 F.3d at 454 (character of rent control program weighed against finding a taking); *Rancho de Calistoga*, 800 F.3d at 1091 (rent control ordinance was "much more an adjustment of the benefits and burdens of economic life") (internal quotations omitted); *MHC Fin. LP*, 714 F.3d at 1128 (same).

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment.

February 10, 2026          SHUTE, MIHALY & WEINBERGER LLP


By:          s/Matthew D. Zinn
             MATTHEW D. ZINN
             MINDY K. JIAN

             Attorneys for Defendants-Appellees
             County of Alameda and Board of
             Supervisors of the County of Alameda

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _25-6142_____

I am the attorney or self-represented party.

**This brief contains _11,131_____ words,** including ____0_____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** __s/Matthew D. Zinn_____ **Date** _February 10, 2026_
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**        *Rev. 12/01/22*