No. 25-6142

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LANDLORDS AND PROPERTY MANAGEMENT COMPANIES IN
ALAMEDA COUNTY,

Plaintiffs – Appellants,

v.

COUNTY OF ALAMEDA; et al.,

Defendants – Appellees,

ALLIANCE OF CALIFORNIANS FOR COMMUNITY
EMPOWERMENT ACTION,

Intervenor – Defendant – Appellee.

———————————————

On Appeal from the United States District Court
for the Northern District of California
3:22-cv-01274-LB

## APPELLEE ALLIANCE OF CALIFORNIANS FOR COMMUNITY
## EMPOWERMENT ACTION'S ANSWERING BRIEF

Marc Seltzer
Krysta K. Pachman
Glenn C. Bridgman
Nicholas N. Spear
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
kpachman@susmangodfrey.com
gbridgman@susmangodfrey.com
nspear@susmangodfrey.com

*Attorneys for Intervenor- Defendant - Appellee*
*Alliance of Californians for Community Empowerment Action*

i

## CORPORATE DISCLOSURE

Appellee Alliance of Californians for Community Empowerment Action's Circuit Rule 26.1-1 Disclosure Statements (Form 34) have been filed with the Court and are incorporated here by reference.

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 1

ISSUES PRESENTED ............................................................................... 4

STATEMENT OF THE CASE ................................................................... 5

    A.    Oakland's and Alameda County's Eviction Moratoria ........... 5

    B.    The District Court Proceedings ............................................... 7

    C.    The Issues on Appeal ............................................................ 10

SUMMARY OF ARGUMENT .................................................................. 11

STANDARD OF REVIEW ....................................................................... 13

ARGUMENT ............................................................................................ 13

    A.    Appellants Failed to Allege that the Eviction
        Moratoria are *Per Se* Physical Takings ............................... 13

        1.    The Eviction Moratoria Were Not *Per Se*
                Physical Takings Because They Regulated the
                Landlord-Tenant Relationship .................................... 14

        2.    The Eviction Moratoria Did Not Physically
                Appropriate Appellants' Property ............................... 22

        3.    The Eviction Moratoria Did Not Prohibit the
                Eviction of Non-Tenants and Did Not Turn All
                Tenancies into "Life Estates" ..................................... 30

        4.    Allowing Appellants' Physical Takings Claims
                to Proceed Would Undercut the Government's
                Ability to Regulate Housing and Respond to
                Emergencies. ............................................................... 35

    B.    Appellants Failed to Allege that the Eviction
        Moratoria are Regulatory Takings under *Penn
        Central* ................................................................................... 37

1.  Appellants Fail to Allege a Substantial Diminution of their Property Values (*Penn Central* Factor #1) ..........................................................38

2.  It is Objectively Unreasonable to Expect the Government to Not Respond to a Public Health and Housing Emergency (*Penn Central* Factor #2) ...............................................................52

3.  The Eviction Moratoria Were Public Programs that Did Not Specifically Target Appellants (*Penn Central* Factor #3) ...............................................56

C.  The District Court Did Not Apply a "Heightened Pleading Standard" to Plaintiffs' Takings Claims................59

CONCLUSION ....................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Services*,
  594 U.S. 758 (2021) .................................................................. 25

*Alford co-Tr. of Lionel D. Alford, Jr., & Tammy Nix Alford*
  *Revocable Tr. v. Walton Cnty.*,
  159 F.4th 844 (11th Cir. 2025) ........................................ 29

*Apt. Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*,
  10 F.4th 905 (9th Cir. 2021) ............................................. 55

*Ark. Game & Fish Comm'n v. United States*,
  568 U.S. 23 (2012) .................................................... 24, 50

*Armstrong v. United States*,
  364 U.S. 40 (1960) ............................................................. 25

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................... 13, 44, 45

*Auracle Homes, LLC v. Lamont*,
  478 F. Supp. 3d 199 (D. Conn. 2020)........................ 18, 57

*Ballinger v. City of Oakland*,
  24 F.4th 1287 (9th Cir. 2022) ................................ *passim*

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................... 13

*Birkenfeld v. City of Berkeley*,
  17 Cal. 3d 129 (1976) ...................................................... 34

*Blackburn v. Dare Cnty.*,
  58 F.4th 807 (4th Cir. 2023) ........................................... 49

*Block v. Hirsh,*
256 U.S. 135 (1921) ................................................................ *passim*

*Bols v. Newsom,*
No. 22-56006, 2024 WL 208141 (9th Cir. Jan. 19, 2024) ........... *passim*

*Bordelon v. Baldwin Cnty., Ala.,*
2022 WL 16543269 (S.D. Ala. Oct. 28, 2022)...................................... 55

*Bridge Aina Le'a, LLC v. Land Use Comm'n,*
950 F.3d 610 (9th Cir. 2020)...................................................... *passim*

*CCA Assocs. v. United States,*
667 F.3d 1239 (Fed. Cir. 2011) ........................................................ 39

*CCA Assocs. v. United States,*
91 Fed. Cl. 580 (2010) ..................................................................... 58

*Cedar Point Nursery v. Hassid,*
594 U.S. 139 (2021) .................................................................. *passim*

*Cienega Gardens v. United States,*
331 F.3d 1319 (Fed. Cir. 2003) ................................................... 51, 55

*Colo. Springs Prod. Credit Ass'n v. Farm Credit Admin.,*
967 F.2d 648 (D.C. Cir. 1992) .......................................................... 29

*Colony Cove Props., LLC v. City of Carson,*
888 F.3d 445 (9th Cir. 2018)...................................................... *passim*

*Crawford-El v. Britton,*
523 U.S. 574 (1998) ......................................................................... 59

*Darby Dev. Co. v. United States,*
112 F.4th 1017 (Fed. Cir. 2024).................................................. *passim*

*Davidson v. Quinn,*
138 Cal. App. 3d Supp. 9 (App. Dep't Super Ct. 1982)...................... 34

*DeMarco v. DepoTech Corp.,*
149 F. Supp. 2d 1212 (S.D. Cal. 2001) ............................................. 45

*Dep't of Hous. & Urb. Dev. v. Rucker,*
   535 U.S. 125 ............................................................................ 25

*E. Enterprises v. Apfel,*
   524 U.S. 498 (1998) ............................................................... 50

*El Papel, LLC v. City of Seattle,*
   No. 22-35656, 2023 WL 7040314 (9th Cir. Oct. 26, 2023).......... *passim*

*Elmsford Apart. Assocs., LLC v. Cuomo,*
   469 F. Supp. 3d 148 (S.D.N.Y. 2020) ............................... 18, 57

*Eyherabide v. United States,*
   345 F.2d 565 (Ct. Cl. 1965) .............................................. 29

*Farhoud v. Brown,*
   2022 WL 326092 (D. Or. Feb. 3, 2022) ............................. 17

*FFV Coyote LLC v. City of San Jose,*
   637 F. Supp. 3d 761 (N.D. Cal. 2022), Br. 51 .................... 45

*First Eng. Evangelical Lutheran Church of Glendale v. Los*
   *Angeles Cnty., Cal.,*
   482 U.S. 304 (1987) ....................................................... 38, 25

*Four Seas Inv. Corp. v. Int'l Hotel Tenants' Assn.,*
   146 Cal. Rptr. 531 (Ct. App. 1978) ................................... 33

*Fragomeno v. Ins. Co. of the W.,*
   255 Cal. Rptr. 111 (Ct. App. 1989) ................................... 34

*Galbraith v. Cnty. of Santa Clara,*
   307 F.3d 1119 (9th Cir. 2002) ......................................... 60

*Gallo v. D.C.,*
   610 F. Supp. 3d 73 (D.D.C. 2022) ............................... 17, 37

*GHP Mgmt. Corp. v. City of Los Angeles*
   No. 23-55013, 2024 WL 2795190 (9th Cir. May 31, 2024),
   *cert. denied,* 145 S. Ct. 2615 (2025) .......................... *passim*

iii

*Heights Apartments, LLC v. Walz,*
   30 F.4th 720 (8th Cir. 2022) ........................................................ 27, 51

*Heights Apts., LLC v. Walz,*
   39 F.4th 479 (8th Cir. 2022) ................................................ 27, 28, 51

*Hendler v. United States,*
   175 F.3d 1374 (Fed. Cir. 1999) .......................................................... 29

*Heydt v. United States,*
   38 Fed. Cl. 286 (1997) ........................................................................ 29

*Hodel v. Irving,*
   481 U.S. 704 (1987) ............................................................................ 50

*Horne v. Dep't of Agric.,*
   576 U.S. 350 (2015) ............................................................................ 24

*In re NVIDIA Corp. Sec. Litig.,*
   768 F.3d 1046 (9th Cir. 2014) ............................................................ 13

*In re Under Armour Securities Litigation,*
   409 F. Supp. 3d 446 (D. Md. 2019) .................................................... 45

*In re Windmill Farms, Inc.,*
   841 F.2d 1467 (9th Cir. 1988) ............................................................ 34

*Johnson v. City of Shelby, Miss.,*
   574 U.S. 10 (2014) .............................................................................. 59

*Kaiser Aetna v. United States,*
   444 U.S. 164 (1979) ............................................................................ 24

*Kohn v. State Bar of Cal.,*
   87 F.4th 1021 (9th Cir. 2023) ............................................................ 29

*Ladd v. United States,*
   630 F.3d 1015 (Fed. Cir. 2010) .......................................................... 29

*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination
   Unit,*
   507 U.S. 163 (1993) ............................................................................ 59

iv

*Lindsey v. Normet,*
405 U.S. 56 (1972) ...................................................................... 55

*Lingle v. Chevron U.S.A. Inc.,*
544 U.S. 528 (2005) ............................................................. *passim*

*Loretto v. Teleprompter Manhattan CATV Corp.,*
458 U.S. 419 (1982) ............................................................. *passim*

*Lucas v. S.C. Coastal Council,*
505 U.S. 1003 (1992) ............................................................ 22, 25

*Martinez v. High,*
91 F.4th 1022 (9th Cir. 2024) ........................................................ 43

*MHC Fin. Ltd. P'ship v. City of San Rafael,*
714 F.3d 1118 (9th Cir. 2013)............................................... 38, 39, 48

*Murr v. Wisconsin,*
582 U.S. 383 (2017) ..................................................................... 50

*Nowlin v. Pritzker,*
34 F.4th 629 (7th Cir. 2022) ........................................................ 49

*Palazzolo v. Rhode Island,*
533 U.S. 606 (2001) ................................................................ 25, 50

*Penn Central Transportation Co. v. City of New York,*
438 U.S. 104 (1978) ............................................................. *passim*

*Penn. Coal Co. v. Mahon,*
260 U.S. 393 (1922) ..................................................................... 37

*Prudential Ins. Co. of Am. v. United States,*
801 F.2d 1295 (Fed. Cir. 1986) ..................................................... 29

*PruneYard Shopping Center v. Robins,*
447 U.S. 74 (1980) ................................................................. 26, 27

