No. 25-6142

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

LANDLORDS AND PROPERTY MANAGEMENT COMPANIES IN ALAMEDA COUNTY,
*Plaintiffs-Appellants*,

v.

COUNTY OF ALAMEDA, ET AL.,
*Defendants-Respondents*,

ALLIANCE OF CALIFORNIANS FOR COMMUNITY EMPOWERMENT ACTION,
*Intervenor-Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:22-cv-01274
Hon. Laurel Beeler

## RESPONDENTS CITY OF OAKLAND AND OAKLAND CITY COUNCIL'S ANSWERING BRIEF

RYAN RICHARDSON, City Attorney
MARIA BEE, Chief Assistant City Attorney,
ALLISON EHLERT, Supervising Deputy City Attorney
ANYA KU, Deputy City Attorney

Oakland City Attorney's Office
One Frank Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-3596
Fax: (510) 238-6500
Email:
AEhlert@oaklandcityattorney.org;
AKu@oaklandcityattorney.org

*Attorneys for Respondents City of Oakland and Oakland City Council*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... 3

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 6

ISSUES PRESENTED ........................................................................ 7

STATEMENT OF THE CASE ............................................................. 8

    A.    The City enacts an eviction moratorium to prevent displacement and mitigate a spike in the number of unhoused residents during the pandemic. ............................ 8

    B.    Landlords fail—three times—to allege adequate facts showing that the City's eviction moratorium amounted to an unconstitutional taking. ............................................ 10

SUMMARY OF THE ARGUMENT ......................................................... 13

STANDARD OF REVIEW ..................................................................... 15

ARGUMENT ....................................................................................... 16

    A.    The district court did not apply a heightened pleading standard; Landlords' allegations simply failed to satisfy Rule 8 .............................................................................. 16

    B.    Landlords did not plausibly plead an as-applied physical-taking claim. ........................................................ 18

        1.    *Yee*, not *Cedar Point*, applies to physical-taking claims arising out of the landlord-tenant context. ...... 19

        2.    This Court should follow its three prior decisions and hold that the City's eviction moratorium is not subject to a physical-taking claim. ........................ 23

        3.    None of the cases on which Landlords rely warrant application of *Cedar Point*. ........................... 25

    C.    Landlords did not plausibly plead a regulatory-taking claim. ................................................................................ 34

        1.    Landlords fail to demonstrate economic impact. ........ 35

2. Landlords fail to demonstrate interference with reasonable, investment-backed expectations. ..............42

3. Landlords fail to allege the character of the government action...................................................... 46

CONCLUSION ................................................................................. 49

CERTIFICATE OF COMPLIANCE...................................................... 2

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*238 Serrano Props. LLC v. State of Cal.,*
    Case No. 24-cv-08443, 2025 WL 2946988 (C.D. Cal. Sept. 22, 2025) .................... 20

*Alabama Association of Realtors v. Department of Health and Human Services,*
    594 U.S. 758 (2021) ....................................................................................... 26

*Alford v. Walton County,*
    159 F.4th 844 (11th Cir. 2025) ..................................................................... 32

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................... 15, 16, 17, 18

*Auracle Homes, LLC v. Lamont,*
    478 F. Supp.3d 199 (D. Conn. 2020) ............................................................ 20

*Baptiste v. Kennealy,*
    490 F. Supp.3d 353 (D. Mass. 2020) ............................................................ 20

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ......................................................................... 15, 16, 17

*Block v. Hirsh,*
    256 U.S. 135 (1921) .......................................................................... 28, 43, 44

*Bols v. Newsom,*
    Case No. 22-56006, 2024 WL 208141 (9th Cir. Jan. 19, 2024) .................. 20, 24, 26

*Brace v. U.S.,*
    72 Fed.Cl. 337 (Fed. Cl. 2006) ..................................................................... 38

*Cedar Point v. Hassid,*
    594 U.S. 139 (2021) ................................................................................ 2, 23

*Colony Cove Props., LLC v. City of Carson,*
    888 F.3d 445 (9th Cir. 2018) ............................................................. *passim*

*Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,*
    508 U.S. 602 (1993) ....................................................................................... 43

*Darby Dev. Co., Inc. v. U.S.,*
    112 F.4th 1017 (Fed. Cir. 2024) ..................................................... 27, 28, 29, 31

*El Papel, LLC v. City of Seattle,*
  Case No. 22-cv-35656, 2023 WL 7040314 (9th Cir. Oct. 26, 2023) ............... *passim*

*Elmsford Apartment Assocs., LLC v. Cuomo,*
  469 F. Supp.3d 148 (S.D.N.Y. 2020) .................................................................. 20

*Farhoud v. Brown,*
  Case No. 20-cv-2226, 2022 WL 326092 (D. Ore. Feb. 3, 2022) ............................ 20

*FCC v. Fla. Power Corp.,*
  480 U.S. 245 (1987) ...................................................................... 19, 29, 33

*Gallo v. D.C.,*
  610 F.Supp.3d 73 ...................................................................................... 43, 44

*Gallo v. D.C.,*
  Case No. 24-cv-01746, 2025 WL 3187270 (D.D.C. Nov. 14, 2025) ........................ 20

*GHP Mgmt. Corp. v. City of L.A.,*
  Case No. 23-55013, 2024 WL 2795190 (9th Cir. May 31, 2024) .................... *passim*

*Hadacheck v. Sebastian,*
  239 U.S. 394 (1915) .................................................................................... 36

*Heights Apartments, LLC v. Walz,*
  30 F.4th 720 (8th Cir. 2022) ....................................................................... 27

*In re JTS Corp.,*
  617 F.3d 1102 ............................................................................................. 15

*Johnson v. Riverside Healthcare Sys. LP,*
  534 F.3d 1116 (9th Cir. 2008) ..................................................................... 17

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
  480 U.S. 470 ............................................................................................... 48

*Lingle v. Chevron U.S.A., Inc.,*
  544 U.S. 528 (2005) .............................................................................. *passim*

*Loretto v. Teleprompter Manhattan CATV Corp.,*
  458 U.S. 419 (1982) ......................................................................... 19, 32, 43

*MHC Fin. Ltd. P'ship v. City of San Rafael,*
  714 F.3d 1118 (9th Cir. 2013) ..................................................................... 36

*Palm v. L.A. Dep't of Water and Power,*
  889 F.3d 1081 (9th Cir. 2018) ..................................................................... 15

4

*Penn Cent. Transp. Co. v. City of N.Y.*,
  438 U.S. 104 (1978) ............................................................................ *passim*

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984) ..................................................................................... 42

*S. Cal. Rental Housing Ass'n v. Cnty. of San Diego*,
  550 F. Supp.3d 853 (S.D. Cal. 2021) ........................................... 20, 44, 45

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ................................................................... 17

*Stuart Mills Props., LLC v. City of Burbank*,
  Case No. 22-cv-04246, 2022 WL 4493573 (C.D. Cal. Sept. 19, 2022) ..................... 20

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
  535 U.S. 302 (2002) ....................................................................................... 1

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ..................................................................................... 16

*Village of Euclid, Ohio v. Ambler Realty Co.*,
  272 U.S. (1926) ............................................................................................ 36

*William C. Haas & Co. v. City & Cnty. of San Francisco*,
  605 F.2d 1117 (9th Cir. 1979) .................................................................... 36

*Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Baltimore*,
  563 F. Supp.3d 428 (D. Md. 2021) ............................................................. 45

*Yee v. City of Escondido*,
  503 U.S. 519 (1992) .............................................................................. *passim*

*Yee.*,
  39 F.4th ................................................................................................ 27, 28

*Rules*

Federal Rule of Civil Procedure 8 ...................................................... 16, 18

FRAP 29(a)(5) ................................................................................................ 2

FRAP 32(a)(5) and (6) .................................................................................. 2

FRAP 32(f) ..................................................................................................... 2

## INTRODUCTION

In 2020, the City of Oakland enacted a temporary, limited eviction moratorium to prevent displacement and protect public health during the Covid-19 pandemic. The moratorium lasted only until 2023, applied solely to landlords' invited tenants, preserved tenants' obligations to pay rent and comply with lease terms, and maintained landlords' right to evict under certain circumstances. Nevertheless, a group of individual and corporate landlords ("Landlords") sued the City, claiming that the moratorium constituted a taking of their property without just compensation, in violation of the Fifth and Fourteenth Amendments to the Constitution. After three years of litigation and three opportunities to plausibly allege their taking claims, the district court correctly dismissed Landlords' complaint for failure to state a claim.

