No. 25-6142

_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

LANDLORDS AND PROPERTY MANAGEMENT COMPANIES
IN ALAMEDA COUNTY,

Plaintiffs – Appellants,

v.

COUNTY OF ALAMEDA, et al.,

Defendants – Appellees,

ALLIANCE OF CALIFORNIANS FOR COMMUNITY
EMPOWERMENT ACTION,

Intervenor – Defendant – Appellee.

_____

On Appeal from the United States District Court
for the Northern District of California
3:22-cv-01274-LB

_____

**Appellants' Combined Reply to City and County Appellees,
Intervenor, and Amicus Curiae**

_____

Emily L. Brough
Andrew Zacks
ZACKS, FREEDMAN &
PATTERSON, PC
180 Montgomery St., Suite 1950
San Francisco, CA 94104
Telephone: (415) 956-8100
emily@zfplaw.com

Jonathan M. Houghton
Deborah J. La Fetra
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
DLaFetra@pacificlegal.org

*Attorneys for Plaintiffs – Appellants*

# Table of Contents

Table of Authorities.................................................................................ii

Introduction and Summary of Argument ................................................. 1

Argument.................................................................................................5

   I.   The Owners Plausibly Alleged a Physical Taking ......................... 5

     A.   The Complaint Contains Detailed, Plausible Allegations That the Moratoria Deprived Owners of the Right to Exclude..........5

     B.   The Sky Will Not Fall If a Physical Takings Claim Is Plausible ..................................................................... 14

   II.  The Owners Plausibly Alleged a Regulatory Taking..................... 16

     A.   The Owners Plausibly Alleged Economic Impact .................... 19

     B.   The Owners Plausibly Alleged Interference with Reasonable Investment-Backed Expectations........................27

     C.   The Public Purpose of the Regulation Does Not Mean That No Taking Had Occurred............................................... 29

     D.   Character was Plausibly Alleged ........................................... 32

Conclusion ............................................................................................. 33

Certificate of Service ............................................................................. 35

Certificate of Compliance....................................................................... 36

# Table of Authorities

**Page(s)**

## Cases

*Alford, Co-Tr. of Lionel D. Alford, Jr., & Tammy Nix Alford*
*Revocable Tr. v. Walton Cnty.,*
159 F.4th 844 (11th Cir. 2025) ............................................... 11, 13, 31

*Apartment Ass'n of Los Angeles County, Inc. v.*
*City of Los Angeles,*
500 F. Supp. 3d 1088 (C.D. Cal. 2020),
*aff'd,* 10 F.4th 905 (9th Cir. 2021) ..................................................... 27

*Arkansas Game & Fish Comm'n v. United States,*
568 U.S. 23 (2012) ................................................................... 15, 19

*Armstrong v. United States,*
364 U.S. 40 (1960) ................................................................... 14, 30

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................. 16, 27

*Baptiste v. Kennealy,*
490 F. Supp. 3d 353 (D. Mass. 2020) .................................................. 27

*Bell Atlantic v. Twombly,*
550 U.S. 544 (2007) ................................................................. 16, 21

*Berk v. Choy.*
No. 24-440, 607 U.S. ___,
2026 WL 135974 (U.S. Jan. 20, 2026) ...................................... 4–5, 21

*Bordelon v. Baldwin Cnty.,*
No. CV 20-0057-C, 2022 WL 16543269 (S.D. Ala. Oct 28, 2022),
*aff'd*, No. 22-13958, 2024 WL 302382 (11th Cir. Jan. 26, 2024)........ 23

*Borden v. Stiles,*
92 Cal. App. 5th 337 (2023) ........................................................... 7

*Cedar Point Nursery v. Hassid,*
594 U.S. 139 (2021) ................................................................. 3, 6, 13

*Chicago, B. & Q.R. Co. v. Chicago,*
166 U.S. 226 (1897) ....................................................................... 12

*Cmty. Hous. Improvement Program v. City of New York*,
    492 F. Supp. 3d 33 (E.D.N.Y. 2020),
    *aff'd sub nom.*, *74 Pinehurst LLC v. New York*,
    59 F.4th 557 (2d Cir. 2023),
    *aff'd*, 59 F.4th 540 (2d Cir. 2023)......................................................23

*Colony Cove Props., LLC v. City of Carson*,
    888 F.3d 445 (9th Cir. 2018)......................................................26

*Cunningham v. Cornell Univ.*,
    604 U.S. 693 (2025)......................................................22

*Darby Dev. Co. v. United States*,
    112 F.4th 1017 (Fed. Cir. 2024)......................................................3, 10

*Duvall v. Craig*,
    15 U.S. 45 (1817)......................................................8

*E. Enters. v. Apfel*,
    524 U.S. 498 (1998)......................................................24–25

*Erickson v. Pardus*,
    551 U.S. 89 (2007)......................................................17

*F.C.C. v. Fla. Power Corp.*,
    480 U.S. 245 (1987)......................................................14

*Faulkner v. ADT Sec. Servs., Inc.*,
    706 F.3d 1017 (9th Cir. 2013)......................................................30

*First English Evangelical Lutheran Church of Glendale v.*
    *Los Angeles Cnty.*,
    482 U.S. 304 (1987)......................................................13, 33

*Garbini v. Protection One, Inc.*,
    49 F. App'x 169 (9th Cir. 2002)......................................................25

*Gibson v. City of Portland*,
    No. 24-1663, 2026 WL 235118 (9th Cir. Jan. 29, 2026)......................................................26

*Heights Apartments, LLC v. Walz*,
    30 F.4th 720 (8th Cir. 2022)......................................................10

*Hernandez v. Ill. Inst. of Tech.*,
    63 F.4th 661 (7th Cir. 2023)......................................................29

iii

*Hodel v. Irving,*
481 U.S. 704 (1987)..............................................................23

*Horne v. Dep't of Agric.,*
576 U.S. 350 (2015)..............................................................13