*Rancho de Calistoga v. City of Calistoga,*
800 F.3d 1083 (9th Cir. 2015)................................................. *passim*

v

*Redevelopment Agency v. Thrifty Oil Co.*,
4 Cal. App. 4th 469 (1992) ...................................................................... 46

*S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*,
550 F. Supp. 3d 853 (S.D. Cal. 2021) ........................................... 18, 57

*S. Grande View Dev. Co., Inc. v. City of Alabaster, Ala.*,
*1 F.4th 1299, 1311 (11th Cir. 2021)* ....................................................58

*San Bernardino Cnty. Flood Control Dist. v. Sweet*,
255 Cal. App. 2d 889 (1967)................................................................... 46

*Sharritt v. Henry*,
2024 WL 4524501 (N.D. Ill. Oct. 18, 2024) ...................................... 29

*Smith v. Marsh*,
194 F.3d 1045 (9th Cir. 1999)............................................................... 43

*Smith v. Royal Ins. Co.*,
111 F.2d 667 (9th Cir. 1940)................................................................. 29

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001)................................................................. 44

*Swierkiewicz v. Sorema N. A.*,
534 U.S. 506 (2002) ................................................................................ 59

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002) ........................................................25, 40, 47, 50

*United States v. Causby*,
328 U.S. 256 (1946) ................................................................................ 25

*Vesta Fire Ins. Corp. v. State of Fla.*,
141 F.3d 1427 (11th Cir. 1998)............................................................. 55

*Western Un. Tel. Co. v. Hansen Rowland Corp.*,
166 F.2d 258 (9th Cir. 1948)................................................................. 34

*Yancey v. United States*,
915 F.2d 1534 (Fed. Cir. 1990) ............................................................ 51

vi

*Yee v. City of Escondido*,
  503 U.S. 519 (1992) ................................................................. *passim*

**Statutes**

Cal. Civ. Proc. Code § 827 ....................................................... 53

Cal. Civ. Proc. Code § 1160 ...................................................... 31

Cal. Civ. Proc. Code § 1161 ................................................. 31, 54

Cal. Civ. Proc. Code § 1161(2) & (3)......................................... 35

Cal. Civ. Proc. Code § 1161(3) .................................................. 36

Cal. Civ. Proc. Code § 1946.1(b) ............................................... 35

Cal. Civ. Proc. Code § 1946.1(c) ............................................... 35

Cal. Civ. Proc. Code § 1954.535 ............................................... 35

Cal. Gov. Code § 7060-7060.7.................................................... 54

Cal. Gov. Code § 7060.4(b) ....................................................... 36

Cal. Gov. Code § 8630(d) .......................................................... 20

Cal. Health & Saf. Code § 17920.3 ........................................... 54

Cal. Health & Saf. Code § 101080 ............................................. 20

**Rules**

Fed. R. Civ. P. 8 ...................................................................... 13

Fed. R. of Civ. P. 12(b)(6) ......................................................... 13

Fed. R. Civ. P 56 ..................................................................... 13

**Other Authorities**

B.E. Witkin, 12 Witkin, Summary 11th Real Prop §§ 733,
  776 (Thomson Reuter 2022) .................................................. 32

Miller & Starr, 10 Cal. Real Est. § 34:199 (Thomson Reuters 4th ed.) ...................................................................................... 31

Will Kenton, Gross Income Multiplier (GIM): Definitions, Uses, and Calculation (Investopedia Aug. 24, 2024), https://www.investopedia.com/terms/g/ gross-income-multiplier.asp (last visited February 7, 2024) ................................... 42

J.P. Morgan, What is the gross rent multiplier? (J.P. Morgan Insights Oct. 15, 2024), https:// www.jpmorgan.com/insights/real-estate/commercial-term-lending/what-is-a-gross-rent-multiplier-grm (last visited February 7, 2026) ................................................................ 41

Gross Rent Multiplier (WallStreetPrep Feb. 20, 2024), https://www.wallstreetprep.com/knowledge/gross-rent-multiplier-grm/ (last visited Feb. 7, 2026) ........................................ 42

## INTRODUCTION

Emergency regulation of the landlord-tenant relationship has a constitutional pedigree dating back over a century. In *Block v. Hirsh*, the Supreme Court held that a prohibition on evictions due to World War I was not a taking. 256 U.S. 135 (1921) (Holmes, J.). Because "[h]ousing is a necessary of life," the Supreme Court explained that a "public exigency will justify the legislature in restricting property rights in land to a certain extent without compensation." *Id.* at 155–157; *see also id.* at 157 ("A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change.").

The principle that courts can constitutionally regulate the landlord-tenant relationship without paying compensation controls this appeal. The Oakland and Alameda County ordinances at issue (the "Eviction Moratoria") were adopted in response to the unprecedented COVID-19 pandemic, at a time when the spread of that disease had shut down much of the country and the national economy. The Eviction Moratoria did not compel anyone to become a landlord, did not require any owner to accept new tenants, and did not forgive rent. Instead, the Eviction Moratoria temporarily limited eviction as a remedy in specified

1

circumstances while the emergency persisted, leaving landlords free to pursue other remedies (including civil actions to recover unpaid rent) and operating alongside public rent-relief programs intended to mitigate the economic shock of the pandemic. The Eviction Moratoria have long since expired: Alameda County's ended in April 2023, and Oakland's ended in July 2023.

Appellants nonetheless seek sweeping constitutional compensation. They ask this Court to treat a temporary adjustment of the landlord-tenant relationship—governing when and under what conditions an existing tenant may be removed from a home the landlord voluntarily rented to them—as a *per se* physical taking. That theory is foreclosed by controlling Supreme Court and Ninth Circuit precedent. Under *Yee v. City of Escondido*, a regulation that "merely regulates" the landlord-tenant relationship is not a *per se* physical taking where the occupants were invited by the owner rather than "forced upon" the owner by the government. 503 U.S. 519 (1992). This Court has applied those same principles in rejecting takings challenges to housing regulations, including in *Ballinger v. City of Oakland*, 24 F.4th 1287 (9th Cir. 2022), and has repeatedly held that COVID-19 eviction moratoria are not *per se*

2

physical takings under *Yee. See GHP Mgmt. Corp. v. City of Los Angeles* No. 23-55013, 2024 WL 2795190, at *1 (9th Cir. May 31, 2024) (mem. disp.), *cert. denied*, 145 S. Ct. 2615 (2025); *El Papel, LLC v. City of Seattle*, No. 22-35656, 2023 WL 7040314, at *2 (9th Cir. Oct. 26, 2023) (mem. disp.); *Bols v. Newsom*, No. 22-56006, 2024 WL 208141, at *1 (9th Cir. Jan. 19, 2024) (mem. disp.).

Appellants' fallback theory—that the moratoria are regulatory takings under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978)—fails at the threshold for the same reasons the district court identified after multiple rounds of pleadings and years of litigation. Appellants did not plausibly plead the required economic impact in a manner consistent with Ninth Circuit law, including because their valuation failed to account for the moratoria's temporary duration and produced facially implausible results. Nor did they plead an objectively reasonable investment-backed expectation of operating free from emergency tenant-protection measures in a heavily regulated field where notice requirements, just-cause limitations, and other eviction constraints have long been features of the background legal environment. And the character of the government action weighs strongly against a

3

taking: these were broadly applicable public programs enacted to address an extraordinary public health and housing emergency, not targeted appropriations singling out particular owners for special burdens.

Appellants' rewriting of the law of takings would have consequences far beyond this case. If temporary restrictions on eviction were recast as physical takings or subject to *Penn Central* whenever they limited an owner's ability to immediately remove an existing tenant, then ordinary and longstanding tenant-protection measures would be placed under a constitutional compensation regime incompatible with *Yee* and with the settled understanding that states and local governments possess broad power to regulate housing and the landlord-tenant relationship. The district court correctly refused to rewrite takings law in this manner and therefore correctly rejected Appellants' physical and regulatory takings claims. This Court should affirm.

## ISSUES PRESENTED

1.      Whether the Eviction Moratoria are *per se* physical takings under *Yee*.

2.      Whether the Eviction Moratoria are regulatory takings under *Penn Central*.

## STATEMENT OF THE CASE

### A.    Oakland's and Alameda County's Eviction Moratoria

On March 4, 2020, California Governor Gavin Newsom declared a state of emergency related to the emerging COVID-19 pandemic. 2-ER-78–79 (SAC ¶ 69). On March 9, 2020, Oakland issued a proclamation of Local Emergency, which was ratified three days later. 2-ER-81 (SAC ¶ 75). On March 10, 2020, Alameda County declared a local emergency. 2-ER-82 (SAC ¶ 79).

On March 27, 2020, Oakland adopted Ordinance No. 13589 C.M.S. 2-ER-76 (SAC ¶ 76); 2-ER-187 (Ordinance No. 13589). The Ordinance stated that "during the state of emergency, and in the interests of protecting public health and preventing transmission of the COVID-19, it is essential to avoid unnecessary displacement and homelessness." 2-ER-189. The Ordinance included a moratorium on residential evictions:

> **SECTION 3. Residential Eviction Moratorium.** Except when the tenant poses an imminent threat to the health or safety of other occupants of the property, and such threat is stated in the notice as the grounds for the eviction, it shall be an absolute defense to any unlawful detainer action filed under Oakland Municipal Code 8.22.360A subsections (1) - (10) that the notice was served or expired, or that the complaint was filed or served, during the Local Emergency. Any notice served pursuant to Oakland Municipal Code 8.22.360A (1) - (10) on a tenant during the Local Emergency shall include the following statement in bold underlined 12-point

font: "**Except to protect the health and safety of other occupants of the property, you may not be evicted during the Local Emergency declared. by the City of Oakland in response to the COVID-19 pandemic. This does not relieve you of the obligation to pay back rent in the future. You may contact the Rent Adjustment Program at (510) 238--3721 for additional information and referrals.**" This section shall remain in effect until May 31, 2020, unless extended.

2-ER-191. The moratorium was extended to remain in effect until the Oakland City Council terminated the Local Emergency. 2-ER-81 (SAC ¶ 77); 2-ER-201–02 (Ordinance No. 13606 C.M.S.). The Ordinance did "not relieve the tenant of liability" for any unpaid rent. 2-ER-192.

On April 21, 2020, Alameda County adopted Urgency Ordinance No. O-2020-23, which imposed a moratorium on residential evictions. 2-ER-82 (SAC ¶ 79); 2-ER-206 (Urgency Ordinance No. O-2020-23). On June 23, 2020, Alameda County adopted Ordinance No. O-2020-32. 2-ER-82 (SAC ¶ 79); 2-ER-220 (Ordinance No. O-2020-32). The Ordinance stated: "The ordinance codified in this chapter is enacted to promote the public peace, health, welfare and safety. The purposes of this chapter are to reduce the transmission of COVID-19, to promote housing stability during the COVID-19 pandemic and to prevent avoidable homelessness." 2-ER-220 (§ 6.120.010). The Ordinance included a moratorium on residential evictions: "Beginning on the effective date of this ordinance

6

and expiring sixty (60) days after the expiration of the local health emergency but not sooner than sixty (60) days after December 31, 2020, the county hereby places a moratorium on all evictions from residential units in the unincorporated and incorporated areas of the county, subject to the exceptions stated below." 2-ER-221–22 (§ 6.120.030(A)). Like the Oakland Ordinance, the Alameda County Ordinance did not relieve any tenant of the obligation to pay rent. 2-ER-225 (§ 6.120.030(D)).