The Supreme Court recognizes two different types of taking claims, both of which Landlords assert: (1) a *per se* physical-taking claim, and (2) a regulatory-taking claim. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321 (2002).

The crux of Landlords' argument with respect to their physical-taking claim is that the City's eviction moratorium forced them to house

1

their tenants against their will. Since the City curtailed their ability to evict, the argument goes, Landlords' right to exclude was infringed and they were forced to suffer an invasion of their rental properties for which the City must compensate them.

Landlords' position asks too much. Under binding Supreme Court precedent, it's a heavy lift to establish that a landlord-tenant regulation, like the City's eviction moratorium, amounts to an unconstitutional physical taking. The Supreme Court has held that when property owners voluntarily choose to enter the rental market and "invite" prospective tenants to lease from them—as Landlords here did—they cannot complain that government regulations restricting their ability to terminate tenancies amount to physical takings of their properties. *Yee v. City of Escondido*, 503 U.S. 519, 528 (1992). Simply put, property owners' decision to enter into lease agreements with their tenants in the first place belies any assertion that the government has foisted their tenants upon them. The "invitation" to rent forecloses the very physical-taking claim alleged by Landlords here.

Landlords cannot prevail under *Yee*, so they contend that the Supreme Court's decision in *Cedar Point v. Hassid*, 594 U.S. 139 (2021),

2

governs instead. It does not. For one thing, *Cedar Point* has nothing to do with the landlord-tenant setting of *Yee*. It arose in a completely different context in which a California law compelled agricultural employers to tolerate the presence of union organizers on their property. That unrelated factual context reveals the primary distinction between *Yee* and *Cedar Point* and why the latter is inapplicable: The agricultural employers never sought out or wanted the union organizers on their property; the government gave them no choice in the matter. That is not true of the relationship between landlords and tenants; landlords want to, and do, offer their properties for possession by their tenants, just as Landlords here did.

*Cedar Point* is thus distinguishable and should not be followed by this Court. Indeed, in three prior unpublished decisions, this Court has unanimously held that *Cedar Point* does not apply and that the Covid-19 eviction moratoria enacted by Seattle, San Diego, and Los Angeles—all materially indistinguishable from Oakland's—did not constitute physical takings under *Yee*. Landlords urge the Court to abandon its reasoning in these decisions and instead rely on decisions from sister Circuits that have upheld physical-taking claims under *Cedar Point*.

3

But there is no convincing reason for this Court to do so. Those decisions misconstrue *Yee* and fail to give deference to the central principle articulated in that case—a principle that applies here—that a property owner's invitation to a tenant to rent takes landlord-tenant regulations out of the realm of physical takings.

Landlords also point to a dissent from the denial of *certiorari* in one of this Court's moratorium cases to bolster their argument on behalf of *Cedar Point*. A dissent from the denial of *certiorari*, however, is not the law, and if it tells us anything at all it's that the Supreme Court is not interested in supplanting *Yee* with *Cedar Point*. This Court should stick to its reasoning in its three earlier decisions and affirm the district court's dismissal of Landlords' physical-taking claims.

Next, Landlords' regulatory-taking claim does not fare better. Regulatory-taking claims are assessed under a three-factor balancing test meant to suss out whether a government regulation goes too far and functions more like a physical occupation of property. *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104 (1978); *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005). Here, Landlords fail to allege sufficient facts as to any of the three *Penn Central* factors.

4

*First*, they failed to adequately plead the economic-impact factor because they did not allege sufficient facts showing that their properties suffered a severe diminution in value attributable to the City's eviction moratorium. For most of the 87 subject properties, they did not allege *any* facts concerning diminution in value; for others, they alleged a diminution of less than 50 percent, which is too low to plausibly plead a taking under this Court's precedent; and for the remaining few, Landlords' diminution allegations are implausible on their face.

*Second*, Landlords did not allege facts sufficient to show that the City's eviction moratorium interfered with their reasonable, investment-backed expectations. As courts (including the Supreme Court) have repeatedly recognized, landlord-tenant relationships are highly regulated and Landlords, thus, necessarily knew their rental businesses would be subject to changes over time. It would have been unreasonable for them to assume that the City's housing regulations would remain frozen as of the date they decided to offer their properties for rent. And even if Landlords could not be expected to anticipate a global pandemic, they certainly should have expected that emergencies

of various stripes could arise that would prompt the City to pause their ability to evict tenants for all the reasons they ordinarily may do so.

*Third*, the character of the City's eviction moratorium weighs against Landlords as it was a *temporary* measure designed to prevent mass displacement and slow the spread of a deadly new pathogen. The moratorium was also limited in scope in that it restricted, but did not eliminate, Landlords' ability to evict; it did not relieve tenants of their obligation to pay rent; and it in no way prevented Landlords from recovering unpaid rent or other damages through breach-of-contract actions. The eviction moratorium imposed a modest, temporary burden on Landlords during a public-health crisis and has long since been lifted. Such a necessary adjustment of the benefits and burdens of modern life cannot plausibly give rise to a regulatory-taking claim.

For all the reasons above, and as more fully described below, this Court should affirm the judgment of the district court dismissing Landlords' physical- and regulatory-taking claims.

## JURISDICTIONAL STATEMENT

The City agrees with Landlords' jurisdictional statement.

# ISSUES PRESENTED

1. To overcome a motion to dismiss their physical-taking challenge to the City's eviction moratorium, Landlords must show why the Court should disregard binding Supreme Court precedent, its own prior rulings, and the weight of federal court authority to find that the City's Covid-19 eviction moratorium authorized third-party occupation of Landlords' properties such that it constituted a physical taking. Do Landlords' arguments for reversal and misplaced reliance on *Cedar Point*, rather than *Yee*, meet this threshold?

2. To overcome a motion to dismiss their regulatory-taking challenge to the City's eviction moratorium, Landlords must plausibly allege economic impact; interference with reasonable, investment-backed expectations; and character of the moratorium sufficient to show a regulatory taking. Do Landlords' conclusory and implausible allegations—lacking basic before-and-after values for many of their own properties—meet this standard?

## STATEMENT OF THE CASE

**A. The City enacts an eviction moratorium to prevent displacement and mitigate a spike in the number of unhoused residents during the pandemic.**

On March 4, 2020, California Governor Gavin Newsom declared a state of emergency in California in response to the Covid-19 pandemic. 2-ER-78–79. Over the following weeks and months, the Governor and state legislature took steps to limit landlords' ability to evict tenants in the face of the unprecedented public-health emergency. 2-ER-79–80. On March 9, 2020, in response to the rapid spread of the Covid-19 virus, the City of Oakland, through the Oakland City Council, declared a local state of emergency. 2-ER-81. This declaration was ratified on March 12, 2020. *Id.* Shortly thereafter, on March 27, 2020, the City enacted its eviction moratorium in Ordinance No. 13589. 2-ER-81, 187–96.