*Johnson v. City of Shelby,*
574 U.S. 10 (2014)................................................................18

*Kaiser Aetna v. United States,*
444 U.S. 164 (1979)..............................................................31

*Knellinger v. Young,*
134 F.4th 1034 (10th Cir. 2025) ........................................18

*Levine v. Diamanthuset, Inc.,*
950 F.2d 1478 (9th Cir. 1991)............................................19

*Lingle v. Chevron U.S.A. Inc.,*
544 U.S. 528 (2005).......................................................29, 31

*Logan v. Zimmerman Brush Co.,*
455 U.S. 422 (1982)..............................................................12

*Loretto v. Teleprompter Manhattan CATV Corp.,*
458 U. S. 419 (1982)..........................................................9, 10

*Lucas v. S.C. Coastal Council,*
505 U.S. 1003 (1992).............................................................8

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)..............................................................22

*Palazzolo v. Rhode Island,*
533 U.S. 606 (2001)...................................................19, 24, 26

*Penn Central Transp. Co. v. City of New York,*
438 U.S. 104 (1978)....................................................... *passim*

*Pennsylvania Coal Co. v. Mahon,*
260 U.S. 393 (1922)..........................................................30–31

*Pollard v. Dwight,*
8 U.S. 421 (1808).................................................................8

*Pruneyard Shopping Center v. Robins,*
447 U.S. 74 (1980)................................................................13

iv

*Redevelopment Agency v. Thrifty Oil Co.*,
4 Cal. App. 4th 469 (1992) ...................................................................... 21

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ................................................................................... 32

*Rosu v. City of New York*,
742 F.3d 523 (2d Cir. 2014) ................................................................... 12

*San Bernardino Cnty. Flood Control Dist. v. Sweet*,
255 Cal. App. 2d 889 (1967) ................................................................... 21

*San Diego Gas & Elec. Co. v. City of San Diego*,
450 U.S. 621 (1981) ................................................................................. 31

*Shaffer v. United States*,
178 Fed. Cl. 576 (2025) ............................................................................. 3

*Swierkiewicz v. Sorema N. A.*,
534 U.S. 506 (2002) ................................................................................. 26

*Tahoe-Sierra Preservation Council, Inc. v.*
*Tahoe Regional Planning Agency*,
535 U.S. 302 (2002) ................................................................................. 33

*Tyler v. Hennepin Cnty.*,
598 U.S. 631 (2023) ................................................................................. 16

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ................................................................ 17

*Willowbrook Apartment Assocs., LLC v.*
*Mayor & City Council of Baltimore*,
563 F. Supp. 3d 428 (D. Md. 2021) ........................................................ 28

*Yee v. City of Escondido*,
224 Cal. App. 3d 1349 (1990), *aff'd*, 503 U.S. 519 (1992) ................... 10

*Yee v. Escondido*,
503 U.S. 519 (1992) ........................................................................... 6, 9–10

*Young v. Grand Canyon Univ., Inc.*,
57 F.4th 861 (11th Cir. 2023) ................................................................. 17

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ................................................................................. 32

## Constitutions

U.S. Const. amend. V ............................................................ *passim*

## Statutes

Cal. Civ. Code § 1946.2 (b)(1), *et seq.* ....................................................... 6

Cal. Civ. Proc. Code § 1161.3 ................................................................. 7

Oakland Municipal Code § 8.22.360.A.6 ................................................. 7

## Rules

Fed.R.Civ.P. 8 ..................................................................... *passim*

Fed.R.Civ.P. 8(a) ............................................................................ 4

Fed.R.Civ.P. 12 ......................................................................... 4–5

Fed.R.Civ.P. 12(b)(6) ..................................................................... 21

## Other Authorities

Appellant's Opening Brief, *Cal. Apartment Ass'n v. Cnty. of
    Alameda*, No. 25-6068 (9th Cir. Dec. 12, 2025) .................................. 29

35A C.J.S. Fed. Civ. P. § 311 (2025) ...................................................... 22

Kausen, Charles, Comment, *Taking One for the Team:
    COVID-19 Eviction Moratoria as Regulatory Takings*,
    59 San Diego L. Rev. 345 (2022) ...................................................... 27

Meltz, Robert, *Takings Law Today: A Primer for the
    Perplexed*, 34 Ecology L.Q. 307 (2007) .............................................. 26

Michelman, Frank I., *Property, Utility, and Fairness:
    Comments on the Ethical Foundations of "Just
    Compensation" Law*, 80 Harv. L. Rev. 1165 (1967) ....................... 8–10

Thomas, Robert H., *Evaluating Emergency Takings:
    Flattening the Economic Curve*,
    29 Wm. & Mary Bill Rts. J. 1145 (2021) ............................................ 33

**Introduction and Summary of Argument**

Under the minimal notice pleading requirement of Fed.R.Civ.P. 8, the Owners'[1] complaint plausibly alleged a takings claim under the Fifth Amendment. The district court erred in concluding otherwise. Through this appeal, the Owners seek only their day in court and the opportunity to resolve their constitutional claims on the merits.

When the government takes private property for a public use, it must pay just compensation to the owner. That is the guarantee of the Fifth Amendment. In this case, at the onset of the COVID pandemic, the Government[2] was concerned that some tenants would lose their jobs and their income, and then might have to choose between paying their rent, or paying for food and medical care. To solve this potential problem, the Government took control of the Owners' private property to provide public pandemic housing.

More specifically, the Government decided to prohibit the Owners from evicting *all* tenants, under virtually all facts and circumstances, by

---

[1] Owners are Appellants, Landlords and Property Management Companies in Alameda County.
[2] "Government" collectively refers to Respondent County of Alameda and Respondent City of Oakland, unless otherwise noted.