On February 28, 2023, Alameda County ended its local emergency. 2-ER-82–83 (SAC ¶ 80). Its eviction moratorium therefore expired on April 29, 2023. *Id.* On May 2, 2023, Oakland enacted an ordinance to phase out its eviction moratorium. 2-ER-81–82 (SAC ¶ 78). The moratorium ended on July 15, 2023. *Id.*

Both Oakland and Alameda County operated rent relief assistance programs during the pandemic for landlords and tenants. 2-ER-83 (SAC ¶ 82).

## B.  The District Court Proceedings

On March 1, 2022, Appellants John Williams, Robert Vogel, Sheanna Rogers, Michael Loeb, and Jaqueline Watson-Baker, along with Housing Providers of America, sued Oakland and Alameda County,

7

alleging that the Eviction Moratoria were unconstitutional takings under federal and California law and violated due process and equal protection. 2-ER-241. Appellants also sought a writ of mandate. *Id.* Appellants alleged they were harmed by the Eviction Moratoria, including because they could not evict tenants who did not pay rent and because they could not evict tenants who otherwise breached their lease terms. *Id.*

On April 28, 2022, the district court granted the parties' stipulation for Appellee Alliance of Californians for Community Empowerment Action's ("ACCE") intervention. 2-ER-272. ACCE is a 501(c)(4) statewide grassroots membership organization dedicated to economic, racial, and social justice, with a particular focus on tenants' rights. SER-33. ACCE played an active role in the passage of the Eviction Moratoria. *Id.*

The parties initially litigated the physical takings claims. On June 6, 2022, the district court granted Appellants' motion to bifurcate their facial claims. 2-ER-273–74. Appellants then moved for summary judgment. 2-ER-276–77. On November 22, 2022, the district court denied Appellants' summary judgment motion. 1-ER-28. The district court also denied the plaintiffs' summary judgment motion in the related *California Apartment Association, et al., v. Board of Supervisors of the County of*

8

*Alameda, et al.*, Case No. 22-cv-02705-LB, action. 1-ER-28. On February 24, 2023, the district court denied Appellants' motion to certify the summary-judgment order for interlocutory appeal. 2-ER-285.

Appellants, after months of extensions, filed a First Amended Complaint on September 20, 2023. 2-ER-151; 2-ER-288–89. The First Amended Complaint added dozens of additional plaintiffs and re-alleged claims for federal and state takings, due process, equal protection, and a writ of mandate. 2-ER-151. Appellees then filed motions to dismiss. 2-ER-291–92. Appellants also moved to dismiss ACCE as an intervenor-defendant. *Id.* On September 3, 2024, the district court granted Appellees' motions to dismiss in both this case and the *CAA* case and dismissed Appellants' claims with prejudice, with the exception of the regulatory takings claims. 1-ER-15. The district court gave Appellants twenty-eight days to amend their regulatory takings claims. 1-ER-27. The district court also denied Appellants' motion to dismiss ACCE. 1-ER-25–26.

Appellants, again after months of extensions, filed their Second Amended Complaint on March 3, 2025, which is the operative pleading.

2-ER-69; 2-ER-299–301.[1] Appellants alleged that they lost income because they couldn't collect rent from many tenants during the pendency of the Eviction Moratoria. *Id.* Some appellants also alleged that they could not evict problematic tenants. *Id.* Appellants included allegations about diminution in value property value for some properties but not others. *Id.* Appellees again moved to dismiss. 2-ER-302–03.

On August 29, 2025, the district court granted Appellees' motions to dismiss and dismissed the remaining regulatory takings claims with prejudice. 1-ER-2. The district court also dismissed the remaining *CAA* regulatory takings claim. *Id.* The district court issued its Amended Judgment the same day. 1-ER-12.

### C. The Issues on Appeal

Appellants filed their notice of appeal on September 26, 2025. 2-ER-263. The Court set a joint briefing schedule with the *CAA* appeal (Case No. 25-06068). Dkt. 8. Appellants filed their opening brief on December 12, 2025. Dkt. 12. Appellants solely challenge the district court's dismissal of the physical and regulatory takings claims. *Id.*

---

[1] Housing Providers of America was dropped as a plaintiff in the Second Amended Complaint. 2-ER-69.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's dismissal of Appellants' regulatory takings claims.

**1.** Appellants failed to allege that the Eviction Moratoria were *per se* physical takings. The Eviction Moratoria regulated pre-existing landlord-tenant relationships. Under *Yee*, the Eviction Moratoria were not physical takings because they did not require any non-landlord to become one and did not permanently prohibit evictions. 503 U.S. at 533–38. Appellants incorrectly analogize the Eviction Moratoria to the regulation at issue in *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021), which forced property owners to accept uninvited individuals onto their property. This Court has repeatedly held that *Yee*, not *Cedar Point*, controls the evaluation of COVID-19 eviction moratoria. *See GHP*, 2024 WL 2795190, at *1; *El Papel*, 2023 WL 7040314, at *2; *Bols*, 2024 WL 208141, at *1.

**2.** Appellants failed to allege that the Eviction Moratoria were regulatory takings under the *Penn Central* factors.

- <u>Economic Impact</u>: Appellants' allegations about the diminution in property values attributable to the Eviction

11

Moratoria, and the related Marchitelli Declaration, were not tied to the duration of the Eviction Moratoria and are improperly speculative and conclusory. Appellants' allegations also fail to allege a sufficient impact to property values from the Eviction Moratoria. *See Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1090 (9th Cir. 2015).

- Distinct-Investment Backed Expectations: Appellants fail to allege it was objectively reasonable to not expect the government to regulate in response to a public health and housing emergency, particularly in light of the highly-regulated nature of landlord-tenant relationship and the longstanding *Block*, 256 U.S. at 153–58, precedent.

- Character of the Government Action: The Eviction Moratoria were a "public program adjusting the benefits and burdens of economic life to promote the common good" and did not specifically target any landlord or group of landlords, which weighs against a regulatory taking. *See Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 635–36 (9th Cir. 2020).

12

**3.** Appellants' claim that the district court imposed a "heightened pleading standard" cannot be squared with the district court's analyses, which applied the appropriate Federal Rule of Civil Procedure 8 and 56 standards.

## STANDARD OF REVIEW

This Court reviews a dismissal under Federal Rule of Civil Procedure 12(b)(6) de novo. *See Ballinger*, 24 F.4th at 1292 (9th Cir. 2022). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court "accept[s] as true all factual allegations and determine[s] whether they are sufficient to state a claim for relief" but does not "accept as true allegations that are conclusory." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ARGUMENT

### A. Appellants Failed to Allege that the Eviction Moratoria are *Per Se* Physical Takings

The district court correctly dismissed Appellants' *per se* physical takings claims. A regulation is a *per se* physical taking only when it

13

"results in a physical appropriation of property." *Ballinger*, 24 F.4th at 1292 (quoting *Cedar Point*, 594 U.S. at 149). Because Appellants "voluntarily chose to lease their property," and the eviction moratoria are "a regulation of [Appellants'] *use* of their property," the Eviction Moratoria do "not amount to a *per se* taking." *Id.* (quoting *Yee*, 503 U.S. at 532).

1. <u>The Eviction Moratoria Were Not *Per Se* Physical Takings Because They Regulated the Landlord-Tenant Relationship</u>

The Supreme Court held in *Yee* that government regulation of the landlord-tenant relationship is not a *per se* physical taking. 503 U.S. at 532. The *Yee* petitioners argued that a local rent control ordinance, coupled with California's Mobile Home Residency Law, was a *per se* physical taking because it gave a mobile homeowners and any successive purchasers "the right to occupy the land indefinitely at a submarket rent." *Id.* at 526–27. The Supreme Court disagreed because the laws at issue "merely regulate[d] petitioners' *use* of their land by regulating the relationship between landlord and tenant," and "thus does not amount to a *per se* taking." *Id.* at 528, 532.[2] The Supreme Court stated that it 'has

---

[2] *Yee* did not consider whether the ordinance constituted a regulatory

consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.'" *Id.* at 528 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982)).

The touchstone of *Yee* was the voluntariness of the landlord-tenant relationship. The *Yee* "Petitioners' tenants were invited by petitioners, not forced upon them by the government." *Id.* at 528. The Supreme Court explained that "it is the invitation, not the rent, that makes the difference. The line which separates [this case] from [the physical taking cases] is the unambiguous distinction between a . . . lessee and an interloper with a government license." *Id.* at 532 (quoting *FCC v. Florida Power Corp.*, 480 U.S. 245, 252–53 (1987)). The Supreme Court noted that a "different case would be presented" if the ordinance were "to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." 503 U.S. at 528.

---

taking under the *Penn Central* test because the issue was not properly raised. *Id.* at 532–39.

This Court in *Ballinger* recently applied this principle in rejecting a physical takings challenge to Oakland's relocation fee ordinance: "'When a person voluntarily surrenders liberty or property,' like when the Ballingers chose to rent their property causing them to pay the relocation fee when they caused the tenants to relocate, 'the State has not *deprived* the person of a constitutionally protected interest.'" 24 F.4th at 1293 (quoting *L.L. Nelson Enters., Inc. v. County of St. Louis*, 673 F.3d 799, 806 (8th Cir. 2012)).[3]

*Yee* controls here. This Court has thrice held that COVID-19 eviction moratoria are not *per se* physical takings under *Yee* because they merely regulate when a landlord can evict an existing tenant. In *GHP*, the Court affirmed the dismissal of a physical takings claim about the City of Los Angeles's residential eviction moratorium because "[u]nder the Supreme Court's current jurisprudence, a statute that merely adjusts the existing relationship between landlord and tenant, including adjusting rental amount, terms of eviction, and even the identity of the tenant, does not effect a taking." 2024 WL 2795190, at *1. In *El Papel*,

---

[3] As in *Yee*, the *Ballinger* plaintiff did not bring a regulatory takings claim. *Id.* at 1292 n.2.

16

this Court affirmed the dismissal of a physical takings claim about Seattle's residential eviction moratorium because "the Supreme Court's decision in [*Yee*] controls here and forecloses the Landlords' per se physical-taking claim." 2023 WL 7040314, at *2. And in *Bols*, this Court affirmed summary judgment for the government on a takings claim for an eviction moratorium for commercial tenants because "Here, as in *Yee*, the government did not require any physical invasion of property, because the tenants were invited by the owners, not forced upon them by the government. And any restriction on a landlord's ability to evict tenants was temporary." 2024 WL 208141, at *1 (cleaned up).