The City's eviction-moratorium ordinance explained that the City "is experiencing a severe housing affordability crisis," "60 percent of Oakland residents are renters," and more than 4,000 City residents are homeless. 2-ER-188. In addition, City residents were suffering income declines and layoffs as a result of the pandemic. *Id.* The purpose of the City's eviction moratorium was, therefore, to "prevent displacement,

8

reduce transmission of . . . Covid-19, and promote the stability and the health and safety of" its residents. 2-ER-190.

The moratorium did not altogether preclude landlords from evicting their tenants. It limited grounds for eviction but maintained landlords' right to evict if "the tenant pose[d] an imminent threat to the health or safety of other occupants of the property," or if an owner sought to exit the rental business, pursuant to California's Ellis Act. 2-ER-81, 191. In addition, the moratorium did not relieve tenants of the obligation to pay rent and otherwise comply with the terms of their lease agreements. Landlords remained free to file breach-of-contract actions to recover lost rent from non-paying tenants as well as compensation for any property damage caused by their tenants. Further, the City, Alameda County, and the State of California each provided funding to support tenant rent relief and to reduce financial hardship landlords experienced from missed rent. 1-ER-5; 2-ER-79.

Though the City's eviction moratorium was originally slated to expire on May 31, 2020, given the constant evolution of the virus and limited availability of vaccines, it was extended through subsequent ordinances and, ultimately, its expiration was tied to the City Council's

termination of the local emergency on July 15, 2023. 2-ER-81, 187–96, 198–204.[1]

## B. Landlords fail—three times—to allege adequate facts showing that the City's eviction moratorium amounted to an unconstitutional taking.

On March 1, 2022, Landlords filed suit in the Northern District of California, asserting claims for unlawful taking, inverse condemnation, and violation of due process and equal protection. 2-ER-241–62. Landlords then moved for summary judgment on their physical-taking and procedural due-process claims. In a lengthy written decision issued on November 22, 2022, the district court denied Landlords' motion in its entirety, finding that the City's moratorium was not a physical taking because: (1) it was temporary, (2) it did not relieve tenants of their obligation to pay rent, and (3) it maintained landlords' right to evict tenants in certain, specified circumstances. 1-ER-28–67.

---

[1] At the same time, the City amended its 2002 Just Cause for Eviction Ordinance to add new protections for tenants recovering from the impacts of the pandemic. 2-ER-81–82. Landlords challenged the constitutionality of these amendments in the district court but have abandoned that challenge in this Court by not raising any arguments with respect to the amendments in their Opening Brief.

On September 20, 2023, Landlords filed their First Amended Complaint, adding fifty-two new individual and corporate plaintiffs to the original five and realleging their taking, inverse-condemnation, and due-process and equal-protection claims. 2-ER-151–85. The district court granted the City's motion, dismissing Landlords' physical-taking claim with prejudice, for the same reasons it denied their motion for summary judgment. 1-ER-20. The district court, likewise, dismissed the due-process and equal-protection claims with prejudice, leaving only Landlords' regulatory-taking claim with leave to amend. 1-ER-23–26.

On March 3, 2025, Landlords filed their Second Amended Complaint. 2-ER-69–150. This latest iteration included a total of fifty-eight individual and corporate plaintiffs claiming ownership over eighty-six properties. *Id.* To address the district court's prior dismissal of their regulatory-taking claim, the SAC added allegations about some properties' delinquent and lost rent, diminished property values, and assorted other costs (e.g., repair and maintenance, legal, turnover, marketing) allegedly incurred as a result of the City's moratorium. 2-ER-69–150.

11

The SAC was supported by the Declaration of Richard Marchitelli, a real estate appraiser. 2-ER-134–50. Marchitelli explained that he reviewed the City and County's eviction moratoria and inspected the exteriors of seven of the eighty-six subject properties, all located in Oakland. 2-ER-135. Based on this review, he opined that the moratoria impacted the market value of all properties in the City and County, including the seven properties whose exteriors he examined, though he confessed he did not analyze the "individual characteristics of each property." 2-ER-138. Marchitelli based his opinion on an unexplained capitalization rate—a measure of the risk of investing in a property— anchored in the "potential effect" of the moratoria, which expired in 2023. *Id.*

The district court granted the City's motion to dismiss the SAC with prejudice. 1-ER-2–14. In so ruling, the court determined Landlords failed to plausibly allege that the economic impact; interference with reasonable, investment-backed expectations; and character of the moratorium rose to the level of a regulatory taking. *Id.*

## SUMMARY OF ARGUMENT

The district court properly granted the City's motions to dismiss Landlords' physical- and regulatory-taking claims.

Contrary to Landlords' contention, the Supreme Court's decision in *Yee*, not its decision in *Cedar Point*, provides the rule of decision governing Landlords' physical-taking claim. As here, the disputed law in *Yee* was a landlord-tenant regulation. The *Yee* Court held that when landlords make their properties available for lease and "invite" tenants to occupy their premises, government regulations that restrict the ability of those landlords to terminate tenancies does not amount to an unconstitutional physical taking. That is precisely the situation here. Landlords voluntarily entered into lease agreements with their tenants. That the City's Covid-19 eviction moratorium then *temporarily* restricted Landlords' ability to evict does not mean the City subjected them to a physical invasion of their property as is required to state a plausible physical-taking claim.

Landlords' reliance on *Cedar Point* is unavailing. *Cedar Point* has nothing to do with landlord-tenant regulations. And unlike the circumstances in *Yee* and here, where the occupants of the property (the

13

tenants) were invited by the property owner, the owners in *Cedar Point* did not invite the occupants and did not want them on their land.

In three prior cases reviewing the indistinguishable moratoria of Seattle, San Diego, and Los Angeles, this Court has uniformly rejected the application of *Cedar Point* and dismissed the plaintiffs' physical-taking claims under *Yee*. The Court should do the same in this case.

Landlords' regulatory-taking claim is analyzed under the three-factor balancing test articulated in *Penn Central*.  Landlords failed to plead facts plausibly suggesting they could satisfy any of these factors. They did not allege that they suffered the severe diminution in property value required by this Court's precedent. They likewise did not allege any facts suggesting that the moratorium interfered with their reasonable, investment-backed expectations. And finally, the nature of the moratorium as a measured response to a once-in-a-century public-health emergency weighs decisively against deeming it a regulatory taking.

14

The district court correctly held that Landlords did not adequately allege either a physical- or a regulatory-taking claim. This Court should affirm.

## STANDARD OF REVIEW

This Court reviews "order[s] granting a motion to dismiss for failure to state a claim de novo," and applies the same standard for assessing the sufficiency of the complaint as the district court. *Palm v. L.A. Dep't of Water and Power*, 889 F.3d 1081, 1085 (9th Cir. 2018) (internal citation omitted); *In re JTS Corp.,* 617 F.3d 1102, 1109. As such, this Court must affirm the district court's dismissal order if it agrees that, taking their allegations as true, Landlords have not alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). The Court need not accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). In evaluating the allegations, the Court "must consider the complaint it its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of

15

which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 332 (2007).

## ARGUMENT

**A.    The district court did not apply a heightened pleading standard; Landlords' allegations simply failed to satisfy Rule 8.**

Contrary to Landlords' argument, the district court did not apply a heightened pleading standard. Its dismissal of their physical- and regulatory-taking claims was premised on their failure to allege plausible, factual allegations, as required by Supreme Court precedent.