1

taking away the Owners' cause of action for unlawful detainer. Their tenants could now refuse to pay rent for any reason or no reason but still keep possession and control of their leased housing regardless of their need. Owners, however, still remained responsible for paying their mortgage, taxes, utilities, and maintenance except now without the rental income to pay for it. Worse still, the Government allowed tenants in breach to retain their ability to sue the Owners for not maintaining the property. The Government also prohibited the Owners from evicting tenants who engaged in criminal conduct or destroyed the Owner's property. As pled in the complaint, many tenants did one, or both, while under the Governments' umbrella of eviction protection. The Governments' regulatory override continued for over three years, during which time tenants had a government license to freely breach the terms of their lease without fear of eviction.

In granting the Governments' motions to dismiss, the district court erred in adopting a pleadings standard that is so demanding that no property owner can ever meet it, effectively barring the courthouse doors.

First, the district court decided, and the Government argues, that no landlord can ever maintain a physical takings claim under any

circumstances. It does not matter that certain tenants engaged in clear, criminal behavior or caused extensive property damage. Nor that most tenants refused to pay rent for years. Instead, the district court held that physical takings claims by landlords are categorically prohibited. To the contrary, the Takings Clause does not immunize governments from physical takings claims simply because they arise in the context of rental housing. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 152 (2021); *Darby Dev. Co. v. United States*, 112 F.4th 1017, 1036 (Fed. Cir. 2024); *Shaffer v. United States*, 178 Fed. Cl. 576, 579–80 (2025).

Second, with regard to the Owners' regulatory takings claim, the district court adopted, and the Government supports, a heightened pleadings standard that requires a property owner to prove (rather than simply allege) its economic losses within the complaint to the district court's satisfaction. The complaint must also prove that its economic losses reached a subjective, undefined level of "severity" of the district court's choosing. And the Owners are charged with anticipating the Governments' regulatory response to a previously unimaginable global pandemic, with their failure to do so punishable by the dismissal of their constitutional claim.

Federal pleading standards forbid such barriers to access. Particularly with respect to takings claims, where the mere filing of a complaint is too early to conclude as a matter of law that the Government has not gone too far. The recent Supreme Court decision of *Berk v. Choy*, No. 24-440, 607 U.S. ___, 2026 WL 135974 (U.S. Jan. 20, 2026), rejects such a result. It was a medical malpractice action filed in federal court on diversity grounds. The issue for determination was whether the pleading requirements were governed by Fed.R.Civ.P. 8(a) or Delaware law which required the plaintiff to include within his complaint an "affidavit of merit" that was signed by a medical professional and provided reasonable evidence of medical negligence. *Id.* at *2. The Supreme Court rejected that state law requirement because it was excess of, and contrary to, Rule 8(a). *Id.* at *4. In federal court, a plaintiff only has to state a plausible claim and "[b]y design, this system of pleading makes it relatively easy for plaintiffs to subject defendants to discovery— even for claims that are likely to fail." *Ibid.* Rule 8(a) thus "sets a ceiling on the information that plaintiffs can be required to provide" and plaintiffs do not have to allege any more than is necessary. *Ibid.* The limitations upon Fed.R.Civ.P. 12 reinforce that point, and the Court has

4

both "consistently rejected" efforts to require "more information for certain kinds of claims," *ibid.*, and held that at the pleadings stage, "evidence of the claim is *not* required." *Id.* at \*3.

Considering the above, the district court erred in dismissing the Owners' Fifth Amendment claim. The modest requirements of Rule 8 apply to the Takings Clause the same as every other action. The district court's decision must be reversed, allowing the Owners the opportunity to proceed to discovery and argue their case on the merits.

## Argument

## I. The Owners Plausibly Alleged a Physical Taking

### A. The Complaint Contains Detailed, Plausible Allegations That the Moratoria Deprived Owners of the Right to Exclude

As fully detailed in the Owners' complaint, the Government forced the Owners to house tenants who engaged in criminal acts, 2-ER-87-88, 2-ER-91-93; including one suspected methamphetamine dealer, 2-ER-85-87; tenants who destroyed the Owners' property, 2-ER-85-87, 2-ER-88-89, 2-ER-91-93; and tenants who refused to pay rent for years, 2-ER-83-119.

Yet under the decision below, these well-pled facts do not matter. Instead, the district court adopted a sweeping categorical rule: landlords cannot plead a physical taking as a matter of law because they do not have the right to exclude existing tenants. To support this improper ruling, the Government offers varying and contradictory rationales that try to broaden the narrow holding of *Yee v. Escondido*, 503 U.S. 519 (1992), into one that absolutely bars all physical takings claims within the landlord-tenant context; and simultaneously narrows *Cedar Point Nursery v. Hassid* into a decision that pertains only to invasions by "strangers." This Court should not countenance such a drastic reduction of fundamental property rights.

As pled, and as undisputed by the County or City, prior to the Governments' eviction ban, property owners had the right to exclude (evict) tenants who (a) refused to pay rent, (b) engaged in criminal conduct, (c) destroyed the property, or (d) violated the material terms and conditions of their lease. *See, e.g.*, Cal. Civ. Code § 1946.2 (b)(1), *et seq.*

6

(unlawful detainer for the above referenced offenses and others);[3] Cal. Civ. Proc. Code § 1161.3 (termination of the lease for certain criminal offenses); Oakland Municipal Code § 8.22.360.A.6 (eviction for nuisance, disorderly conduct, causing substantial damage, destroying the peace, illegal conduct and others).

The eviction bans clearly took those rights away. 2-ER-187-194; 2-ER-206-218.[4] But paradoxically, the district court held, and Government argues, that nothing was taken from these Owners. *See* County Answering Brief (AB) at 2, 27, 29 (the eviction ban did not interfere with, or take, the owner's right to exclude), *id.* at 30 n.5 (physical takings claims are inapplicable to landlords); City AB at 22–23, 31 (landlords cannot maintain a physical takings claim against tenants); ACCE AB at 19–21

---

[3] This statute defines "[t]enancy to be the *lawful* occupation of a residential real property." *Borden v. Stiles*, 92 Cal. App. 5th 337, 341 (2023) (cleaned up) (When someone occupies property without complying with the terms of the occupancy, the person becomes a "holdover tenant, and no longer in lawful occupation.").