Courts across the country have similarly rejected physical takings claims for COVID-19 eviction moratoria under *Yee. See, e.g.*, *Gallo v. D.C.*, 610 F. Supp. 3d 73, 87 (D.D.C. 2022), *on reconsideration*, 2023 WL 7552703 (D.D.C. Nov. 14, 2023) (Washington D.C.'s COVID-19 eviction moratorium is "legally indistinguishable from the one in *Yee*, so *Yee* commands that Gallo's physical-occupation taking claim fails"), *aff'd*, 2025 WL 1446283 (D.C. Cir. May 20, 2025); *Farhoud v. Brown*, 2022 WL 326092, at *10 (D. Or. Feb. 3, 2022) (applying *Yee* and dismissing physical takings claim against Multnomah County's eviction moratorium); *S. Cal.*

17

*Rental Hous. Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 865–66 (S.D. Cal. 2021) ("Unlike an invasion of property by an uninvited guest, the landlords here have solicited tenants to rent their properties, and the Ordinance simply regulates landlords' relationship with tenants"), *appeal denied as moot*, 2022 WL 16832819 (9th Cir. Nov. 9, 2022); *Elmsford Apart. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 162–64 (S.D.N.Y. 2020) (rejecting physical takings challenge to New York's eviction moratorium because "[t]he Supreme Court has ruled that a state does not commit a physical taking when it restricts the circumstances in which tenants may be evicted"); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 220–21 (D. Conn. 2020) ("The Executive Orders at issue here, also like the state and local laws in *Yee*, 'merely regulate [Plaintiffs'] use of their land by regulating the relationship between landlord and tenant.'").

The district court appropriately applied *Yee* to deny Appellants' summary judgment motion and grant Appellees' motions to dismiss the physical takings claims. 1-ER-40–48 (SJ Order); 1-ER-20 (MTD Order). The Eviction Moratoria expressly regulated the pre-established landlord-tenant relationship. The Oakland eviction moratorium provides a

18

defense to certain unlawful detainer actions filed under Oakland Municipal Code 8.22.360A. 2-ER-191. Municipal Code 8.22.360A is part of Oakland's "Just Cause for Eviction" Ordinance, which addresses a landlord's ability to evict a tenant. SER-24–29. Alameda's eviction moratorium states "No landlord or lender may evict a resident, or otherwise require a resident to vacate a residential unit . . . while this section is in effect." 2-ER-221–22. "Resident" is defined as a "a tenant, homeowner or their household." *Id.* at 221.

The Eviction Moratoria also do not fall into either of the "different case[s]" that the *Yee* court identified. 503 U.S. at 528. The Eviction Moratoria do not "compel a landowner over objection to rent his property." *Id.* Neither ordinance forces anyone to involuntarily enter into a landlord-tenant relationship. Non-renting landowners are not required to rent their property against their will (or do anything at all). And nothing in the ordinances requires a landlord to take on any new tenants. Rather, the ordinances only regulate a landlord's ability to evict someone who the landlord previously invited onto their property. 1-ER-190–91; 2-ER-221–22.

19

The Eviction Moratoria also do not require any landlord to "refrain in perpetuity from terminating a tenancy." *Yee*, 503 U.S. at 528. The Eviction Moratoria, when enacted, were time-limited to the pendency of the jurisdiction's Local Emergency. 2-ER-202 (Oakland moratorium: "This section shall remain in effect until the Local Emergency declared on March 9, 2020, has been terminated by the City Council."); 2-ER-221–22 (Alameda County moratorium: "Beginning on the effective date of this ordinance and expiring sixty (60) days after the expiration of the local health emergency . . . ."). The laws authorizing the Local Emergencies, in fact, required them to be temporary. *See* Cal. Gov. Code § 8630(d) ("The governing body shall proclaim the termination of the local emergency at the earliest possible date that conditions warrant."); Cal. Health & Safety Code § 101080 ("The board of supervisors, or city council, if applicable, . . .shall proclaim the termination of the local health emergency at the earliest possible date that conditions warrant the termination."); Oakland Municipal Code 8.50.050.C.3 ("The Local Emergency shall be terminated as soon as reasonably possible."), https://library.municode.com/ca/oakland/codes/code_of_ordinances?node Id=TIT8HESA_CH8.50EMSEORDICO_8.50.050EMSEOR (last visited

20

February 10, 2026). And Appellants conceded in the Second Amended Complaint that both of the Eviction Moratoria have expired and that landlords can evict tenants who do not satisfy their future rent payment obligations. 2-ER-82–84.

Appellants' argument that "regulations affecting tenancy are not immunized from constitutional claims alleging physical takings," Br. 36–41 (lowercased and unbolded), is a strawman. The district court did not hold that laws affecting tenancy can never be a physical taking, 1-ER-40–48 (SJ Order), and no Appellee has ever advocated for that position. *Yee* explicitly identified situations in which a landlord-tenant regulation could be a physical taking—when a landowner is forced to become a landlord over her objection and when the government bars a landlord from evicting a tenant in perpetuity. 503 U.S. at 528. But as explained above, the Eviction Moratoria did not do either of these things. Appellants' argument that the Eviction Moratoria are "temporary takings" and "partial takings," Br. 36–41, are based entirely on inapposite non-landlord-tenant caselaw that does not override the

21

binding *Yee* and *Ballinger* precedents.[4] Appellants' philosophical disagreements with *Yee* provide no basis to reverse the district court.

### 2. The Eviction Moratoria Did Not Physically Appropriate Appellants' Property

Appellants claim that the Eviction Moratoria physically appropriated their property and are takings pursuant to the Supreme Court's decision in *Cedar Point*. Br. 28–36. Appellants' argument appears to rest on the incorrect premise that *Yee* was abrogated *sub silentio* by the Supreme Court in *Cedar Point*. *Cedar Point* did no such thing. A physical appropriation means "*taking* as one's own." *Cedar Point*, 594 U.S. at 158. In *Cedar Point*, the Supreme Court held that a regulation requiring agricultural companies to allow union organizers to "take access" to the agricultural companies' properties for temporary periods was a *per se* physical taking. *Id.* at 144–46, 149–52. The Supreme Court

---

[4] The inapposite caselaw will be addressed in more detail in the next section. Appellants also challenge the district court's analysis of "economic use" because they claim it does not relate to physical takings. Br. 37–38. The district court's "economic use" analysis was in regards to whether the Eviction Moratoria were *per se* takings under *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992). 2-ER-44. Appellants do not contend that the district court's *Lucas* analysis was incorrect or that the district court's rejection of the physical takings claim was premised on its determination about economic use. Thus, this argument is also irrelevant to this Court's *per se* physical takings analysis.

explained that "[t]he access regulation appropriates a right to invade the growers' property and therefore constitutes a *per se* physical taking." *Id.* at 149. "The upshot of this line of precedent is that government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation." *Id.* at 152.

There is a critical distinction between the facts in *Cedar Point* and those in *Yee*—the union organizers in *Cedar Point* had never been invited onto the agricultural growers' properties. *See Yee*, 503 U.S. at 532 ("[I]t is the invitation . . . that makes the difference."). Thus, the union organizers were at all times 'interloper[s] with a government license." *Id.* This is the "line" that *Yee* explained separates landlord-tenant regulations from regulations that enact physical takings by requiring landowners to allow an uninvited interloper onto their property. *Id.* *Cedar Point* acknowledged this distinction—putting Appellants' suggestion (Br. 35) that the Eviction Moratoria "were also substantially more invasive than the regulation in *Cedar Point*" at odds with the Supreme Court's ruling. 594 U.S. at 149. ("The essential question . . . is whether the government has physically taken property for itself or

someone else—by whatever means—or has instead restricted a property owner's ability to use his own property."). Because the Eviction Moratoria solely regulated a landlord's relationship with pre-existing tenants (i.e., the "use" of the landlord's property), the Eviction Moratoria are controlled by *Yee*, not *Cedar Point*.

The other precedential physical takings cases Appellants cite, Br. 28–47, are similarly distinguishable. In each of these cases, governmental action required landowners to submit to an *uninvited* physical occupation of their property. None involved the regulation of voluntary access, let alone the regulation of a pre-existing landlord-tenant relationship. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 361–62 (2015) (regulation required growers to transfer raisins they produced to the government); *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 27–34 (2012) (U.S. Army Corp of Engineers authorized flooding of the petitioner's wildlife management area to benefit farmers); *Loretto*, 458 U.S. at 438–40 (ordinance allowed cable companies to place wires on landlords' property);[5] *Kaiser Aetna v. United States*, 444 U.S. 164, 178–

---

[5] The *Loretto* court made clear that the regulation at issue and the Court's holding related to a right provided to third parties, not tenants. 458 U.S. at 439–440.

80 (1979) (government required public right of access to a privately owned pond after a dredged channel linked the pond to navigable water, "result[ing] in an actual physical invasion"); *United States v. Causby*, 328 U.S. 256, 264–65 (1946) (government allowed airplanes to fly over private property).[6]

Appellants incorrectly argue that the Eviction Moratoria were *per se* physical takings because they "strip[] a private property owner of the

---

[6] The other Supreme Court cases Appellants cite in their physical takings sections, Br. 26–48, were not physical takings cases (and some were not even takings cases at all). *See Ala. Ass'n of Realtors v. Dep't of Health & Human Services*, 594 U.S. 758, 763–65 (2021) (analyzing the scope of the CDC's authority under § 361(a) of the Public Health Service Act) (addressed in *GHP*, 2024 WL 2795190, at *1 n.3); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 306–12, 321–32 (2002) (analyzing whether a three-year development moratorium was a regulatory taking); *Dep't of Hous. & Urb. Dev. v. Rucker*, 535 U.S. 125, 130 (analyzing whether the Anti-Drug Abuse Act allowed public housing authorities to terminate a lease when a household member or guest engaged in drug-related activity without the tenant's knowledge); *Palazzolo v. Rhode Island*, 533 U.S. 606, 617–30 (2001) (analyzing whether regulation barring a landowner from fillings wetlands and marsh was a regulatory taking); *Lucas*, 505 U.S. at 1020–32 (analyzing whether a coastal-zone construction ban was a regulatory taking); *First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty., Cal.*, 482 U.S. 304, 316–22 (1987) (considering whether a regulation that denied the petitioner the ability to build on their property constituted a taking); *Armstrong v. United States*, 364 U.S. 40, 46–49 (1960) (government's assertion of sovereign immunity prevented lienholders from asserting rights over property).

right to exclude." Br. 30 (citing *Cedar Point*, 594 U.S. at 149–50 and *Loretto*, 458 U.S. at 435). The Supreme Court has repeatedly held that mere limitations on the right to exclude are not categorical takings. The *Yee* court, in fact, rejected this exact argument: "Because they voluntarily open their property to occupation by others, petitioners cannot assert a per se right to compensation based on their inability to exclude particular individuals." 503 U.S. at 531. In *PruneYard Shopping Center v. Robins*, the Supreme Court ruled that a requirement permitting state-protected activities of free expression and petition at a shopping mall open to the public was not a taking. 447 U.S. 74, 82–86 (1980). The Supreme Court explained:

> It is true that one of the essential sticks in the bundle of property rights is the right to exclude others. And here there has literally been a "taking" of that right to the extent that the California Supreme Court has interpreted the State Constitution to entitle its citizens to exercise free expression and petition rights on shopping center property. But it is well established that "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense."