Federal Rule of Civil Procedure 8 provides, "[a] pleading that states a claim for relief must contain … a short and plain statement of the grounds for the court's jurisdiction." While this Rule does not require "detailed factual allegations," it "requires more than labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions." *Twombly*, 550 U.S. at 555, 557. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). In other words, a claim needs to plead sufficient facts to "allow[] the court

16

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556.)

The Ninth Circuit has applied *Twombly* and *Iqbal*'s principles to the cases before it, adopting essentially a two-step test.

First, courts separate conclusory statements from sufficiently detailed allegations because "to be entitled to the presumption of truth, allegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

Next, courts weigh the factual allegations that are taken as true to determine if they "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expenses of discovery and continued litigation." *Id.* To survive a motion to dismiss under Rule 12(b)(6) the allegations must plausibly allege both a "cognizable legal theory" and "sufficient facts" to support that theory. *Johnson v. Riverside Healthcare Sys. LP*, 534 F.3d 1116, 1121 (9th Cir. 2008).

The district court applied the correct standard in ruling on the City's motion to dismiss. It did not demand that Landlords satisfy "an improper heightened pleading standard." App. Br. at 25. Unfortunately for Landlords, their sparse, conclusory allegations lacked the requisite facts to give their complaint the required sheen of plausibility. As the Supreme Court observed in *Iqbal*, "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." 556 U.S. at 678.

## B. Landlords did not plausibly plead an as-applied physical-taking claim.

The Takings Clause of the Fifth Amendment, incorporated against the States through the Fourteenth Amendment, provides that, "nor shall private property be taken for public use without just compensation."

Landlords contend that the City's temporary Covid-19 eviction moratorium constituted a *per se* physical taking. They theorize that because the moratorium constrained their ability to evict tenants, it unconstitutionally infringed on their right to exclude and forced them to provide public housing against their will. Landlords' argument fails

under binding Supreme Court law, under the reasoning of *three* separate decisions of this Court, and under the weight of other federal authority.

### 1. *Yee*, not *Cedar Point*, applies to physical-taking claims arising out of the landlord-tenant context.

A *per se* physical taking occurs only when there has been "a permanent occupation of property." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982). Indeed, "[t]he government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee*, 503 U.S. at 527 (emphasis in original).

The Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto*, 458 U.S. at 440 (citing cases); *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987). Further, landlords' right to exclude "is not absolute in the landlord/tenant context." *El Papel, LLC v. City of Seattle*, Case No. 22-cv-35656, 2023 WL 7040314, *2 (9th Cir. Oct. 26, 2023).When the

19

regulation at issue arises out of the landlord-tenant context—as is the case here—the Supreme Court's decision in *Yee* governs. As even Landlords concede, App. Br. 28–29, n.6, both this Court and the majority of other federal courts confronted with physical-taking claims challenging Covid-19 eviction moratoria have held that *Yee* supplies the governing rule.[2]

*Yee* concerned the imposition of a local rent-control ordinance against the backdrop of a state-wide regulatory scheme that made it more difficult for the owners of mobile-home parks to evict tenants. Tenants of mobile-home parks own their mobile homes but rent plots of

---

[2] *See GHP Mgmt. Corp. v. City of L.A.*, Case No. 23-55013, 2024 WL 2795190 (9th Cir. May 31, 2024), *cert. denied*, 145 S.Ct. 2615 (2025); *Bols v. Newsom*, Case No. 22-56006, 2024 WL 208141 (9th Cir. Jan. 19, 2024); *El Papel*, 2023 WL 7040314 , *cert. denied*, 144 S.Ct. 827 (2024); *Gallo v. D.C.*, Case No. 24-cv-01746, 2025 WL 3187270, \*6 (D.D.C. Nov. 14, 2025); *238 Serrano Props. LLC v. State of Cal.*, Case No. 24-cv-08443, 2025 WL 2946988, \*5 (C.D. Cal. Sept. 22, 2025); *Stuart Mills Props., LLC v. City of Burbank*, Case No. 22-cv-04246, 2022 WL 4493573, \*2–3 (C.D. Cal. Sept. 19, 2022); *Farhoud v. Brown*, Case No. 20-cv-2226, 2022 WL 326092, \*10 (D. Ore. Feb. 3, 2022); *S. Cal. Rental Housing Ass'n v. Cnty. of San Diego*, 550 F. Supp.3d 853, 867 (S.D. Cal. 2021); *Baptiste v. Kennealy*, 490 F. Supp.3d 353, 388 (D. Mass. 2020); *Auracle Homes, LLC v. Lamont*, 478 F. Supp.3d 199, 220–21 (D. Conn. 2020); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp.3d 148, 162–63 (S.D.N.Y. 2020).

land, called "pads," from the park owners. *Yee*, 503 U.S. at 523.
California enacted a law restricting the grounds on which a park owner
could terminate a mobile-home tenant's lease of the pad. *Id.* at 524. The
City of Escondido then enacted a rent-control ordinance that limited the
rent park owners could charge and forbade them from increasing that
rent without prior approval of the City Council. *Id.* The Yees, mobile-
home park owners, sued, alleging that Escondido's rent-control
ordinance constituted a physical taking. *Id.* at 525. They reasoned the
ordinance gave tenants the right to occupy their pads at below-market
rates indefinitely, especially considering the eviction restrictions
imposed by California law. *Id.* at 526–27.

The Supreme Court disagreed. It concluded that Escondido's
ordinance did not amount to a physical taking. Central to the Court's
holding was that the park owners had "voluntarily rented their land to
mobile-home owners" and in fact had "invited" their tenants to rent
from them. *Id.* at 527–28. The mobile-home tenants had not been
"forced upon [the park owners] by the government," nor had the
government compelled the owners "to submit to the physical occupation
of [their] land." *Id.* In other words, even though the rent-control

21

ordinance made it highly attractive for mobile-home tenants to stay put, it did not constitute a physical taking, "even when considered in conjunction with the" California law that confined park owners' ability to evict tenants, because the government had not forced the park owners to lease their property and it had not precluded them from ever terminating a lease.

On the subject of terminating tenancies, the *Yee* Court noted that park owners remained free to evict tenants if the owners elected to change the use of their land and gave the tenants six to twelve months' notice. *Id.* at 528. The Court explained that "[a] different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Id.*

Landlords insist that the City's eviction moratorium should be assessed under the Supreme Court's decision in *Cedar Point*, not *Yee*. Landlords are wrong. *Cedar Point* had nothing to do with landlord-tenant relations. It instead concerned a California law that gave labor organizers a right to be physically present on the property of agricultural employers for up to three hours a day, 120 days a year, to

attempt to unionize the employers' workers. 594 U.S. at 143. The Court

held that this access regulation constituted a *per se* physical taking

because it "appropriate[d]" the property owners' "right to exclude." *Id.*

at 149. The agricultural employers had no choice but to accept the labor

organizers' presence on their property.

*Cedar Point* is inapposite to the circumstances here. It did not

involve a landlord-tenant regulation; it did not involve a property owner

voluntarily granting access to the "occupier;" and it did not suggest that

its analysis should supplant that of *Yee* in the landlord-tenant context.[3]

> **2. This Court should follow its three prior decisions and hold that the City's eviction moratorium is not subject to a physical-taking claim.**

This Court has applied *Yee*, and expressly declined to apply *Cedar*

*Point*, in three separate decisions (albeit unpublished ones) in which

landlords challenged the Covid-19 eviction moratoria of Los Angeles,

---

[3] The *Cedar Point* Court dismissed concerns that deeming the access regulation there a physical taking would risk invalidating other government regulations by explaining that "many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights." *Id.* at 160. One of those "background restrictions" is the history of landlord-tenant regulations, described in further detail below.