[4] Amicus Berkeley Rent Stabilization Board incorrectly claims that there were applicable exceptions to the Government's eviction bans. *See* Brief of Amicus Curiae Berkeley Rent Stabilization Board at 11. There were no exceptions for nuisance, criminal activity, or non-imminent threats to health and safety. Nor does the Government assert otherwise.

(same). It is like the government towing away your car and then claiming that your car never existed in the first place.

The district court's decision can only be upheld if the landlords' bundle of sticks never included the right to evict current tenants. Otherwise, a property right was unequivocally taken from these Owners. The Government does not (and cannot) support that contention through originalism, textualism, or otherwise.[5] *See Pollard v. Dwight*, 8 U.S. 421, 430 (1808) (the true owner of property retains the right to evict for breach of a covenant); *Duvall v. Craig*, 15 U.S. 45, 60 & n.c (1817) (describing eviction as a remedy for breaking of a covenant in early American, English, and Roman law). The existence of California's unlawful detainer laws is also clear evidence that property rights were taken. *See* Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv. L. Rev. 1165, 1239

---

[5] The City claims that the "history of landlord-tenant regulations" is a "background law." City AB at 23 n.3. The City both misunderstands background law, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027–28 (1992), and ignores the fact that California's unlawful detainer laws have been a well-established part of the history of landlord-tenant regulations since 1872.

(1967) ("No one, at least, would assert that productivity is unduly jeopardized when society refuses to honor the expectations of thieves that their enjoyment of stolen goods will continue unmolested or, what is the same thing, if thieves are discouraged … from forming such expectations in the first place.").

The right to exclude a current tenant *does* exist. *Yee* plainly supports that unwavering legal principle and it found no such pre-existing limitation on the fundamental right to exclude. To the contrary, *Yee* was premised on the fact that owners were *not* forced to house tenants against their will, 503 U.S. at 528, and "had the city required such an occupation, of course, petitioners would have a right to compensation, and the city might then lack the power to condition petitioners' ability to run mobile home parks on their waiver of this right." *Id.* at 531–32; *see also id.* at 528 ("A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy.").

*Yee*'s limiting holding is also consistent with *Loretto v. Teleprompter Manhattan CATV Corp.,* which held that a forced physical possession of

commercial property is a categorical taking, not a mere regulation of use. 458 U.S. 419, 438–39 (1982). Thus, "a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." *Id.* at 439 n.17. In these circumstances, "tenant" simply identifies who the illegal occupier is; it does not denote any inherent limitation on an owner's right to exclude. *Yee v. City of Escondido*, 224 Cal. App. 3d 1349, 1356 (1990) ("If an owner's property has been taken by the government, it should be of no constitutional consequence to whom the property has been given."), *aff'd* 503 U.S. 519 (1992); *Loretto*, 458 U.S. at 432 n.9 (A physical taking is "without regard to whether the State, or instead a party authorized by the State, is the occupant.").

The recent cases of *Darby* and *Heights* therefore correctly held that the government is not immunized from physical takings liability simply because it arises within the rental housing context. *See Darby Dev. Co.,* 112 F.4th at 1035 ("[W]e see nothing in *Yee* (or any other binding precedent we are aware of) that immunizes—as a *categorical* matter—government action implicating the landlord-tenant relationship from being treated as a physical taking."); *Heights Apartments, LLC v. Walz,*

10

30 F.4th 720, 733 (8th Cir. 2022) ("*Cedar Point Nursery* controls here and *Yee*, which the Walz Defendants rely on, is distinguishable. The rent controls in *Yee* limited the amount of rent that could be charged and neither deprived landlords of their right to evict nor compelled landlords to continue leasing the property past the leases' termination."); *see also Alford, Co-Tr. of Lionel D. Alford, Jr., & Tammy Nix Alford Revocable Tr. v. Walton Cnty.*, 159 F.4th 844, 854 (11th Cir. 2025) (In the context of a COVID ban that precluded property owners from occupying their private beach, "Walton County wrested the rights to possess, use, and exclude from the Landowners, and it took those rights for itself. That triggers the Landowners' right to just compensation.").

The Government, however, hedges its bets and oscillates between two inconsistent arguments: (a) claiming that the Owners had no right to exclude pre-existing tenants and that the Governments' eviction bans took nothing away; and (b) admitting that the Owners did have a right to exclude, but the Government was excused from the consequences of taking it. To wit, the County agrees that before the enactment of its eviction bans, the court could terminate an existing leasehold once a property owner showed that the tenant breached the material terms and

11

conditions of the lease. County AB at 33. That admission cannot be reconciled with the County's argument that its eviction ban took nothing from the Owners. Nor does the outcome change because of the need to utilize the judicial system for the eviction process. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause");[6] *Rosu v. City of New York*, 742 F.3d 523, 526 (2d Cir. 2014) ("[T]he cause of action itself constitutes a cognizable property interest."). The Owners' well pled complaint is grounded in property rights that were taken away, not the process for enforcing them. The Governments' eviction bans stripped Owners of the right to exclude holdover tenants and the right to seek their removal in court. And any owner who attempted to try was at risk for criminal punishment and civil financial penalties. 2-ER-216.

Likewise, the City admits that the right to exclude tenants in breach does exist. But it argues that there was no constitutional violation

---

[6] The Takings Clause was incorporated against the states through this same clause. *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 240–41 (1897).

here because the taking was only temporary. *See* City AB at 30–31. The Supreme Court has repeatedly stated that the temporary nature of a taking is relevant only to calculation of just compensation, not liability. *Cedar Point Nursery*, 594 U.S. at 153; *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304, 318 (1987); *see Alford Revocable Tr.*, 159 F.4th at 856 (the COVID regulation was a physical taking even though it was only temporary).