*Id.* at 82 (citation and footnote omitted). Here, the district court correctly held that a limitation on a right to exclude, on its own, does not result in a *per se* physical taking. 1-ER-42 ("[T]here is no blackline rule that every law that interferes with a right to exclude is automatically a per se

26

taking."). To the extent Appellants argue that *Cedar Point* overruled *Yee* or *PruneYard* on these principles, they are wrong; *Cedar Point* cited both cases in its discussion of takings law precedent. 594 U.S. at 149, 156–57.

The non-binding and incorrect decisions in *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022), and *Darby Development Co. v. United States*, 112 F.4th 1017, 1037 (Fed. Cir. 2024), do not alter this analysis. In *Walz*, the Eighth Circuit held *Cedar Point*, not *Yee*, applied to an eviction moratorium and found that the appellant had stated a claim for a *per se* physical taking. 30 F.4th at 733. The *Walz* court distinguished *Yee* because "[t]he landlords in *Yee* sought to exclude future or incoming tenants rather than existing tenants." *Id*. But the Eighth Circuit's analysis was based on a mistaken reading of *Yee*:

> [T]he panel decision on the Takings Clause misreads the most analogous decision of the Supreme Court on the matter of per se takings. The panel thought the objecting landlords in [*Yee*] sought only "to exclude future or incoming tenants rather than existing tenants." The landlords in *Yee*, however, complained of their inability to evict "*tenants of mobilehomes presently in The Park*, as well as the successors in interest of such tenants."

*Heights Apts., LLC v. Walz*, 39 F.4th 479, 480 (8th Cir. 2022) (Colloton, J., dissenting from denial of rehearing en banc) (citations omitted); *see also Yee*, 503 U.S. at 525. This Court in *GHP*, citing Judge Colloton's

27

dissental, "decline[d] to follow" *Walz* because the Ninth Circuit is "bound by *Yee*." 2024 WL 2795190, at *1 n.2.

The Federal Circuit's *Darby* decision similarly—and improperly—held that an eviction moratorium's temporary limitation on a right to exclude non-paying tenants was a *per se* physical taking. 112 F.4th at 1034–35. Because the Ninth Circuit is "bound by *Yee*," this Court should similarly "decline to follow" *Darby*. *GHP*, 2024 WL 2795190, at *1 n.2. More broadly, *Darby*'s analysis of why *Cedar Point*, and not *Yee*, controls is in direct tension with this Court's analysis in *GHP*, *El Papel*, and *Bols* holding that *Yee*, and not *Cedar Point*, controls. 2024 WL 2795190, at *1; 2024 WL 208141, at *1; 2023 WL 7040314, at *2. These three decisions did not have an occasion to consider *Darby* because it post-dated them, but the logic of the decisions is a direct refutation of the *Darby* analysis.[7]

Appellants' arguments that "*Yee* does not apply," Br. 41–47 (lowercased and unbolded), simply rehash Appellants' positions about

---

[7] Appellants also point to a dissent from the Supreme Court's denial of certiorari of this Court's *GHP* decision. Br. 29. The *GHP* certiorari dissent distinguished *Yee* because "it was not 'an outright prohibition on evictions for nonpayment of rent.'" 145 U.S. at 2617. But as this Court explained in *Ballinger*, "legislative enactments 'regulating the economic relations of landlord and tenants are not per se takings.'" 24 F.4th at 1293 (quoting *Fla. Power Corp.*, 480 U.S. at 252).

*Cedar Point* and the limits of landlord-tenant takings law, and fail for

the reasons discussed above and in *GHP*, *El Papel*, and *Bols*.[8]

---

[8] As with their Supreme Court case law, Appellants' other appellate and district court case law supporting their physical takings arguments, Br. 28–47, are inapposite and irrelevant because none address physical takings in the context of the landlord-tenant relationship. *See Alford co-Tr. of Lionel D. Alford, Jr., & Tammy Nix Alford Revocable Tr. v. Walton Cnty.,* 159 F.4th 844, 854–60 (11th Cir. 2025) (analyzing whether a regulation restricting a landowners' access to a private beach was a physical taking); *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1025–37 (9th Cir. 2023) (analyzing whether the California State Bar has sovereign immunity); *Ladd v. United States*, 630 F.3d 1015, 1019–25 (Fed. Cir. 2010) (analyzing whether a Notice of Interim Trail Use or Abandonment issued by the Surface Transportation Board pursuant to the Trails Act was a taking of appellants' state law reversionary interest in property); *Hendler v. United States*, 175 F.3d 1374, 1378–83 (Fed. Cir. 1999) (analyzing compensation owed for a taking related to the EPA's entry onto land to install wells and monitor groundwater); *Colo. Springs Prod. Credit Ass'n v. Farm Credit Admin.*, 967 F.2d 648, 656–57 (D.C. Cir. 1992) (statute requiring production credit association to purchase stock in the Farm Credit System Financial Assistance Corporation was not a *per se* physical taking); *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986) (stating that the government's refusal to vacate office space in a building it had previously leased could be a taking); *Smith v. Royal Ins. Co.*, 111 F.2d 667, 670–71 (9th Cir. 1940) (analyzing whether the appellant had a leasehold interest in land or a mere license in a fire insurance case); *Sharritt v. Henry*, 2024 WL 4524501, at *11–12 (N.D. Ill. Oct. 18, 2024) (analyzing whether Illinois tax provisions and practices were unconstitutional takings); *Heydt v. United States*, 38 Fed. Cl. 286, 307–08 (1997) (analyzing whether the government's storage of property at the plaintiff's facility was a taking); *Eyherabide v. United States*, 345 F.2d 565, 569 (Ct. Cl. 1965) (actionable taking where the United States Navy viewed the plaintiff's property as part of the "greater range" of its Mojave Gunnery Range "B").

### 3. The Eviction Moratoria Did Not Prohibit the Eviction of Non-Tenants and Did Not Turn All Tenancies into "Life Estates"

Appellants incorrectly claim that the Eviction Moratoria went beyond regulation of the landlord-tenant relationship because they barred the eviction of individuals who Appellants had never invited onto their properties. *See, e.g.*, Br. 5–6, 32, 50 (discussing allegations that certain Appellants were prevented from evicting "Airbnb trespassers" due to Alamanda's eviction moratorium). The district court explained that the Eviction Moratoria "do not on their face allow 'squatters' to occupy rental units without paying rent" and found this distinction "critical" because "[t]he Supreme Court has held repeatedly that it is the invitation to allow a person to occupy a property that distinguishes per se takings from regulatory takings governed by the *Penn Central* factors." 1-ER-45.

Oakland' "Residential Eviction Moratorium" provides a defense to "any unlawful detainer action filed under Oakland Municipal Code 8.22.360A subsections (1)–(10)." 2-ER-191. Subsections (1)–(10) of Oakland Municipal Code 8.22.360A address evictions of "tenants." SER-24–27. The definition of "tenant" for purposes of 8.22.360A is explicitly

30

limited to people who are entitled to occupy property. SER-22. Moreover, California law defines "unlawful detainer" in relation to tenants. *See* Cal. Civ. Proc. Code § 1161 (titled "Unlawful detainer" defined) ("A tenant of real property, for a term less than life, or the executor or administrator of the tenant's estate heretofore qualified and now acting or hereafter to be qualified and act, is guilty of unlawful detainer . . . .").[9] A similar but distinct action, forcible detainer, addresses people who illegally take possession of property. *See* Cal. Civ. Proc. Code § 1160. The Oakland eviction moratorium only addresses unlawful detainers. 2-ER-191. [10]

The same is true of Alameda' County's "Moratorium on eviction during local health emergency." 2-ER-221–22; *accord id.* at 220 (stating that the purpose of the Alameda County eviction moratorium is to help

---

[9] *See also* Miller & Starr, 10 Cal. Real Est. § 34:199 (Thomson Reuters 4th ed.) ("Relationships that permit an unlawful detainer proceeding. As a general rule, an unlawful detainer action can only be prosecuted by an owner of land against a tenant of real property. This usually requires that a landlord bring the action against a tenant. However, the statute also permits an action for unlawful detainer by a sublessor against a sublessee; by an owner against an employee, agent, or licensee who occupies the owner's property, such as a resident manager; and by a cooperative against a stockholder who has an exclusive occupancy agreement. An unlawful detainer action also is available to recover possession from a licensee." (emphasis and footnotes omitted)).

[10] Appellants do not allege that they tried, and failed, to evict the "Airbnb trespassers" in an action for forcible detainer. *See* 2-ER-91–93.

31

tenants, homeowners, and mobilehome owners). The Alameda County eviction moratorium states that it "places a moratorium on all evictions from residential units." 2-ER-221–22. "Residential unit" is defined as a "structure or mobilehome" in which a "person or household pays rent to a landlord or mortgage payments to a lender." 2-ER-221. A trespasser does not pay rent. The provision further states that "No landlord or lender may evict a resident, or otherwise require a resident to vacate a residential unit . . . while this section is in effect." 2-ER-222. A "resident" is a "tenant" or "homeowner." 2-ER-221. Tenant is defined as: "residential tenant, subtenant, lessee, sublessee, or any other person entitled by written or oral rental agreement, or by sufferance, to use or occupancy of a residential unit." *Id.* A trespasser is none of those things. The provision also states that "Violation of this chapter is an affirmative defense to any unlawful detainer action or other proceeding to recover possession of a residential unit." 2-ER-222.[11] There is no mention anywhere of forcible detainers.

---

[11] While unlawful detainer is the most common, there are other procedures that can be used to evict tenants, including ejectment and quiet title. *See* B.E. Witkin, 12 Witkin, Summary 11th Real Prop §§ 733, 776 (Thomson Reuter 2022).

Appellants also erroneously analogize invited tenants who allegedly breached their lease terns (e.g. by non-payment of rent) to the "interlopers" in the physical takings cases. Br. 33. Under California law, a tenant who is alleged to have breached a lease remains a tenant until an unlawful detainer action results in a judgment for the landlord. *See Four Seas Inv. Corp. v. Int'l Hotel Tenants' Assn.*, 146 Cal. Rptr. 531, 535 (Ct. App. 1978) ("It is not true that a tenant who unlawfully detains becomes a mere trespasser: to the contrary, a tenant is entitled to peaceful possession until the detainer action culminates in a judgment of forfeiture."). Here, the Eviction Moratoria provided defenses to unlawful detainer actions while the Eviction Moratoria remained in effect. 2-ER-191 (Oakland eviction moratorium); 2-ER-222 (Alameda County eviction moratorium). Thus, Appellants' existing tenants did not lose their status as tenants during the pendency of the Eviction Moratoria, even if Appellants wanted to evict them.