San Diego, and Seattle as unconstitutional physical takings. *GHP Mgmt.*, 2024 WL 2795190, at *1; *Bols*, 2024 WL 208141, at *1;[4] *El Papel*, 2023 WL 7040314, at *2.

In *GHP Management*, this Court held that "we are bound by *Yee*." 2024 WL 2795190, at *1 (explaining that "a statute that merely adjusts the existing relationship between landlord and tenant . . . does not effect a taking"). Los Angeles' eviction moratorium did not amount to a physical taking because the landlords "voluntarily opened their property to occupation by tenants;" the moratorium did not compel the landlords to rent their property forever; and it permitted the landlords to evict "their previously invited tenants for reasons not otherwise prohibited." *Id.* In the same vein, this Court in *Bols* rejected *Cedar Point* as "not as broad as [the landlord] suggests." 2024 WL 208141, at *1. Applying *Yee*, this Court held that San Diego's eviction moratorium did not amount to a physical taking "because it does not require commercial lessees to accommodate tenants other than those that they already voluntarily invited." *Id.* Finally, in *El Papel*, this Court held

---

[4] *Bols* pertained to San Diego's Covid-19 moratorium on evictions of commercial tenants, not residential tenants. 2024 WL 208141, at *1.

that the right to exclude "is not absolute in the landlord/tenant context." 2023 WL 7040314, at *2. It rejected a physical-taking claim against Seattle's eviction moratorium on the by now familiar grounds that the landlords had volunteered to rent their property, willingly entered into lease agreements with their tenants, and retained the right to evict during the pendency of the moratorium for specified purposes. *Id.* at *2.

This Court's decisions in *GHP Management*, *Bols*, and *El Papel* are correct and there is no reason to depart from them in this case. There is nothing different or unique about Oakland's eviction moratorium that would justify a different outcome here, nor do Landlords argue otherwise.

### 3. None of the cases on which Landlords rely warrant application of *Cedar Point*.

Despite this Court's uniform and unanimous prior decisions, Landlords urge the Court to cut a new path. They primarily invoke a dissent from the denial of *certiorari* in *GHP Management*, and two decisions by sister Circuits that are not as well reasoned as this Court's decisions.

*First*, Landlords rely on Justice Thomas's dissent from the denial of *certiorari* in *GHP Management*. Justice Thomas would have taken

the case to resolve the Circuit split between this Court and the Eighth and Federal Circuits (more on that in a moment) and because in his view, "an eviction moratorium would plainly seem to interfere with a landlord's right to exclude." 145 S.Ct. at 2616–17. Justice Thomas attracted the vote of only one other justice (Justice Gorsuch), but not the two more needed to grant *cert.*, let alone the three more needed to declare Covid-19 eviction moratoria unconstitutional physical takings. His opinion therefore does not suggest that this Court should deviate from *Yee* or its three prior decisions rejecting this argument, nor does Justice Thomas's dissent suggest that if this Court were to take that drastic step, it would be upheld by the Supreme Court.[5]

*Second*, Landlords point to two decisions, one by the Eighth Circuit and the other by the Federal Circuit, that applied *Cedar Point*,

---

[5] Landlords also rely on the Supreme Court's decision in *Alabama Association of Realtors v. Department of Health and Human Services*, 594 U.S. 758, 765 (2021) (*per curiam*). But as this Court has twice held, *Alabama Association* is irrelevant because it merely held that the Centers for Disease Control lacked the statutory authority to issue an eviction moratorium. *Bols*, 2024 WL 208141, at *2; *El Papel*, 2023 WL 7040314, at *2. The *Alabama Association* Court did not say anything about physical-taking claims and it "did not mention or call *Yee* into doubt." *El Papel*, 2023 WL 7040314, at *2.

rather than *Yee*, and concluded that the landlords in those cases had stated viable physical-taking claims. *Darby Dev. Co., Inc. v. U.S.*, 112 F.4th 1017, 1034–36 (Fed. Cir. 2024); *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 733 (8th Cir. 2022), *en banc* review denied, 39 F.4th 479 (8th Cir. 2022). *Darby* and *Heights Apartments* are not persuasive. This Court should not break from its prior decisions to follow their lead.

To begin with, the flaws in *Heights Apartments* were highlighted by Chief Judge Colloton in his dissent from the denial of rehearing *en banc*. He noted that the panel had erred by misreading *Yee*. 39 F.4th at 480. The panel thought that the mobile-home park owners in *Yee* complained only about their inability to evict "future or incoming tenants rather than existing tenants," thus setting aside the "invitee" doctrine, when in truth the owners complained about their inability to evict both future and current, invited tenants. *Heights Apartments*, 30 F.4th at 733; *Heights Apartments*, 39 F.4th at 480 (citing *Yee*, 503 U.S. at 525); *see also GHP Mgmt.*, 2024 WL 2795190, at *1 n.2 (stating that *Heights Apartments* misconstrued *Yee*). Further, Chief Judge Colloton criticized the panel for failing to explain why the more severe intrusion on property rights in *Yee* that occurred outside the scope of a global

27

emergency *did not* amount to a physical taking but the less intrusive

eviction moratorium enacted in the midst of such an emergency *did*. As

the Chief Judge put it:

> [T]he panel decision never addressed why the scheme in *Yee* that allowed a landlord to evict existing tenants only for limited reasons after up to 12 months' notice did not constitute a *per se* taking, while a temporary eviction moratorium during a pandemic ostensibly does.

*Heights Apartments*, 39 F.4th at 480; *see also Block v. Hirsh*, 256 U.S.

135, 156 (1921) ("[A] public exigency will justify the legislature in

restricting property rights in land to a certain extent without

compensation.")

For its part, the Federal Circuit's decision in *Darby* is likewise

unconvincing. *Darby* justified its reliance on *Cedar Point* by rejecting

the notion, not actually stated in *Yee*, that landlord-tenant regulations

are categorically immune from physical-taking challenges—a point

Landlords here seize on as well. *Darby*, 112 F.4th at 1035. But the City

is not arguing that no landlord-tenant regulation could ever under any

circumstances constitute a physical taking. Nor does the Court need to

delve into that question to conclude that the City's Covid-19 eviction

28

moratorium—like those of Seattle, San Diego, and Los Angeles—did not cross the threshold of a physical taking.

*Darby* further contravened *Yee* by rejecting *Yee*'s central premise that landlords voluntarily choosing to rent out their property is fundamentally inconsistent with physical-taking claims. 112 F.4th at 1036. But the Supreme Court has explained that it is the "invitation" to lease that "makes the difference" between a regulation that constitutes a physical taking and one that does not. *FCC*, 480 U.S. at 252–53. *Cedar Point* did not discuss this distinction because there was never an invitation by the agricultural employers to the union organizers.

Nevertheless, according to *Darby* and Landlords, *Cedar Point* requires courts to disregard a property owner's voluntary invitation to lease at the start of a relationship if the landlord is subsequently required to temporarily continue that rental relationship during an emergency. *Darby*, 112 F.4th at 1036. In other words, the initial invitation to lease becomes immaterial once the government enacts legislation regulating that lease. There are at least three problems with applying that argument here.

*First*, *Yee* rejected it: Escondido's rent-control ordinance, coupled with California's eviction limitations on mobile-home park tenants, meant that park owners were compelled to continue leasing to their current tenants. *Yee* could have held that by effectively forcing park owners to accept their tenants' ongoing occupation of the owners' land, the regulatory scheme had wrought a physical taking, notwithstanding the owners' initial voluntary decision to lease to those same tenants. But that is not what *Yee* held. It emphasized the park owners' original decision to open their property to their tenants as the dispositive consideration in the physical-taking analysis. This makes practical sense; otherwise, every new regulation in the constantly changing field of landlord-tenant law that strengthens tenant protections will be subject to a physical-taking challenge by landlords.