Accordingly, the district court erred in adopting the Governments' inconsistent arguments.[7] The property owner's right to exclude is not Schrödinger's Cat, both existing and not existing at the same time. Prior to the eviction bans, property owners had the right to exclude tenants who refused to pay rent, engaged in criminal conduct, or destroyed the property. When the Governments' regulations forcibly took that right

---

[7] ACCE's arguments are similarly unavailing. It also cites *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980), for proposition that there are certain pre-existing limitations on the right to exclude. ACCE AB at 26–27. However, the Supreme Court has consistently characterized *Pruneyard* as a regulatory takings case, not a physical takings case. *Cedar Point Nursery*, 594 U.S. at 156; *Horne v. Dep't of Agric.*, 576 U.S. 350, 364 (2015). Moreover, *Pruneyard* was limited to properties open to the public, which is "readily distinguishable from regulations granting a right to invade property closed to the public." *Cedar Point Nursery*, 594 U.S. at 157.

13

away from the Owners, it became a compelled occupation that is actionable under the Fifth Amendment. *F.C.C. v. Fla. Power Corp.*, 480 U.S. 245, 252–53 (1987) ("this element of required acquiescence is at the heart of the concept of occupation" and transforms third parties into "interloper[s] with a government license"). Therefore, the complaint plausibly alleges that the eviction bans effectively confiscated that property right. *See Armstrong v. United States*, 364 U.S. 40, 48 (1960) ("Before the liens were destroyed, the lienholders admittedly had compensable property. Immediately afterwards, they had none. This was not because their property vanished into thin air. It was because the Government for its own advantage destroyed the value of the liens."). There is no justification to ignore the entirety of the Owners' allegations in favor an unsupported categorical rule of law that bars all physical takings claims, for all owners under all circumstances.

B. **The Sky Will Not Fall If a Physical Takings Claim Is Plausible**

The County and ACCE both suggest sprawling and dire impacts should this Court reverse the decision below. The County warns that the Owners' physical takings claim threatens the viability of rent control statutes. County AB at 34–35. ACCE fears that standard notice

14

provisions pertaining to evictions would get swept up in the Owners' "sea change in the law." ACCE AB at 35–37. These alarms are both grossly overblown and routine. In takings cases, the government frequently claims that a decision in favor of property owners will result in widespread challenges to a panoply of government regulations. As Justice Ginsburg noted, "time and again in Takings Clause cases, the Court has heard the prophecy that recognizing a just compensation claim would unduly impede the government's ability to act in the public interest." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 36 (2012). And yet, "the sky did not fall" after other takings decisions "and today's modest decision augurs no deluge of takings liability." *Id.* at 37. The same holds true here.

Again, this appeal is only about whether the Owners plausibly pled a takings claim. Reversal of the order below only means that the parties will embark on discovery, summary judgment motions, and trial. No rent control statutes or notice statutes will be imperiled by a ruling on a pleadings standard.

15

## II. The Owners Plausibly Alleged a Regulatory Taking

Rule 8 makes minimal demands of the contents of a complaint. The plaintiff only has to give fair notice of a plausible claim, not definitive proof of a winning one. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544, 555–56 (2007). In that regard, takings claims are no different than any other. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 637 (2023) ("At this initial stage of the case, Tyler need not definitively prove her injury or disprove the County's defenses. She has plausibly pleaded on the face of her complaint that she suffered financial harm from the County's action, and that is enough for now.").

The decision below establishes a pleadings standard—only for takings plaintiffs—that can never be met. To plausibly allege a regulatory taking under *Penn Central*, it is not enough for an owner to allege economic impact. In order to be "plausible," a property owner must prove economic devastation to the courts' subjective satisfaction. What solace can be taken from the theoretical possibility of fulfilling that requirement is undone by the impossibility of meeting the district court's (and Governments') mandate for investment-backed expectations. It held that an owner must anticipate all potential future regulation of property,

16

including those stemming from an unprecedented and unforeseeable global pandemic. Under that standard, a property owner's reasonable investment-backed expectations can never be disrupted, no matter what the facts and circumstances, because everything must be anticipated. Likewise, according to the district court and the Government, a regulation's character will always be in the government's favor so long as a public purpose exists, thus making the plausibility of *any* regulatory takings claim dependent on an essentially merits finding on all three prongs of *Penn Central*.

The law holds otherwise. Procedurally, notice pleading is designed to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (cleaned up). "A plaintiff needs to plead the who, what, when, where, and how regarding a claim only when Rule 9(b)'s heightened pleading standard [for fraud cases] applies." *Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 873 (11th Cir. 2023). When a plaintiff "does not aver fraud, ... his allegations need not satisfy Rule 9(b)." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). Takings claims do not sound in fraud, so the court below erred in its requirement for

17

heightened pleading. Instead, under Rule 8, "[t]he federal rules effectively abolish the restrictive theory of the pleadings doctrine" and "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11–12 (2014) (citation omitted). "[T]o stave off threshold dismissal for want of an adequate statement of their claim," plaintiffs are "required to do no more" than "state[] simply, concisely, and directly events that, they allege[], entitle them to damages." *Id.* at 12.

Accordingly, a takings plaintiff must plead only that its property was taken by the government for public use without the payment of just compensation. *Knellinger v. Young*, 134 F.4th 1034, 1043 (10th Cir. 2025). The Owners here exceeded that requirement. They plausibly alleged that the regulations caused a substantial economic impact upon each property, as shown by facts, figures, and the declaration of an expert real estate appraiser. 2-ER-83-119. The Owners also plausibly alleged the regulations' interference with their reasonable investment-backed expectations. 2-ER-119-120, 122-124. And finally, they plausibly alleged that they were singled out to bear a substantial burden in the name of public purpose. 2-ER-83-120, 2-ER-122-124.