The cases cited in an amicus brief supporting Appellants (Dkt. 15.2) do not compel a different conclusion. The brief relies extensively on stale nineteenth century case law, out-of-jurisdiction authority, and irrelevant references, including a citation to Judge Judy. The few more modern

33

California and Ninth Circuit cases support that Appellants' tenants remained tenants during the pendency of the Eviction Moratoria. *See, e.g.*, *Birkenfeld v. City of Berkeley*, 17 Cal. 3d 129, 147–51 (1976) (describing an unlawful detainer action as being between a landlord and a tenant); *Fragomeno v. Ins. Co. of the W.*, 255 Cal. Rptr. 111 (Ct. App. 1989) (same); *Davidson v. Quinn*, 138 Cal. App. 3d Supp. 9, 11–12 (App. Dep't Super Ct. 1982) (same); *In re Windmill Farms, Inc.*, 841 F.2d 1467, 1471 (9th Cir. 1988) (same).[12]

Appellants meritlessly claim that the Eviction Moratoria "transform[ed] all leases into life estates." Br. 44–45. Not so. The Eviction Moratoria have expired, and Appellants can evict tenants who do not pay their rent or otherwise breach their leases going forward. 2-ER-82–84. Nor were the Eviction Moratoria "the equivalent of the taking of an easement or a tenancy-in-common," Br. 33–34, because they did not give the government or any other uninvited guest access to Appellants' property, and instead only regulated a landlord-tenant relationship into

---

[12] The amicus brief incorrectly asserts that *Western Un. Tel. Co. v. Hansen Rowland Corp.*, 166 F.2d 258 (9th Cir. 1948), describes California substantive law. Dkt. 15.2 at 2. *Hansen*, an appeal from the Western District of Washington, applied Washington substantive law.

which Appellants voluntarily entered without any governmental coercion.

### 4. Allowing Appellants' Physical Takings Claims to Proceed Would Undercut the Government's Ability to Regulate Housing and Respond to Emergencies.

Appellants attempt to portray their physical takings arguments as a simple extension of the Supreme Court's takings jurisprudence in cases like *Cedar Point*. They are not. A ruling in Appellants' favor on their physical takings claim ruling would be a sea change in the law. Indeed, the constitutionality of myriad commonplace housing regulations that limit a landowner's ability to immediately evict tenants would be called into question, including:

- Cal. Civ. Proc. Code § 1161(2) & (3): Landlord required to give a tenant three days' notice of nonpayment of rent or failure to perform lease conditions or covenants before filing an unlawful detainer action.

- Cal. Civ. Code § 1946.1(c): Landlord required to give 30-days' notice of eviction for month-to-month lease where tenant has lived on the property for less than a year.

- Cal. Civ. Code § 1946.1(b): Landlord required to give 30-days' notice of eviction for month-to-month lease where tenant has lived on the property for more than a year.

- Cal. Civ. Code § 1954.535: "Where an owner terminates or fails to renew a contract or recorded agreement with a governmental agency that provides for rent limitations to a qualified tenant,

35

the tenant or tenants who were the beneficiaries of the contract or recorded agreement shall be given at least 90 days' written notice of the effective date of the termination[.]"

- Cal. Gov. Code § 7060.4(b): An eviction under the Ellis Act (when a landowner wants to take rental property off the market) requires one-year's notice if the tenant is over 62.

- Oakland Mun. Code § 8.22.360(A)(2)(c): If a tenant is being evicted for exceeding the limits of occupants in a rental unit, the tenant has 17 days (14 days plus the 3-day notice period under Cal. Civ. Proc. Code § 1161(3)) to cure the violation before being evicted.

Tellingly, Appellants do not explain how the sweeping relief they seek is justified under a takings regime that has repeatedly reaffirmed the government's "broad power to regulate housing conditions in general and the landlord-tenant relationship" without needing to pay compensation. *Ballinger*, 24 F.4th at 1292 (quoting *Loretto*, 458 U.S. at 440).

Appellants' rewriting of takings law would also impermissibly harm the government's ability to adjust housing regulations to respond to emergencies. In *Block*, the Supreme Court considered legislation in the District of Columbia that prohibited evictions for two years due to the "emergencies growing out of" World War I, with the exception of owner move-ins, which were allowed with thirty-days' notice. 256 U.S. at 153–54. The Supreme Court held that this legislation was not a taking

36

requiring just compensation. Stating that "[h]ousing is a necessary of life," the Court explained that a "public exigency will justify the legislature in restricting property rights in land to a certain extent without compensation." *Id.* at 155–157. The legislation at issue, designed to address a temporary public housing and health crisis arising from World War I, was deemed to be an appropriate exercise of that power. *Id.* at 157 ("A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change."). The same is true here and authorized Oakland and Alameda County to implement temporary restrictions in response to the COVID-19 pandemic without thereby working a taking. *See, e.g.*, *Gallo*, 2023 WL 7552703, at \*6 (analogizing a COVID-19 eviction moratorium to *Block*). Appellants do not mention, let alone address, the controlling *Block* decision.

### B. Appellants Failed to Allege that the Eviction Moratoria are Regulatory Takings under *Penn Central*

The district court also correctly dismissed Appellants' regulatory takings claims. A regulation is only a taking if it goes "too far." *See Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922). "[O]nly the most extreme

regulations can constitute takings." *First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty., Cal.*, 482 U.S. 304, 330 (1987).

Courts consider regulatory takings claims under the *Penn Central* test. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537–39 (2005). The *Penn Central* factors are "[1] the regulation's economic impact on the claimant, [2] the extent to which the regulation interferes with distinct investment-backed expectations, and [3] the character of the government action." *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018) (quoting *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013)).

Here, Appellants fail to sufficiently allege <u>any</u> *Penn Central* factor, let alone all three, despite receiving numerous opportunities to amend their deficient pleadings. *See Rancho de Calistoga*, 800 F.3d at 1090–91 (granting motion to dismiss regulatory takings claim for failure to allege *Penn Central* factors).

### 1. Appellants Fail to Allege a Substantial Diminution of their Property Values (*Penn Central* Factor #1)

The first *Penn Central* factor is "the challenged regulation's economic impact on the property owner." *Bridge Aina Le'a*, 950 F.3d at 630. The economic impact of a regulation is determined by "compar[ing]

the value that has been taken from the property with the value that remains in the property." *Colony Cove*, 888 F.3d at 450 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)). "Although *Colony Cove* considered the economic impact of an alleged taking after a jury trial, its formula for determining economic impact is binding at all stages of the litigation process." *GHP*, 2024 WL 2795190, at *2.

The alleged diminution in value must be "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Colony Cove*, 888 F.3d at 451 (quoting *Lingle*, 544 U.S. at 539). This is an extremely high bar. In *MHC*, this Court held that an 81% diminution in value was insufficient to establish a taking, and noted that diminutions-in-value of even 92.5% would not be enough. 714 F.3d at 1127 (citing *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915)). And in *Colony Cove*, this Court stated that it is "aware of no case in which a court has found a taking where diminution in value was less than 50 percent." 888 F.3d at 451 (quoting *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011)).

39

The district court correctly held that Appellants "do not plausibly plead economic impact." I-ER-10–11. This alone dooms Appellants' regulatory takings claims. *See GHP*, 2024 WL 2795190, at *2 (affirming dismissal of regulatory takings claim for COVID-19 eviction moratorium because "the Landlords failed to allege the diminution in property values they suffered as a result of the eviction moratorium").

*First*, Appellants do not allege facts that show a diminution *attributable* to the Eviction Moratoria. In *Bridge Aina Le'a*, this Court rejected the plaintiff's asserted diminution because it did not take into account the "duration of the restriction," which is "one of the important factors that a court must consider in the appraisal of a regulatory takings claim." 950 F. 3d at 632 (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002)). *Bridge Aina Le'a* involved a decision by the State of Hawaii Land Use Commission to reclassify land that was subsequently vacated by a Hawaii circuit court. *Id.* at 618–23. The plaintiff asserted that the land "suffered an 83.4% diminution in fair market value" by purporting to compare the value of the land before and after the Land Use Commission's decision. *Id.* at 631–32. The Ninth Circuit held that this "substantially overstate[d] the relevant diminution

40

in value [plaintiff] could have suffered for the purposes of weighing this factor" because "[w]hen we account for the reversion's temporary duration, the resulting relevant diminution is much smaller than 83.4%." *Id.* at 632. This Court noted that the purported diminution in value dropped significantly when comparing (a) a proposed rate of return over the temporary duration of the reclassification to (b) the pre-reclassification valuation. *Id.*

Appellants' diminution-in-value calculations do not take the duration of the Eviction Moratoria into account. Appellants used a "gross rent multiplier" ("GRM") to calculate the purported diminutions-in-value alleged in the Second Amended Complaint. *See, e.g.*, 2-ER-106 (SAC ¶ 123).[13] A GRM is "the ratio of an investment property's market value to the annual gross rent it generates." J.P. Morgan, What is the gross rent multiplier? (J.P. Morgan Insights Oct. 15, 2024), https://www.jpmorgan.com/insights/real-estate/commercial-term-lending/what-

---

[13] The Second Amended Complaint fails to include diminution-in-valuation allegations *at all* for many of Appellants' properties. *See, e.g.*, 2-ER-83–93 (SAC ¶¶ 85–91) (failing to include valuation allegations for Appellants Williams, Vogel, Rogers, Loeb, Watson-Baker, and Kirk); *see also id.* at 105–06, 112–19 (SAC ¶¶ 120, 122, 133–46). This failure is reason alone to affirm the dismissal of these Appellants' takings claims.

41

is-a-gross-rent-multiplier-grm (last visited February 10, 2026). The GRM "estimate[s] the number of years required for the property to break even and become profitable." Gross Rent Multiplier (WallStreetPrep Feb. 20, 2024), https://www.wallstreetprep.com/knowledge/gross-rent-multiplier-grm/ (last visited Feb. 10, 2026).[14] Appellants calculated the purported diminutions using a GRM of 14, *see, e.g.*, 2-ER-106 (SAC ¶ 123), which assumes that the Eviction Moratorias' effects on rental income would remain in place and unchanged for at least 14 years. *See* Will Kenton, Gross Income Multiplier (GIM): Definitions, Uses, and Calculation (Investopedia Aug. 24, 2024), https://www.investopedia.com/terms/g/gross-income-multiplier.asp (last visited February 10, 2026) (referring to this methodology as a "crude valuation technique" because changes in revenue "are not explicitly considered"). But Appellants admitted that the Eviction Moratoria only lasted for 3 years—not 14—and that Appellants can evict tenants for failure to pay rent going forward. 2-ER-81–83 (SAC ¶¶ 75–80).

---

[14] For example, a property valued at $500,000 with $25,000 in annual rental income would have a GRM of 20, meaning it would take 20 years for the annual rental income of $25,000 to cover the $500,000 purchase value.