*Second*, *Darby*'s reasoning gives short shrift to the fact that Covid-19 eviction moratoria, like the City's, were entirely temporary in nature. Oakland's moratorium did not require Landlords "to refrain *in perpetuity* from terminating a tenancy," *Yee*, 503 U.S. at 528 (emphasis added), but only for the duration of the local emergency.

30

*And finally*, Landlords do not point to any cases in which a voluntary relationship between two private parties is transformed into a government-compelled physical occupation as a result of a temporary government regulation—let alone a temporary regulation enacted to curb the effects of a global pandemic.

*Darby* also declined to follow *Yee* because in *Yee*, the mobile-home park owners retained their right to evict tenants for the nonpayment of rent, but landlords subject to eviction moratoria did not. *Darby*, 112 F.4th at 1035. This is a distinction without a difference. It was not a consideration important to the analysis in *Yee* and in any event, the City's moratorium did not relieve tenants of their obligation to pay rent; Landlords have always had the right to bring breach-of-contract actions to recoup any lost rent.[6]

For all of these reasons, neither the Eighth Circuit's decision in *Heights Apartments*, nor the Federal Circuit's decision in *Darby*, should

---

[6] The Marchitelli Declaration, attached to the SAC, acknowledges that Landlords maintain various legal remedies to collect unpaid rent but notes that some of these remedies "might not make economic sense to pursue." 2-ER-137. That an available remedy is time-consuming or costly does not render it unavailable nor does it convert the moratorium into a taking.

be followed by this Court. This Court's own prior decisions in *GHP Management*, *Bols*, and *El Papel* correctly apply *Yee* and are more apt guides.

Next, Landlords attempt to align this case with *Alford v. Walton County*, 159 F.4th 844 (11th Cir. 2025), where the Eleventh Circuit concluded that a Covid-19 restriction on property owners' use of their own beachfront property constituted a taking. *Alford* is irrelevant because it has nothing to do with landlord-tenant regulations. Unlike Landlords here, the plaintiffs in *Alford* did not rent out their land and were not complaining about their inability to evict tenants; they were instead complaining about their inability to use their own beachfront property. *Alford* says nothing about how this case should be decided.

Landlords also attempt to analogize this case to *Loretto*, where the Supreme Court held that the government-authorized installation of cable boxes on a property owner's building constituted a physical taking. 458 U.S. at 438. Landlords' reliance on *Loretto* is misplaced. The offending "occupation" in *Loretto* was the permanently affixed cable boxes, not the property owner's tenants. Like *Alford*, *Loretto* has

32

nothing to do with landlord-tenant regulations or a landlord's invitation for a tenant to possess the landlord's property.

A more apt analogy is to *Federal Communications Commission v. Florida Power Corporation*. There, Florida Power Corporation voluntarily leased space on its utility poles to a cable television company. 480 U.S. at 248. Because it voluntarily leased the space, the Supreme Court found it could not claim a physical taking when the FCC decreased the rent for the leased utility pole space. *Id.* at 252–53. Likewise, here, once Landlords voluntarily invited tenants onto their properties, they could no longer claim a physical taking when the government limited the grounds for evicting their invitees.

Last but not least, Landlords argue that the government's encumbrance of a property right, without fully commandeering the right, can constitute a taking, citing to authorities about easements and tenancies-in-common. But again, that is not what happened here. Landlords' right to evict has been subjected to certain limitations, just as it historically has been. The City did not grant an easement or tenancy-in-common to Landlords' tenants. Landlords themselves granted their tenants an interest in a tenancy. The moratorium merely

33

temporarily restricted the grounds upon which Landlords could evict those tenants during a global pandemic.

\* \* \*

In sum, *Yee* governs this case and it, along with this Court's prior decisions, establishes that the City's eviction moratorium did not amount to a physical taking. Landlords provide no convincing reason to jettison *Yee* in favor of *Cedar Point*. As the district court correctly concluded, there was no physical taking here because the City's eviction moratorium was not indefinite, did not absolve tenants of their obligation to pay rent, included exceptions, and applied only to tenants invited by Landlords, as opposed to unauthorized squatters. 1-ER-43–48. This Court should affirm the district court's decision dismissing Landlords' physical-taking claim.

## C. Landlords did not plausibly plead a regulatory-taking claim.

Landlords next argue that the City's temporary Covid-19 eviction moratorium constituted a regulatory taking. Regulatory takings are assessed according to the three-factor test set forth in *Penn Central*.

The Supreme Court adopted the *Penn Central* test to determine if a regulation "goes too far," rising to the level of a taking. *Lingle*, 544

34

U.S. at 538 (internal citation omitted). The *Penn Central* factors include: (1) the economic impact of the regulation; (2) its interference with reasonable investment-backed expectations; and (3) the character of the regulation. *Penn Cent.*, 438 U.S. at 124. The inquiry "turns in large part" on the first factor (economic impact), while the second (interference with expectations) is also "primary" and the third (character) "may be relevant." *Lingle*, 544 U.S. at 539–40. Courts consider the analysis as a whole because "if an owner possesses a full bundle of property rights, the destruction of one strand of the bundle is not a taking." *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018) (cleaned up).

The district court determined that Landlords failed to state a regulatory-taking claim because they did not plausibly plead that, with respect to each of the *Penn Central* factors, the City's moratorium went too far. 1-ER-2–12. Below, the City discusses the sufficiency of Landlords' allegations as to each *Penn Central* factor in turn.

### 1. Landlords fail to demonstrate economic impact.

"[E]conomic impact is determined by comparing the total value of the affected property before and after the government action." *Colony*

*Cove*, 888 F.3d at 451.[7] While "[p]rojected income streams can contribute to a method for determining the post-deprivation value of property, … the severity of the loss can be determined only by comparing the post-deprivation value to pre-deprivation value." *Id.*

In *Colony Cove*, this Court said it is "aware of no case in which a court has found a taking where diminution in value was less than 50 percent." 888 F.3d at 451. In fact, the Supreme Court and this Court have each found regulations not to be takings even where affected property values were reduced by up to ninety-five percent. *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. at 365, 397 (1926) (no taking despite 75 percent diminution in property value); *Hadacheck v. Sebastian*, 239 U.S. 394, 414 (1915) (same); *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1128 (9th Cir. 2013) (no taking despite 81 percent diminution in property value); *William C. Haas & Co. v. City & Cnty. of San Francisco*, 605 F.2d 1117, 1121 (9th Cir.

---

[7] Landlords attempt to warn this Court away from applying *Colony Cove* here because in that case this Court did not reach its conclusion that the challengers failed to establish a taking until a post-trial motion. App. Br. at 55. However, nothing about the principles stated in *Colony Cove* limits their application to post-trial. Thus, there is nothing preventing this Court from applying its own caselaw here.

1979) (no taking despite 95 percent diminution in property value).

Thus, the bar for Landlords to plausibly allege that the moratorium

economically impacted their properties to the level of a regulatory

taking is high, and Landlords do not meet it.