It is also important that *Penn Central* is not a single factor test, but an ad hoc test, with no magic formula, and due consideration given to all relevant facts and circumstances. *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124–25 (1978); *Arkansas Game & Fish Comm'n*, 568 U.S. at 31; *Palazzolo v. Rhode Island*, 533 U.S. 606, 634 (2001) (O'Connor, J., concurring). Or in other words, it is not a "one-strike-and-you're-out" test. It requires a holistic evaluation and each and every *Penn Central* factor does not have to be satisfied in order to defeat a motion to dismiss. *See Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1482 (9th Cir. 1991) (A motion to dismiss can only be granted if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.") (citation omitted).

## A. The Owners Plausibly Alleged Economic Impact

The Governments' arguments about economic impact spotlight the district court's improper heightened pleadings standard. In disputing the Owners' methodology and insisting on the satisfaction of their own subjective, undelineated benchmarks, the Government demands far more of property owners than notice pleading requires.

As to methodology, the Government argues that gross rent multipliers do not properly measure economic impact, County AB at 38; ACCE AB at 41–42, nor operating losses.[8] City AB at 37; County AB at 39–40. The Government also questions whether the discounted cash flow method is appropriate and whether the declaration of an expert real estate appraiser is plausible when it compares capitalization rates for similarly situated properties. City AB at 38, 41–42; County AB at 39; ACCE AB at 45–46.

These disputes are not resolvable as a matter of law on a motion to dismiss. To the extent that the Government challenges any particular valuation methodology, the factfinder will decide that at trial, based upon an evaluation of expert opinions by licensed real estate appraisers.[9] The court below thus erred in demanding expert opinions and proof, when

---

[8] The Owners pled that operating losses, which are an economic impact, were caused by the Governments' regulations, 2-ER-119-20, and that a commercial property's value is based on its income and expenses. 2-ER-135-36.

[9] The same applies with respect to the Governments' arguments that certain pled allegations of economic loss are "implausible." For example, to the extent that the Government disputes that the property of Hollis Street Partners lost $29 million in value due to the regulations (2-ER-95), the matter will be resolved discovery and trial.

only notice and plausibility are required. At this stage, the complaint merely has to be plausible, and it is. *Twombly*, 550 U.S. at 555.

The Owners made a related argument before the district court, and it was not waived as the district court and Government contends. *See* Docket No. 199, Opposition to Motion to Dismiss, at 25. However, when the Owners declined to provide expert evidence to validate the gross multiplier method on a Rule 12(b)(6) motion, the district court ruled against them. 1-ER-10-11. The same occurred with respect to before and after valuations, which also require expert determinations. *Ibid.*; *see also Redevelopment Agency v. Thrifty Oil Co.*, 4 Cal. App. 4th 469, 476 (1992); *San Bernardino County Flood Control Dist. v. Sweet*, 255 Cal. App. 2d 889, 899 (1967).

In sum, contrary to Rule 8, as explained in *Berk*, *supra*, the district court improperly required the Owners' complaint to establish evidentiary proof of a winning claim using a methodology that the Government finds acceptable. The district court also failed to accept the Owners' allegations as true, failed to grant inferences in the Owners' favor, and improperly demanded expert confirmation to sustain the complaint as plausible.

21

This dispute-based approach for a motion to dismiss is the antithesis of the pleadings requirement of Rule 8. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 710 (2025) (Alito, J., concurring) ("[I]t would make no sense to require a complaint to anticipate and attempt to refute all the affirmative defenses that a defendant might raise."); *see* 35A C.J.S. Fed. Civ. P. § 311 (2025) ("Well-pleaded facts, not legal theories or conclusions, determine the adequacy of a complaint."). Rather, the burden placed upon a plaintiff must be consistent "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the pleadings stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Ibid.* Conversely, at the summary judgment stage, the plaintiff must set forth more specific facts supported by evidence or affidavits and, at the trial stage, the plaintiff must support its burden of proof by the evidence adduced. *Ibid.*

The district court and the Government then ratcheted up the pleadings standard even further by insisting the Owners meet a subjective measure of economic loss. To wit, the County and City both assert that an owner must prove "severe" economic loss. *See* County AB

22

at 36–37; City AB at 5, 37. Similarly, ACCE believes that the owner must establish an "enormous" economic impact. ACCE AB at 48.

However, what constitutes "severe" or "enormous" is in the eye of the beholder. *See Hodel v. Irving*, 481 U.S. 704, 714 (1987) (with respect to the escheat regulation that deprived certain property owners of values of $2,700 and $1,816, "the relative economic impact of § 207 upon the owners of these property rights can be substantial"); *Cmty. Hous. Improvement Program v. City of New York,* 492 F. Supp. 3d 33, 49–50 (E.D.N.Y. 2020) (a 20% loss in value was sufficient, together with other *Penn Central* factors, to state a claim), *aff'd sub nom.*, *74 Pinehurst LLC v. New York*, 59 F.4th 557 (2d Cir. 2023), *aff'd*, 59 F.4th 540 (2d Cir. 2023); *Bordelon v. Baldwin Cnty.*, No. CV 20-0057-C, 2022 WL 16543269 (S.D. Ala. Oct. 28, 2022) (finding a taking where the owner was deprived of $600,000 in lost rent, which equated to approximately 18% of property value), *aff'd*, No. 22-13958, 2024 WL 302382 (11th Cir. Jan. 26, 2024).