Appellants' allegations, even if taken as true, represent at most the diminution in value that would have taken place if (counterfactually) the Eviction Moratoria were still in effect. See *Bridge Aina Le'a*, 950 F.3d at 631 ("[I]t is not proper to measure economic impact based on a 'hypothetical economic result' that assumes a state of affairs that did not exist."). Appellants conceded this in the district court, *see* I-ER-10–11 ("[P]laintiffs did not respond to the defendants' arguments that their gross-rent multiplier fails to account for the temporary nature of the moratoria, thus conceding the argument"), and do not address their use of GRM at all in their opening brief. Appellants have therefore doubly waived any ability to dispute that their diminution-in-value allegations fail to take into account the "duration of the restriction." *See Martinez v. High*, 91 F.4th 1022, 1028 n.4 (9th Cir. 2024) (declining to consider argument not made in the district court); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[A]rguments not raised by a party in its opening brief are deemed waived."). Appellants' approach to calculating diminution would allow landlords to collect post-moratoria rents from their tenants (and seek eviction for non-payment) while simultaneously claiming that the valuations of their properties are permanently

43

hindered by the now-expired Eviction Moratoria. This Court does not allow such double-counting.

Indeed, Appellants' diminution allegations are implausible on their face. *See Iqbal*, 556 U.S. 681 (factual allegations must be "plausible"). For example, the Second Amended Complaint alleges that the "overall estimated property value" for Appellant 1130 30th Street, LP's multi-unit residential building "declined from $810,380 at the onset of the COVID-19 pandemic in March 2020 to -$159,723.08 in June 2023 – i.e., a -119.7% decline in value in a three-year period." 2-ER-104–05 (SAC ¶ 119). But judicially noticeable facts show that this same property sold for *$1,217,500* in 2024. 1-ER-11 (footnote 26). The district court, unsurprisingly, stated that "[t]he numbers do not make sense" and noted that Appellants "did not dispute this." *Id.*; see *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit."). Appellants again ignore this issue on appeal. These implausible allegations underscore the impropriety of Appellants' diminution calculations.

44

*Second*, the "declaration of an expert real estate appraiser" that Appellants attached to their Second Amended Complaint does not satisfy the Rule 8 pleading standard. Appellants cannot use "expert" opinions to circumvent Rule 8's prohibition on conclusory factual allegations. *See Iqbal*, 556 U.S. at 681 (conclusory allegations are "not entitled to be assumed true"). For example, in *DeMarco v. DepoTech Corp.*, the Southern District of California struck an expert affidavit attached to a complaint but permitted "the expert's *nonconclusory assertions* within specific paragraphs in the complaint." 149 F. Supp. 2d 1212, 1221–22 (S.D. Cal. 2001) (emphasis added). Similarly, in *In re Under Armour Securities Litigation*, the District of Maryland struck expert reports attached to a complaint but considered "factual allegations . . . that were derived from the expert reports," explaining that "mere conclusory statements" and "opinions" are distinguished from "factual allegations." 409 F. Supp. 3d 446, 454–55 (D. Md. 2019). Appellants' assertion that the attachment of the Marchitelli Declaration "by itself, satisfied the necessary pleadings standard," Br. 51, is simply wrong.[15]

---

[15] Appellants cite *FFV Coyote LLC v. City of San Jose*, 637 F. Supp. 3d 761, 770 (N.D. Cal. 2022), Br. 51, but that case does not state that the expert report alone was sufficient to allege economic impact. Rather, the

The "Marchitelli Declaration" and the related allegations in the Second Amended Complaint, 2-ER-121–22, 134–39 (SAC ¶¶ 153–56), are wholly conclusory and insufficient to allege economic impact. Marchitelli opines that the Eviction Moratoria raised the capitalization rates for properties in Oakland and Alameda County "by at least 200 to 300 basis points." 2-ER-121–22, 138 (SAC ¶ 153). But this is solely based on Marchitelli's say so. He offers no explanation for how chose his basis point numbers beyond vague assertions about risk profiles and his "knowledge and expertise," he cites to no data showing that actual real estate prices in Oakland or Alameda County in fact reflect a 200 to 300 basis point capitalization rate increase, he provides no analysis of the real estate data for any specific property at issue in this lawsuit, and he identifies no comparator situations supporting that a 200 to 300 basis point

expert report was just one of several factors that the court considered (and referenced in a single sentence, without further analysis). Appellants' other cited cases have nothing to do with pleading standards. *See Redevelopment Agency v. Thrifty Oil Co.*, 4 Cal. App. 4th 469, 476 (1992) (addressing whether the government needed to put in expert goodwill valuation evidence or whether it was sufficient to attack the credibility of the landowner's evidence); *San Bernardino Cnty. Flood Control Dist. v. Sweet*, 255 Cal. App. 2d 889, 898 (1967) (discussing when a witness who is not a real estate appraiser or broker can opine on fair market value).

increase likely occurred. Marchitelli's opinion, in fact, is in direct tension with the significant post-Eviction Moratoria *increase* in the value of Appellant 1130 30th Street, LP's property discussed above. Appellants appear to recognize the fatal weakness of the Marchitelli Declaration, pointing to his statement that "[t]he exact economic loss will be determined by an appraisal report to be prepared in the future." Br. 52 (quoting 2-ER-139). Regardless of whether Marchitelli could, at some future point, provide non-conclusory assertions, he has not done so now.

In addition, the Marchitelli Declaration's reliance on speculative future uncertainty about "do[ing] business" in Oakland and Alameda County cannot be squared with binding Supreme Court and Ninth Circuit precedent. The *Bridge Aina Le'a* court explained that "[m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership. They cannot be considered as a taking in the constitutional sense." 950 F.3d at 631 (quoting *Tahoe-Sierra*, 535 U.S. at 332). If the rule were otherwise, any temporary regulatory takings claim could be transformed into a permanent takings claim simply by alleging an ongoing fear that similar regulatory action could be taken in the future. This is not consistent with

47

the government's "broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Ballinger*, 24 F.4th at 1292 (quoting *Loretto*, 458 U.S. at 440).

*Third*, Appellants' alleged economic impacts are not substantial enough to state a regulatory takings claim. As discussed above, this Court has repeatedly held that the economic impact required for a regulatory taking is enormous and even diminutions of 75% to 92.5% are insufficient. *See Colony Cove*, 888 F.3d at 451; *MHC*, 714 F.3d at 1127–28. The district court explained that only nine of the more than fifty Appellants alleged a property value decline of over 50%, that only three of those nine—with diminutions ranging from 52.99% to 55.16%—arguably did not use the improper GRM methodology,[16] and that the Marchitelli Declaration estimated a decline of 31.6%. I-ER-10–11. The district court correctly held that these economic impacts are insufficient

---

[16] Appellants explicitly stated that they used GRM for certain properties, but are silent on the specific methodology for others. *Compare, e.g.*, I-ER-112 (SAC ¶ 132), *with* 2-ER-104 (SAC ¶ 118). Appellants have never disputed that they used GRM for diminution calculations for all properties and have never identified any alternative methodology they used.

to establish a regulatory taking even if taken as true. I-ER-11.

Appellants incorrectly argue that the district court could not consider the quantum of economic impact at the motion-to-dismiss stage. Br. 52–56. In *Rancho de Calistoga*, this Court considered the amount of economic impact in affirming a motion to dismiss: "Rancho claims diminution in market value (from $16,580,000 to $11,850,000 under rent control, or 28.53%), as well as lost income. This economic impact is an inevitable consequence of the rent-control scheme but not an unconstitutional one." 800 F.3d at 1090. Other circuits similarly consider the quantum of economic impact when assessing the sufficiency of a regulatory takings claim. *See, e.g.*, *Blackburn v. Dare Cnty.*, 58 F.4th 807, 812–13 (4th Cir. 2023) (stating that "[i]n this Circuit, prevailing on this factor requires that a plaintiff allege that the challenged regulation caused a *substantial* diminution in value to the regulated property"); *Nowlin v. Pritzker*, 34 F.4th 629, 634 (7th Cir. 2022) (holding regulatory takings claim against a COVID-19 shelter-in-place order insufficiently alleged, including because the plaintiffs failed to allege "How much money did they lose?"). Appellants argue that the district court improperly relied on *Colony Cove*, Br. 55–56, but as explained above

49

*Colony Cove*'s "formula for determining economic impact is binding at all stages." *GHP*, 2024 WL 2795190, at \*2.

Appellants' cited caselaw, Br. 47–56, address general principles of takings law and inapposite factual situations. None relieves Appellants of their burden to plausibly allege facts supporting a substantial economic impact to their property. *See Murr v. Wisconsin*, 582 U.S. 383, 394, 405 (2017) (discussing general takings principles and noting, in the context of economic impact, that "[t]he expert appraisal relied upon by the state courts refutes any claim that the economic impact of the regulation is severe"); *Ark. Game & Fish*, 568 U.S. at 31 (discussing the myriad ways in which a physical or regulatory taking could occur in the context of a temporary flooding case); *Tahoe-Sierra*, 535 U.S. at 326–27 (discussing general takings principles); *Palazzolo,* 533 U.S. at 634–36 (Connor, J., concurring) (describing general *Penn Central* analytic principles); *E. Enterprises v. Apfel*, 524 U.S. 498, 523 (1998) (discussing general takings principles in the context of the Coal Industry Retiree Health Benefit Act, and noting that "economic impact" is of "particular significance")*; Hodel v. Irving*, 481 U.S. 704, 717 (1987) (finding a taking in the extreme case where a regulation caused the "complete abolition of

both the descent and devise of a particular class of property") (addressed in *GHP*, 2024 WL 2795190, at \*2); *Cienega Gardens v. United States*, 331 F.3d 1319, 1340–43 (Fed. Cir. 2003) (stating that the plaintiff must show "serious financial loss" and finding that a 96% loss, established after a damages trial, to be sufficient for the first *Penn Central* factor); *Yancey v. United States*, 915 F.2d 1534, 1539–41 (Fed. Cir. 1990) (not disturbing the district court's factual finding that a seventy-seven percent reduction of value of a turkey flock resulting from a quarantine was sufficient to establish economic impact).

*Finally*, Appellants' allegations about other forms of economic harm, such as lost rental income and damage to rental units, are insufficient to show economic impact. *See Colony Cove*, 888 F.3d at 451 ("[The mere loss of some income because of regulation does not itself establish a taking."); *accord GHP*, 2024 WL 2795190, at \*2. Appellants' reliance on the Eighth Circuit's non-binding *Walz* decision, Br. 54–55, is therefore misplaced. The *Walz* court stated that the plaintiff's allegations that the moratorium "deprived it of receiving rental income and managing its property according to the leases' terms and Minnesota law" sufficiently alleged economic impact. 30 F.4th at 734. Regardless of

51

whether that is an accurate statement of Eighth Circuit law, it is not consistent with the binding Ninth Circuit *Colony Cove* precedent.

### 2. It is Objectively Unreasonable to Expect the Government to Not Respond to a Public Health and Housing Emergency (*Penn Central* Factor #2)

"[A] purported distinct investment-backed expectation must be objectively reasonable." *Colony Cove*, 888 F.3d at 452. "What is relevant and important in judging reasonable expectations is the regulatory environment at the time of the acquisition of the property" because "those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Bridge Aina Le'a*, 950 F.3d at 634 (cleaned up) (quoting *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1345 (Fed. Cir. 2018) and *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.,* 508 U.S. 602, 645–46 (1993)).