Notably, Landlords altogether fail to provide before-and-after

values for *47* of the properties at issue in the operative complaint (the

SAC). As to 23 of these 47, they attempt to satisfy the economic-impact

factor through general "property losses," like repair and maintenance

costs, legal fees, turnover expenses, and marketing costs. App. Br. at 50

(citing to SAC).[8] Those types of losses are not a substitute for the

---

[8] Landlords allege some "property losses" but no before-and-after values for 23 properties: 245 Lee St, Oakland; 2850 Hannah St, Oakland; 385-389 Palm Ave, Oakland; 398 Euclid Ave, Oakland; 433 Perkins St, Oakland; 1438 Madison St, Oakland; 1530 Harrison St, Oakland; 1551 Madison St, Oakland; 1553 Alice St, Oakland; 1555 Madison St, Oakland; 1935-1948 E. 29th St, Oakland; 2000 E. 30th St, Oakland; 2032-2040 E. 30th St, Oakland; 4220 Montgomery St, Oakland; 2801 Summit St, Oakland; 125 Moss Ave, Oakland; 1109 32nd St, Oakland; 20076 Emerald Ct, Castro Valley; 23243 Maud Ave, Hayward; 1225-1227 92nd Ave, Oakland; 565 Bellevue Ave #2501 & #2502, Oakland; 4514 Fairbairn Ave, Oakland; 133 Gable Dr, Fremont. 2-ER-83–93, 105–06, 112–19.

Landlords allege *no values at all* for the remaining 24 properties: 301 Lenox Ave, Oakland; 7511-7527 Bancroft Ave, Oakland; 8603 Hillside St, Oakland; 8701 Hillside St, Oakland; 1935-1945 E. 30th St, Oakland;

before-and-after property values required by *Colony Cove*. Indeed, as this Court has previously explained, "the mere loss of some income because of regulation does not itself establish a taking." *Colony Cove*, 888 F.3d at 451. Neither is the "discounted cash flow method," which Landlords rely on for eight of the subject properties, a reliable way to demonstrate diminution in value. *Brace v. U.S.*, 72 Fed.Cl. 337, 351 (Fed. Cl. 2006). That's why "the total value of the affected property before and after the government action" is the preferred measure of "economic impact." *Colony Cove*, 888 F.3d at 451. This information—the pre-moratorium value of their properties compared with the post-moratorium value—is entirely within Landlords' control, yet they do not allege any relevant facts as to the majority of the subject properties.

Landlords manage to plead some facts about before-and-after property values for the remaining 39 properties, but these allegations

---

2375 Fruitvale Ave #301, Oakland; 835 40th St #4, Oakland; 923-923A Apgar St, Oakland; 40th St #4, Oakland; 1036 62nd St, Oakland; 2839 Linden St, Oakland; 1054 18th Street, Oakland; 220 Grand Ave, Oakland; 831 6th Ave, Oakland; 1125-1135 E. 18th St, Oakland; 1221 E. 20th St, Oakland; 1705 Mandela Pkwy, Oakland; 2133-2143 Dwight Way, Berkeley; 2618 Martin Luther King Jr Way, Berkeley; 1715 High St, Oakland; 1830 6th Ave, Oakland; 1694 12th St, Oakland; 1630 Center St, Oakland; 3629 West St, Oakland. *See* 2-ER-74–78.

either disclose an insufficient reduction in value or are implausible on their face. On the first point, allegations for 30 of the subject properties allege reductions in property value below 50 percent.[9] As noted above, this Court is "aware of no case in which a court has found a taking where diminution in value was less than 50 percent." *Colony Cove*, 888 F.3d at 451. Thus, it is implausible that such allegations could support a regulatory taking claim—even more so when considered together with Landlords' failure to sufficiently allege the second and third *Penn Central* factors.

Just nine properties, all located in Oakland, allege reductions in property value exceeding fifty percent, but an examination of one such

---

[9] Landlords allege diminution in value of less than 50 percent for 30 properties: 716-720 37th St, Oakland; 1454 36th Ave, Oakland; 1844 7th Ave, Oakland; 3250 Hollis St, Oakland; 3700 International Blvd, Oakland; 1828 28th Ave, Oakland; 1701-1707 36th Ave, Oakland; 1002-1008 E. 23rd St, Oakland; 2554 E. 16th St, Oakland; 1638 47th Ave, Oakland; 800-818 E. 20th St, Oakland; 1155 5th St, Oakland; 2355 Broadway, Oakland; 1614 Campbell Street, Oakland; 3900 Adeline St, Emeryville; 1080 23rd Ave, Oakland; 3030 Chapman St, Oakland; 722 30th St, Oakland; 2215-2217 Eighth St, Berkeley; 5200 Adeline St, Emeryville; 296 Mather St #7, Oakland; 964 46th St, Oakland; 1722 27th Ave, Oakland; 2000 Linden St, Oakland; 4600 Adeline St, Emeryville; 527 23rd Ave, Oakland; 4401 San Leandro St, Oakland; 1688-1692 12th St, Oakland; 1732-1744 27th Ave, Oakland; 2633 Telegraph Ave, Oakland. 2-ER-93–107, 108–10, 112.

property's allegations demonstrates the implausibility of Landlords'
calculations. For 3649 Martin Luther King Jr. Way, Landlords allege a
119.7 percent reduction in property value from 2020 ($810,380) to 2023
(- $159,723.08).[10] 1-ER-105. The notion that this property had a
negative value of nearly $160,000—in the always hot Bay Area real-
estate market, no less—is implausible on its face. But the proverbial
nail in Landlords' coffin is that Alameda County Recorder records show
that 3649 Martin Luther King Jr. Way was sold in December 2024 for
$1,217,500. 1-ER-11, n.26. Thus, with a 2024 sale price of $1,217,500
and a 2020 value of $810,380, this property did not decrease in value by
119.7 percent; it instead *increased* in value by 33 percent. Landlords'
allegations do not plausibly allege a regulatory taking for this property.

---

[10] Why Landlords use 2020 and 2023 as the cut-off points is
unexplained. Moreover, the *temporary* nature of the City's eviction
moratorium defeats any attempt to establish that Landlords suffered
the kind of dramatic loss in property value necessary to satisfy the
economic-impact factor. Once the moratorium was lifted in July 2023,
any purported loss in value attributable to it presumably would have
disappeared with the moratorium itself.

Nor do their allegations suffice for the remaining eight properties.[11] Again, Landlords arbitrarily pick years for before-and-after values, including alleging values for some properties, in their 2025 SAC, in the middle of the moratorium, which expired in 2023.[12] And again, Landlords fail to address the implausibility that these properties today have maintained losses of up to nearly 100 percent of their value in the Bay Area's competitive real estate market.

Landlords attempt to substitute the declaration of real-estate appraiser Richard Marchitelli for actual facts regarding the before-and-after values of their property, but his declaration does not suffice. Marchitelli reviewed the City and County's eviction moratoria and the exteriors of seven properties to opine that the moratoria impacted the

---

[11] Landlords allege diminution in value of greater than 50 percent for 8 properties in addition to 3649 Martin Luther King Jr. Way: 860 34th St, Oakland (-97.88%), 827 30th St, Oakland (-67.18%); 695-701 30th St, Oakland (-62.49%); 1021 Campbell St, Oakland (-57.98%), 2166 E. 27th Ave, Oakland (-55.16%); 2701 High St, Oakland (-53.70%); 1616 35th Ave, Oakland (-52.99%); 1704 Upper 14th St, Oakland, (-50.40%). 2-ER-99–101, 104–05, 107–12.

[12] For 695-701 30th St; 860 34th St; and 1704 Upper 14th St, Landlords allege a before values in 2019 and after values in 2022. 2-ER-107–08, 110–12. For 1021 Campbell St, Oakland, Landlords allege a before value in 2019 and after value in *2021*. 2-ER-111.

41

market value of all properties in the City and County. 2-ER-138. He reached these conclusions without analyzing the "individual characteristics of each property" and without explaining why his assigned capitalization rate was anchored in the "potential effect" of a realized, and now expired, moratorium. *Id*. These admittedly general conclusions are insufficient to plausibly allege a real economic impact.