For the Government, the definition of severe is dependent on establishing, within a complaint, a mandatory minimum of economic loss that they do not expressly delineate except to argue that the Owners have not met it. It is decidedly contrary to *Penn Central*'s maxim that cases

23

must be evaluated without adherence to any magic formula and on an ad hoc basis, with justice and fairness as its guide. *Palazzolo*, 533 U.S. at 635–36 (O'Connor, J., concurring) ("Courts instead must attend to those circumstances which are probative of what fairness requires in a given case.") (quoting *Penn Central*, 438 U.S. at 124); *E. Enters. v. Apfel*, 524 U.S. 498, 523 (1998) ("[T]he process for evaluating a regulation's constitutionality involves an examination of the justice and fairness of the governmental action.") (cleaned up).

The Owners each alleged a severe economic impact as the result of the eviction ban and, on a motion to dismiss, those pleadings must be taken as true. They certainly are plausible. Commercial properties have a narrow margin between income and expenses, and the forced loss of even small percentages of income can have extraordinarily detrimental impacts. For example, Owner John Williams owned a rental property for which the income barely covered the expenses. 2-ER-83-85. Due to the physical stress caused by the non-paying renter that he was prohibited from evicting and the very real possibility of losing his property to foreclosure, Williams was hospitalized for panic attacks, chronic stress, and depression to the point of disability. To keep his property, he emptied

24

his 401(k) and savings accounts and took out loans. *Ibid*. Owner Robert Vogel's substantial financial losses also led to the depletion of his bank account, fear of foreclosure and extreme stress manifesting in physical disabilities. 2-ER-85-87. Owner Sheanna Rogers was forced to close her independent living facility to the extraordinary detriment of the residents who lived there and their families. 2-ER-87-88. Owner 1614 Campbell Street endured a negative cash return of 18% (2-ER-97) and Owner Madison Properties suffered a negative cash return of 16%. 2-ER-95-96. All these allegations provided plausible notice to the government of the substance of the Owners' takings claims.

In response, the Government argues that "what is severe to you does not seem severe to me." This is a dispute for trial; it cannot be resolved as a matter of law on a motion to dismiss. *See Garbini v. Protection One, Inc.*, 49 F. App'x 169, 170–71 (9th Cir. 2002) (fact-intensive questions of economics, "normally aided by the testimony of expert witnesses, are best left to trial or summary judgment, and not to a motion to dismiss") (citation omitted). Moreover, there is no legal basis to draw a line in sand and hold that a property owner must assert a specific and defined minimum percentage of economic loss to plausibly

25

plead a regulatory takings claim. *See, e.g.*, *Palazzolo*, 533 U.S. at 633–34 (O'Connor, J., concurring) (the factors are "guideposts" and not "mathematically precise variables"); *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018) ("[N]o litmus test determines whether a taking occurred."); Robert Meltz, *Takings Law Today: A Primer for the Perplexed*, 34 Ecology L.Q. 307, 334 (2007) (the Supreme Court has never established any "definite numbers" or a "specified percentage").

Accordingly, under the liberal pleadings standard of Rule 8, a property owner only has to plausibly allege any measure of economic impact as a result of the government's regulation. Each Owner exceeded that pleading requirement here. 2-ER-83-119. *See also Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 507 (2002) ("Petitioner's complaint easily satisfies Rule 8(a)'s requirements because it gives respondent fair notice of the basis for his claims and the grounds upon which they rest."); *Gibson v. City of Portland*, No. 24-1663, 2026 WL 235118, at *16 (9th Cir. Jan. 29, 2026) (reaffirming that "Rule 8 requires every pleading that states a claim for relief to contain three things: a short and plain statement of the grounds for the court's jurisdiction, a short and plain

26

statement of the claim showing that the pleader is entitled to relief, and a demand for the relief sought.") (quoting *Iqbal*, 556 U.S. at 678).

## B. The Owners Plausibly Alleged Interference with Reasonable Investment-Backed Expectations

There is no support for the district court's holding, or the Governments' arguments, that the Owners should have reasonably expected the COVID eviction bans. *Apartment Ass'n of Los Angeles County, Inc. v. City of Los Angeles*, 500 F. Supp. 3d 1088, 1096 (C.D. Cal. 2020), *aff'd*, 10 F.4th 905 (9th Cir. 2021) ("[T]he scope and nature of the COVID-19 pandemic, and of the public health measures necessary to combat it, have no precedent in the modern era, and [] no amount of prior regulation could have led landlords to expect anything like the blanket Moratorium."); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 389–90 (D. Mass. 2020) ("[T]he Moratorium does significantly interfere with plaintiffs' reasonable investment backed expectations … a reasonable landlord would not have anticipated a virtually unprecedented event like the COVID-19 pandemic and the ensuing six-month ban on evicting and replacing tenants who do not pay rent."); *see* Charles Kausen, Comment, *Taking One for the Team: COVID-19 Eviction Moratoria as Regulatory Takings*, 59 San Diego L. Rev. 345, 380 nn.219–20 (2022) ("no property

27

owner that purchased their property before 2020 could have reasonably foreseen that a global pandemic would require local, state, and federal governments to pass regulations prohibiting evictions") (citing articles and news reports emphasizing the unprecedented nature of the regulations).

Indeed, the City acknowledged that other courts have held as much. City AB at 45 (citing *Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Baltimore*, 563 F. Supp. 3d 428, 444 (D. Md. 2021)) ("But housing providers are not generally subject to blanket, exception-free restrictions on their ability to raise rents or collect late fees" even in the context of the protective measures enacted because of COVID.). Even if COVID is removed from the equation as the City argues (City AB at 45), there could be no reasonable expectation that the Government would prohibit virtually all good cause evictions for a period of over three years, particularly when the federal government and other jurisdictions lifted their moratoria long before Oakland and Alameda County. *See*

28

Appellant's Opening Brief, *Cal. Apartment Ass'n v. Cnty. of Alameda*, Case No. 25-6068, at 67–69 (9th Cir. Dec. 12, 2025).[10]

With respect to this prong of *Penn Central*, that should end the matter. The Owners plausibly alleged that their reasonable investment-backed expectations did not consider the imposition of a yearslong eviction ban that compelled owners to house occupants that refused to pay rent, engaged in criminal acts, or destroyed the property. 2-ER-119-120, 122-124. *Cf. Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 669 (7th Cir. 2023) (plaintiff challenging school's switch to online learning survives motion to dismiss because there was a "reasonable inference" of in-person education).