Appellants incorrectly allege that the Eviction Moratoria hindered their "objective reasonable investment-backed expectations" because they "relied on . . . longstanding property law principles that . . . a housing provider renter relationship could only be maintained when there was payment of rent in exchange for possession and so long as the renter

52

complied with the material terms of the lease." 2-ER-119 (SAC ¶ 148). As a threshold matter, Appellants mischaracterize the Eviction Moratoria. Neither moratorium waived nor forgave rent. 2-ER-193 (Oakland Eviction Moratorium § 9); 2-ER-225 (Alameda Eviction Moratorium § 6.120.090(A)). The Eviction Moratoria solely prohibited eviction as a remedy for non-payment. Landlords retain the right to file civil actions for non-payment of rent that accrued during the pandemic. 2-ER-193 (Oakland Eviction Moratorium § 7); 2-ER-225 (Alameda Eviction Moratorium § 6.120.090(D)).

More importantly, Appellants ignore that the landlord-tenant relationship is highly regulated at the state and local levels with numerous limitations on a landlord's ability to charge rent and to enforce lease terms. 2-ER-11 (explaining that Appellants failed to sufficiently allege this *Penn Central* factor because "Property owners operate in a regulated field and cannot reasonably expect freedom from landlord-tenant regulation"). Long before the pandemic, state and local laws dictated when and for what reasons a landlord could evict a tenant, as well as the timing of evictions and changes in rent. *See, e.g.*, Cal. Civ. Code, § 827 (Requires either a 30 or 90 day notice to change rent for all

properties in California); Cal. Code Civ. Proc., § 1161 (requirements for at-fault eviction notices); Cal. Gov. Code, § 7060-7060.7 (The Ellis Act); Cal. Health & Saf. Code § 17920.3 (list of habitability violations); Alameda Cty. Code § 3.70.010 et seq. (Alameda County Just Cause Ordinance); Oakland Mun. Code § 8.22.300 *et seq.* (Just Cause for Eviction Ordinance); Oakland Mun. Code, § 8.22.800 *et seq.* (Uniform Relocation Ordinance - setting payment amounts for nofault evictions). And as discussed throughout, there is extensive caselaw on the landlord-tenant relationship in the takings context. *See Rancho de Calistoga*, 800 F.3d at 1090 ("Because Rancho cannot reasonably expect that its property will be continually unencumbered by government regulation, this factor also favors the City.").

Appellants claim that landlords would not have expected a moratorium on evictions when they purchased their property, Br. 56–61, but the government's ability to restrict a landlord's property rights in an emergency is well-established. *See Block*, 256 U.S. at 155–56 (responding to a public health crisis arising from World War I). Appellants cannot claim surprise that the government would take action in the heavily-regulated landlord-tenant industry in response to the COVID-19

54

pandemic. *See, e.g.*, *Apt. Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 913 (9th Cir. 2021) ("We need not decide whether the eviction moratorium is a substantial impairment of contractual relations because even assuming it is, given the challenges that COVID-19 presents, the moratorium's provisions constitute an appropriate and reasonable way to advance a significant and legitimate public purpose." (internal quotation marks and citation omitted)).[17] It is not "objectively reasonable," *Colony Cove*, 888 F.3d at 452, for Appellants to expect that the landlord-tenant relationship would not be "buttressed by subsequent amendments" providing protections to tenants in the event of a crisis. *See Bridge Aina Le'a*, 950 F.3d at 635.

---

[17] Cases involving a change in regulatory strategy, Br. 60–61, are distinguishable because Oakland's and Alameda County's Eviction Moratoria were a response to a public health crisis, not a new regulatory modality. *See Cienega Gardens*, 331 F.3d at 1349–51 (not reasonably foreseeable that Congress would discourage participation in a program Congress created); *Bordelon v. Baldwin Cnty., Ala.*, 2022 WL 16543269, at *24 (S.D. Ala. Oct. 28, 2022) (a change in regulatory interpretation and revocation of land use certificates and building permits not reasonably foreseeable); *Vesta Fire Ins. Corp. v. State of Fla.*, 141 F.3d 1427, 1432 (11th Cir. 1998) (efforts by state to shore up insurance industry by prohibiting insurers from withdrawing was not reasonably foreseeable). Appellants also cite *Lindsey v. Normet*, 405 U.S. 56 (1972), Br. 59, but that is not a regulatory takings case, and the *Lindsey* court explicitly noted that "the definition of landlord-tenant relationships are legislative, not judicial, functions." 405 U.S. at 74.

### 3. The Eviction Moratoria Were Public Programs that Did Not Specifically Target Appellants (*Penn Central* Factor #3)

"[T]he character of the governmental action—for instance whether it amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good—may be relevant in discerning whether a taking has occurred." *Bridge Aina Le'a*, 950 F.3d at 635–36 (quoting *Lingle*, 544 U.S. at 539).

Here, as the district court held, Appellants' own allegations illustrate that the ordinances were a "public program adjusting the benefits and burdens of economic life to promote the common good." 2-ER-12. In response to a once-in-a-century pandemic that severely impacted tenants' health and finances, Oakland and Alameda County instituted protections to prevent tenants from eviction during the pendency of the emergency. 2-ER-78–83 (SAC ¶¶ 69–80). The Eviction Moratoria were phased out once the emergency subsided. 2-ER-81–83 (SAC ¶¶ 78, 80). Oakland, Alameda County, and the State all operated rental relief programs that provided assistance to landlords affected by the pandemic. 2-ER-83 (SAC ¶ 82). Appellants do not allege that any

56

single landlord or group of landlords were targeted or singled out. *See Bridge Aina Le'a*, 950 F.3d at 636 ("For one, we recognize that government action that singles out a landowner from similarly situated landowners raises the specter of a taking. The concentrated effect of the reversion here, however, was reflective of the confines of a generally applicable Hawaii law land use reclassification procedure. We cannot find in this generally applicable scheme that this factor weighed in Bridge's favor." (citations omitted)).

Courts across the country have repeatedly upheld COVID-19 eviction moratoria as precisely the type of programs contemplated by the third *Penn Central* factor. *See, e.g.*, *Elmsford*, 469 F. Supp. 3d at 168 (governments can constitutionally "in times of emergency or otherwise, reallocate economic hardships between private parties, including landlords and their tenants, without violating the Takings Clause."); *Auracle Homes*, 478 F. Supp.3d at 223 ("[T]he character of the governmental action also weighs against a finding that Plaintiffs have suffered a regulatory taking[.]"); *S. Cal. Rental Hous. Ass'n*, 2021 WL 3171919, at *9 ("Regulations which originate from public programs designed to promote the common good must balance economic benefits

57

and burdens, and generally do not violate the Takings Clause.").

Appellants do not seriously dispute any of this. Instead, they argue that they were economically burdened by the Eviction Moratoria. Br. 61–64. This conflates the first and third *Penn Central* factors—the first factor looks at the economic impact on the property owner, whereas the third looks at the nature of the governmental program and the distribution of the burden. *See Bridge Aina Le'a*, 950 F.3d 630–33, 635–36. Appellants also incorrectly claim that analyzing "whether the regulation 'merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good' is the equivalent of the 'substantially advances' test that was abrogated by the Supreme Court in *Lingle*." Br. 64. But the quoted language Appellants attack is fully consistent with *Lingle*; in fact, it is *Lingle*'s own description of the appropriate analysis. 544 U.S. at 539.[18]

---

[18] The "substantially advances" test found a regulatory taking if a regulation did not substantially advance legitimate state interests. *Lingle*, 544 U.S. at 540. *S. Grande View Dev. Co., Inc. v. City of Alabaster, Ala.*, 1 F.4th 1299, 1311 (11th Cir. 2021), and *CCA Assocs. v. United States*, 91 Fed. Cl. 580, 602 (2010), which Appellants cite, Br. 62–63, are cases applying *Lingle* to prior circuit law (*S. Grande*) and a prior decision (*CCA*).

### C. The District Court Did Not Apply a "Heightened Pleading Standard" to Plaintiffs' Takings Claims

Appellants incorrectly claim that the district court "demand[ed] that the Owners meet an improper heightened pleading standard." Br. 25. The district court expressly applied the appropriate procedural standards at each stage of the case—Rule 56 for Appellants' motion for summary judgment on the physical takings claims, and Rule 8 for the motions to dismiss the First and Second Amended Complaints. I-ER-8–9, 17–19, 36–37.

The district court's analysis was nothing like the "heightened standards" cases Appellants cite. Br. 25–28. *See Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (rejecting requirement that a complaint in a civil rights suit expressly reference § 1983); *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510–11 (2002) (rejecting requirement that a plaintiff plead a prima facie case of discrimination in Title VII cases because that is an evidentiary standard); *Crawford-El v. Britton*, 523 U.S. 574, 597–601 (1998) (rejecting requirement of clear and convincing evidence of intent to survive summary judgment in a § 1983 case); *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164–69 (1993) (holding that Rule 9(b)-like specificity was not

59

required in municipal liability § 1983 cases); *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002) (rejecting specificity requirements in constitutional tort cases).[19]

The district court did not require that Appellants plead any claim with specificity or meet any specific evidentiary burden. Appellants claim that the district court's assessment of the quantum of economic impact constituted a heightened pleading standard, Br. 53–54, but the district court only required Appellants to plead sufficient information for the district court to assess whether the diminutions-in-value, if taken as true, plausibly constituted a *Penn Central* regulatory taking. As explained above, this was fully consistent with Ninth Circuit practice. Appellants do not identify any other "heightened pleading standard" that the district court purportedly applied.

## CONCLUSION

The Court should AFFIRM the district court's August 29, 2025 Amended Judgment (I-ER-13–14).

---

[19] The other cases Appellants cite in the "heightened pleading standards" section describe generic rules for assessing the sufficiency of a complaint at the motion-to-dismiss stage.

Dated:  February 10, 2026        SUSMAN GODFREY L.L.P.

By:   */s/ Nicholas N. Spear*
      Marc Seltzer
      Krysta K. Pachman
      Glenn C. Bridgman
      Nicholas N. Spear
      SUSMAN GODFREY L.L.P.
      1900 Avenue of the Stars, Suite 1400
      Los Angeles, California 90067-6029
      Telephone: (310) 789-3100
      Facsimile: (310) 789-3150
      mseltzer@susmangodfrey.com
      kpachman@susmangodfrey.com
      gbridgman@susmangodfrey.com
      nspear@susmangodfrey.com

      *Attorneys for Intervenor – Defendant-*
      *Appellee Alliance of Californians for*
      *Community Empowerment Action*

## CERTIFICATE OF COMPLIANCE

9th Cir. Case No: 25-6142

I am the attorney for Appellee Alliance of Californians for Community Empowerment Action.

**This brief contains 12,558 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;

    [ ] a party or parties are filing a single brief in response to multiple briefs; or

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32- 2(a).

**Signature** /s/ *Nicholas N. Spear*    **Date** February 10, 2026