The district court correctly concluded that Landlords failed to allege facts to demonstrate that the moratorium caused sufficient economic impact to plausibly support a regulatory-taking claim.

**2.      Landlords fail to demonstrate interference with reasonable, investment-backed expectations.**

The second *Penn Central* factor is that the regulation interfered with the property owners' reasonable, investment-backed expectations. To satisfy this factor, Landlords must allege facts showing that the moratorium hindered "more than a unilateral expectation or an abstract need," *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (cleaned up), and that their expectations were objectively reasonable. *Colony Cove*, 888 F.3d at 452. "[T]he submission that appellants may establish a 'taking' simply by showing that they have been denied the

42

ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable." *Penn Central*, 438 U.S. at 130.

Demonstrating that a regulation interferes with expectations is difficult to satisfy where a business operates in a regulated environment, like housing. *Gallo v. D.C.*, 610 F.Supp.3d 73, 90 (citing *Loretto*, 458 U.S. at 440). "[T]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993) (internal citation omitted); *Gallo*, 610 F.Supp.3d at 90. This "is especially true during times of emergency." *Gallo*, 610 F.Supp.3d at 90 (citing *Block*, 256 U.S. at 153–54 (1921)).

Landlords' argument that despite the history of government regulation of housing, their expectation to "continue operating their investment properties consistent with the regulations that were in place prior to the eviction bans," App. Br. at 56–57, is simply unreasonable. Landlords operate their rental businesses in Oakland against the backdrop of the City's long and robust track record of regulating

43

landlord-tenant relationships. *See* Oakland Mun. Code ("OMC")

§ 8.22.010 *et seq.* (Residential Rent Adjustment Program), § 8.22.300 *et seq.* (Just Cause for Eviction Ordinance), § 8.22.400 *et seq.* (Terminating Tenancy to Withdraw Residential Rental Units from the Rental Market Ordinance), § 8.22.600 *et seq.* (Tenant Protection Ordinance), and § 8.22.800 *et seq.* (Uniform Residential Tenant Relocation Ordinance). It is patently unreasonable for Landlords to view the City's moratorium as the "reviv[al]" of a "long-dormant regulation," App. Br. at 60, when it amended an ordinance that was last amended less than two years prior, in 2018. 1-ER-33, n.18. Landlords cannot reasonably have expected the housing regulations in place on March 26, 2020—the day before the City's eviction moratorium was passed—to remain unchanged indefinitely. Landlords cannot plausibly allege they were not on notice that the City could continue regulating their rental properties and relationships with tenants, especially in the face of an emergency. *See Gallo*, 610 F.Supp.3d at 90 (citing *Block*, 256 U.S. at 153–54).

Landlords knew they were operating in a "highly regulated" business. *See S. Cal. Rental*, 550 F.Supp.3d at 867. The moratorium did not impinge on their "right to continue to collect rents." *Id.* And it did

44

not destroy their right to evict; it merely "defer[red] that process until the conclusion of the [moratorium's] limited duration." *Id.*

Landlords fail to demonstrate the necessary interference. They do not provide any facts, but merely pay lip service to this factor, alleging that the moratorium "unreasonably and substantially interfered with [their] investment-backed expectations." 2-ER-123–24, 174–75. These conclusory allegations cannot satisfy the second *Penn Central* factor.

As to whether their expectations were reasonable, those expectations "must yield to a 'public program adjusting the benefits and burdens of economic life to promote the common good.'" *Id.* (citing *Penn Central*, 438 U.S. at 124).

Admittedly, courts are split on which party this factor favors, and some have sided with landlords, concluding they could not realistically have predicted a new housing regulation pausing most evictions as a result of a global pandemic. *See e.g., Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Baltimore*, 563 F. Supp.3d 428, 444 (D. Md. 2021). However, this is the wrong question. The question is not whether Landlords could have anticipated the Covid-19 emergency, but whether they could have anticipated a regulation that would

45

*temporarily* constrain (not entirely eliminate) their ability to evict tenants. Given the highly regulated nature of landlord-tenant relations, including in Oakland, it's appropriate to charge Landlords with the knowledge that something unforeseen could happen that would prompt the City to halt most evictions for a period of time.

Given the unreasonableness of their expectations, coupled with the fact that they were not deprived of their right to recover rent and sue their tenants for property damage, this Court should affirm the district court's finding that the City's eviction moratorium did not interfere with Landlords' reasonable, investment-backed expectations.

### 3. Landlords fail to demonstrate the taking character of the government action.

Finally, the character of the government action must be assessed to determine if it "adjust[s] the benefits and burdens of economic life to promote the common good"; regulations that fall within these parameters are not takings. *Penn Central*, 438 U.S. 104 at 124.

As the relevant ordinances plainly state, the purpose of the City's moratorium was to keep people housed during the pandemic and thereby contain the spread of Covid-19 and avoid other public-health and welfare problems that increase with homelessness. As the *GHP*

46

*Management* court determined with respect to Los Angeles' Covid-19 eviction moratorium, "[t]here can be little dispute that, absent the Moratorium's protections, significant numbers of tenants with Covid-related loss of income would have been evicted, resulting not only in the harms typical of mass displacements, but exacerbating the spread of Covid-19 as well, to the detriment of all." 2022 WL 17069822 at *5.

The City reasonably determined that an eviction moratorium was necessary to safeguard the public in the face of an unprecedented, global pandemic. Despite Landlords' protestations, the moratorium did not "single[] [them] out to bear the severe and substantial burden of providing public pandemic housing." App. Br. at 61–62. The moratorium distributed the burden of responding to the public-health crisis among all property owners in the City. That Landlords chose to sue does not turn a universally applied "public program adjusting the benefits and burdens of economic life" into a targeted deprivation of Landlords' rights.

Owners are not permitted to use their properties in ways that injure the public "and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts

47

its power to enforce it." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491.

Landlords' failure to sufficiently allege that the character of the moratorium evidences a taking dooms their claim.

\* \* \*

In sum, Landlords fail to plausibly allege the *Penn Central* factor that the analysis "turns" on: that the before-and-after values of their properties were significantly impacted by the moratorium. *See Lingle*, 544 U.S. at 539. They fail to plausibly allege the second, also "primary" *Penn Central* factor: that their expectations—that the City's regulatory landscape would remain static from the day they elected to put their properties on the rental market—were reasonable and interfered with. *See id.* And they fail to plausibly allege the final, "relevant" *Penn Central* factor: that rather than adjusting benefits and burdens for the public good, they were singled out to bear the brunt of the City's policy decision to minimize the number of people who would lose shelter during a global public-health crisis. *See id.* at 540. As such, viewed separately or as a whole, Landlords' allegations do not demonstrate that the moratorium did anything more than temporarily restrict one stick

in their otherwise intact bundle of rights. They thus fail to sufficiently allege a regulatory taking.

## CONCLUSION

For the foregoing reasons, this Court should uphold the judgment of the district court.

Dated:  February 10, 2026        RYAN RICHARDSON, City Attorney

ALLISON EHLERT, Supervising
Deputy City Attorney
ANYA KU, Deputy City Attorney

*Attorneys for Respondents City of
Oakland and Oakland City Council*

49

# CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ALLISON EHLERT, Supervising
Deputy City Attorney
ANYA KU, Deputy City Attorney

*Attorneys for Respondents City of
Oakland and Oakland City Council*

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number:** 25-6142

I am the attorney or self-represented party.

**This brief contains 9,545 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Dated: February 10, 2026

ANYA KU, Deputy City Attorney