## C. The Public Purpose of the Regulation Does Not Mean That No Taking Had Occurred

A public purpose is presumed for every taking. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). Here, however, the County relies on the public purpose to weigh reasonable investment-backed expectations in the Governments' favor. County AB at 49. The City relies

---

[10] *See* Docket No. 8, coordinating argument in the instant case and *California Apartment Association*.

on public purpose to demonstrate that the character of the regulation favors the Government. City AB at 47. Intervenor ACCE does both. ACCE AB at 54, 65. None are correct.

First, on a motion to dismiss, neither the district court nor the Government can substitute their personal beliefs for the Owners' pleadings. *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013) (the plaintiffs' allegations must be taken as true). Mere disagreements do not mean that allegations are implausible as a matter of law.

Second, the existence of a public use means that the Takings Clause *does* apply, not that the government has immunity from liability. The Fifth Amendment presupposes public use, *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922), and the Supreme Court has consistently stated that if private property is being put to public use, then the public must pay for it. *See, e.g.*, *Armstrong*, 364 U.S. at 49 ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."). As

30

Justice Brennan wrote, "when one person is asked to assume more than a fair share of the public burden … it is only fair that the public bear the cost of benefits received[.]" *San Diego Gas & Elec. Co. v. City of San Diego*, 450 U.S. 621, 656–57 (1981) (Brennan, J., dissenting from dismissal of the appeal on ripeness grounds).

Thus, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Mahon*, 260 U.S. at 416. The Takings Clause is a constitutional condition placed upon the government's exercise of power for the public's benefit: *if* the government takes private property for a public use, *then* the government must pay compensation for what it takes. *See Lingle,* 544 U.S. at 540 ("As its text makes plain, the Takings Clause does not prohibit the taking of private property, but instead places a condition on the exercise of that power[.]") (citation omitted); *see also Kaiser Aetna v. United States*, 444 U.S. 164, 174 (1979). The public purpose for the Governments' regulations endowed these governments with the power to act, but it does not permit them to bypass the Fifth Amendment and take control of property without just compensation. *Alford Revocable Tr.*, 159 F.4th at 859

("Nothing 'other than our usual constitutional standards' applies during a pandemic' … [and] the normal requirements of the Takings Clause remain in force, even during emergencies.") (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 25 (2020) (Gorsuch J., concurring)); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 629 (1952) (Douglas, J., concurring) ("There can be no doubt that the emergency which caused the President to seize these steel plants was one that bore heavily on the country. But the emergency did not create power; it merely marked an occasion when power should be exercised.").

### D.  Character was Plausibly Alleged

The Government gives little attention to the character prong of *Penn Central* beyond mirroring the district court's determination that the regulation was not tantamount to a physical invasion and it adjusted the benefits and burdens of economic life. The County additionally argues that character warrants dismissal based on the public purpose of the regulation and that it was partial and temporary. County AB at 51–52. As noted above, the government is not insulated by the public purpose, nor can that improper rationale satisfy multiple *Penn Central* factors. The Supreme Court has also clearly held that neither partial takings nor

32

temporary takings are exempt from government liability as a matter of law. *See, e.g.*, *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002); *First English*, 482 U.S. at 318.

The City states that character "may be relevant" and likewise makes arguments based on public purpose. *See* City AB at 35, 47–48. But "[t]he character of the governmental action does not mean the government's reasons. It is not a substitute for a due process or rational basis test." Robert H. Thomas, *Evaluating Emergency Takings: Flattening the Economic Curve*, 29 Wm. & Mary Bill Rts. J. 1145, 1153 (2021) (citation omitted). Accordingly, as demonstrated in the Owners' Opening Brief at 61–64, the Owners' plausibly alleged character. 2-ER-83-120, 2-ER-122-124.

## Conclusion

The Amended Judgment of the District Court dated August 29, 2025, incorporating the decision of the District Court dated September 2, 2024, dismissing the Owners' as-applied physical takings argument under the Fifth Amendment and the California Constitution, and the decision of the District Court dated August 29, 2025, dismissing Owners'

33

regulatory takings argument under the Fifth Amendment and the California Constitution, should be reversed and the case remanded to the District Court for further proceedings, together with such other and further relief as the Court deems reasonable, fair and just.

DATED: March 10, 2026.

Respectfully submitted,

| | |
|---|---|
| Emily L. Brough | _s/ Jonathan M. Houghton_ |
| Andrew Zacks | Jonathan M. Houghton |
| ZACKS, FREEDMAN & | Deborah J. La Fetra |
| PATTERSON, PC | PACIFIC LEGAL FOUNDATION |
| 180 Montgomery St., Suite 1950 | 3100 Clarendon Blvd., Suite 1000 |
| San Francisco, CA 94104 | Arlington, VA 22201 |
| Telephone: (415) 956-8100 | Telephone: (916) 419-7111 |
| emily@zfplaw.com | JHoughton@pacificlegal.org |
| | DLaFetra@pacificlegal.org |

*Attorneys for Plaintiffs – Appellants*

34

## Certificate of Service

I hereby certify that on March 10, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Jonathan M. Houghton
Jonathan M. Houghton

35

## Certificate of Compliance for Briefs

9th Cir. Case Number: 25-6142

I am the attorney or self-represented party.

**This brief contains 6,755 words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief (select only one):

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

[ ] it is a joint brief submitted by separately represented parties;

[ ] a party or parties are filing a single brief in response to multiple briefs; or

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

DATE: March 10, 2026.           s/ Jonathan M. Houghton
                                Jonathan M. Houghton
                                *Attorney for Plaintiffs – Appellants*

36